# EXHIBIT K

1              IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4  CRUMP INSURANCE SERVICES, INC.,

5          Plaintiff,

6       vs.                        No. C-07-4636 MMC

7  MICHAEL P. McGRATH, an individual,

   ALL RISKS, LTD., a corporation,

8  and Does 1 through 50, inclusive,

9          Defendants.

10

11

12  _____

13

14      VIDEOTAPED DEPOSITION OF MICHAEL P. McGRATH

15             San Francisco, California

16            Wednesday, April 30, 2008

17

18

19

20

21  Reported by:

    SUZANNE F. BOSCHETTI

22  CSR No. 5111

23  Job No. 85930A

24

25

MICHAEL P. McGARTH

04/30/08

Page 14

1    June 5th.

2            MS. RUTTER:  Well, don't -- don't speculate.

3    Objection to the extent it calls for you to speculate as

4    to when you received it.

5    BY MR. STERN:

6        Q.  Are you speculating, or is that your best

7    estimate of when you received it?

8        A.  I'm speculating.

9        Q.  And why did you say you believed it would have

10   been June 5th?

11       A.  I speculated June 5th because I received an

12   e-mail from him in the morning saying, is this your

13   correct e-mail address, on June 5th.

14       Q.  Do you recall on what day of the week June 5th

15   was, 2007?

16       [A.  Yes.  That's a Tuesday because I started on

17   Monday, June 4th.

18       Q.  Started what on June 4th?

19       A.  At All Risks.

20       Q.  And that's 2007, correct?

21       A.  Correct.]

22       Q.  The -- to the best of my knowledge, most of the

23   events we will be talking about I believe will be in

24   2007.  When we're not talking about 2007, I'll try to be

25   very clear as to the year.  Okay?

MICHAEL P. McGARTH

04/30/08

Page 65

1    Alecta policy, correct?

2        A.   Correct.

3        Q.   And you had gotten a quote, correct?

4        A.   Mm-hmm.   Yes.

5        Q.   Did Crump ever provide insurance based upon

6    either that quote or some subsequent work trying to

7    provide that type of insurance?

8            MS. RUTTER:   Objection to the extent it calls

9    for you to speculate.

10           THE WITNESS:   Don't understand your question.

11   BY MR. STERN:

12       Q.   Okay.   Was insurance ultimately provided to

13   that customer?

14           MS. RUTTER:   Speculation.

15           THE WITNESS:   Yes.

16   BY MR. STERN:

17       Q.   And was it provided by All Risks?

18       A.   Yes.

19       Q.   And was it provided by All Risks after you went

20   over to All Risks?

21       A.   Yes.

22       [Q.   And did you do anything at All Risks to get

23   that business?

24       A.   Sent him an e-mail and let him know where I

25   was.

MICHAEL P. McGARTH

1        Q.   Sent an e-mail to who?

2        A.   Paul Lockie, L-o-c-k-i-e.

3        Q.   L-o-c --

4        A.   -- k-i-e.

5        Q.   And he was where?

6        A.   Woodruff Sawyer, the retailer.

7        Q.   And when did you send it?

8        A.   June 5th.

9        Q.   2007?

10       A.   Yes.

11       Q.   Do you have a copy of that e-mail?

12       A.   Not on me.  It's in my computer.  I don't know

13  if I have a copy.

14       Q.   Where was it sent from?

15       A.   All Risks' computer.

16       Q.   And tell me, as best you recall, what the

17  e-mail said?

18            MS. RUTTER:  Counsel -- why don't you go ahead

19  and answer.  After you answer the question, I just --

20  we've been going over an hour --

21            MR. STERN:  Oh.

22            MS. RUTTER:  -- so I'd like to --

23            MR. STERN:  I'm sorry.

24            MS. RUTTER:  -- take a break.

25  BY MR. STERN:

1      Q.   Just finish the answer to that question.

2      A.   Sure.  Dear Paul, I just want to let you know

3   I'm now at All Risks Insurance Brokers, and I would have

4   said 101 California Street, Suite 3100, San Francisco,

5   California, 999 -- and then my phone number is 343-2400.

6   Look forward to doing business with you in the future.

7   Regards, Mike.

8          MR. STERN:  Okay.  Let's take a break.  What do

9   you want five minutes?  Seven minutes?

10         MS. RUTTER:  Sure.

11         VIDEO OPERATOR:  The time is 10:18.  We're

12   going off the record.

13         (Recess.)

14         VIDEO OPERATOR:  The time is 10:36.  We are

15   back on record.

16   BY MR. STERN:

17      Q.   Before we took the break, you had described to

18   me the substance of an e-mail you said you had sent to

19   Paul Lockie at Woodruff Sawyer, and I'll characterize it

20   as essentially just announcing your new business

21   affiliation with All Risks with the contact information,

22   address and phone number, correct?

23      A.   Yes.

24      Q.   Did it contain any other information?

25      A.   No.

MICHAEL P. McGARTH

04/30/08

Page 68

1      Q.   Did you send similar messages to anyone else?

2      A.   Yes.

3      Q.   Who?

4      A.   Linda Donley.

5      Q.   And with what company?

6      A.   This is all Woodruff Sawyer.

7      Q.   Okay.

8      A.   Brett Lawrence.

9      Q.   And give me the business affiliation of the

10  people you mentioned?

11     A.   Sure.   They're all brokers at Woodruff Sawyer.

12     Q.   You mentioned Paul, Linda, Brett?

13     A.   Brett Lawrence, yeah.

14     Q.   Anyone else?

15     A.   Steve Gately.

16     Q.   Anyone else?

17     A.   Judy Haines.

18     Q.   Give me as complete an answer as you can

19  remember.

20     A.   Kristy Furrer with a K.   Last name's

21  F-u-r-r-e-r.   Robin Fisher.   Probably lastly would be

22  Chuck Schumacher.

23     Q.   And are all these people with Woodruff Sawyer?

24     A.   Yes.

25     Q.   Did you send any similar type of e-mail to

MICHAEL P. McGARTH

1    anyone else --

2        A.  Yes.

3        Q.  -- when you relocated to All Risks?

4        A.  Yes.

5        Q.  Who?

6        A.  Rob Machacek.  It's Rob, and it's Machacek,

7    M-a-c-h-a-c-e-k.  And Steve Aguilar.  They're with HUB

8    International, H-U-B.

9        Q.  Steve Aguilar?

10       A.  Aguilar, A-g-u-i-l-a-r.

11       Q.  Anyone else?

12       A.  Roberta Blanchette.  And she's at Willis.

13       Q.  W-i-l-l-i-s?

14       A.  Yes.

15       Q.  Did you send any other type of communication to

16   anyone else notifying them that you were now at All

17   Risks?  And we're talking the time frame, you know,

18   essentially June 2007.

19       A.  When you say any other type of communication --

20       Q.  Right.

21       A.  Just an e-mail.

22       Q.  And did it go to anyone else who you haven't

23   mentioned?

24       A.  I would have to look at my log.  Those -- we --

25   those would probably be my main -- my main contacts.

1    Q.   How did you know how to communicate with the

2    various people you mentioned?

3    A.   E-mail.

4    Q.   How did you know how to get in contact with

5    them through the e-mail?  Did you have their addresses?

6    A.   Yes.

7    Q.   Where did you get that?

8    A.   From my address book.

9    Q.   This was a personal address book or what?

10   A.   Business.

11   Q.   And where did -- where was that normally kept

12   before you left Crump?

13   A.   In -- where did I -- where did I get the list

14   of e-mail addresses?

15   Q.   Where was the list kept before you left

16   Trump -- Crump?

17       MS. RUTTER:  Better get your client right.

18       MR. STERN:  Yeah.

19       THE WITNESS:  Where was the list kept?  Oh, in

20   my Outlook at Crump.

21   BY MR. STERN:

22   Q.   On their computer system?

23   A.   Yes.

24   Q.   Did you take a copy of that with you -- I mean,

25   did you download it somehow or what?

1      A.   Yes.

2      Q.   Tell me what you did.

3      A.   On Sunday I went in and wanted to get some

4    pictures.  I went into Crump's office, 2007.

5      Q.   That would be the 3rd of June?

6      A.   Yes.

7           And I knew it would be hard to resign, and I

8    wanted to get some of the personal stuff out.  And the

9    one -- I had appointments with doctors, and I had some

10   personal e-mail stuff, so I -- I actually downloaded, I

11   believe, the calendar and the e-mail -- my e-mail

12   addresses, which has personal and business in there.

13     Q.   Did -- did you take the entire database that

14   was your e-mail addresses?

15          MS. RUTTER:  Objection.  Vague and ambiguous as

16   to "database."

17          THE WITNESS:  About six pages, five pages.

18   BY MR. STERN:

19     Q.   When printed out --

20     A.   Yes.

21     Q.   -- five pages?

22     A.   Yes.

23     Q.   Okay.  Describe to me what you did in terms of

24   downloading the information, the calendar and the e-mail

25   addresses.  Describe to me what exactly you did.

1      A.   Sure.   I opened up Outlook.   Went in -- there's

2   an icon below.   It says address -- or contacts.   I'm

3   sorry.   Clicked on the contacts and printed it.

4      Q.   Printed onto paper?

5      A.   Yes.

6      Q.   And what information did you print?

7      A.   It printed e-mail addresses of everybody I

8   had -- you know, anybody I had on the -- on the e-mail.

9      Q.   And about how many names or contacts were there

10  in that grouping?

11     A.   I would say 50.

12     Q.   Only 50 contacts in the entire list?

13     A.   Yeah.   I use business cards to e-mail most of

14  the time, but the important and personal that I had on

15  there was, if I had a friend or something like that, I'd

16  put them on -- if I -- if I e-mailed them more than --

17     Q.   When you say it was -- I think you said about

18  six pages when you printed it?

19     A.   Yeah.

20     Q.   Was it one person per line so that you had 50

21  or 60 on a page or -- let me -- let me fix that -- 50 or

22  60 lines on a page?

23     A.   No.   I would -- I remember it being 10 to 15 on

24  each, how it -- how it printed out.

25     Q.   Per page?

Page 76

1    you at All Risks?

2        A.   No.

3        Q.   There's a -- there's a person named Cyndi

4    Marty, correct?

5        A.   Correct.

6        Q.   And Ms. Marty worked with you at Crump,

7    correct?

8        A.   Yes.

9        Q.   And she left with you to go to All Risks,

10   correct?

11           MS. RUTTER:  Objection.  Vague and ambiguous as

12   to "left with you" --

13           MR. STERN:  Let me rephrase it.

14           MS. RUTTER:  -- "to go to All Risks."

15   BY MR. STERN:

16       Q.   Ms. Marty resigned Crump and went over to All

17   Risks, correct?

18       A.   Correct.

19       Q.   She went over as part of the deal that you

20   negotiated with All Risks, correct?

21       A.   Correct.

22       Q.   So you had it in the works that you and

23   Ms. Marty would leave Crump and go to All Risks,

24   correct?

25           MS. RUTTER:  Objection.  Vague and ambiguous.

MICHAEL P. McGARTH

1    was that you had with Nick following that Tri-City

2    merger or purchase, I guess?

3        A.   My recollection of the conversation was that

4    Nick said that you and Peter Scott, Sheryl Smith, Joe

5    Mallory, five or six employees were all ex-Tri-City and

6    you left Tri-City for a reason.  You know, I -- I think

7    it's time that you and I talk again.

8            That's my recollection.

9        Q.   And you indicated that might make sense,

10   correct?

11       A.   Yes.

12       Q.   And what happened next?

13       A.   I think -- I believe he said I would -- I would

14   like to fly out and meet you in person.

15       Q.   And is that what happened?

16       A.   Yes.

17       Q.   So Nick came out to San Francisco.  And what's

18   your best recollection of when that took place?

19           And you're welcome to again look at the 2007

20   calendar if that might jog your memory.

21       A.   Approximately April.

22       Q.   Do you have any documentation that shows any of

23   these dates or events?

24       A.   No.

25       Q.   So on approximately April 2007, Nick Cortezi

MICHAEL P. McGARTH

04/30/08

Page 86

1    flew out to San Francisco and you and he got together?

2        A.   Yes.

3        Q.   Anyone else present?

4        A.   No.

5        Q.   And where did you get together?

6        A.   I believe we had dinner at Cosmopolitan Cafe.

7        Q.   And was that the only meeting you had at that

8    time frame?

9        A.   Yes.

10       Q.   And what was discussed?

11       A.   General business conditions.  Would I be

12   interested in working for All Risks to start up a

13   property brokerage operation out in California.

14       Q.   Did All Risks at that point in time do property

15   brokerage in California?

16       A.   Very limited.

17       Q.   What else was discussed in that dinner meeting

18   in approximately April?

19       A.   Who was on my team.

20       Q.   And did you tell him any names?

21       A.   Yes.

22       Q.   Who did you tell him was on the team?

23       A.   Cyndi Marty, Cora De La Cruz.  C-o-r-a and a

24   D-e, L-a, C-r-u-z.

25       Q.   Correct.

MICHAEL P. McGARTH                                    04/30/08

Page 100

1    20 -- 20 percent a year for the last 12 years, so he was

2    going into more financials with All Risks.

3              [He wanted to know how we work as a team, what

4    our duties were, which he knew.

5              We just kind of went over it with him and said,

6    you know, we're both brokers.

7              Cyndi is an exceptional marketer.  So we went

8    over what Cyndi's background was.  Cyndi would talk

9    about her past at Marsh because Marsh is very important

10   to Cyndi because she was there for so long.  I remember

11   that.]

12        Q.  Was a lot of the business she did the Marsh &

13   McClennan --

14        A.  Yes.

15        Q.  -- business?

16        A.  Yes.

17        Q.  Was there any discussion about the fact that I

18   think you said what, that All Risks was not -- what was

19   your term?

20        A.  Oh, not appointed with?

21        Q.  Not appointed.

22        A.  Yeah.  We knew Marsh wasn't going to come with

23   us.

24        Q.  Was there any discussion about that topic?

25        A.  No.  I don't recall if there was or not.

1        A.   Yes.

2        Q.   Okay.

3        A.   Yes.

4        Q.   So that would be anytime from May 25th to

5   June 2nd, 2007?

6        A.   Yes.

7        Q.   And who did you tell you would sign?

8        A.   I can't recall if it was either Nick or Matt.

9        Q.   Did you have any communications with Cyndi

10   prior to coming back from Hawaii with respect to the

11   proposal?

12             MS. RUTTER:   Which proposal?

13             MR. STERN:   The one from All Risks.

14             MS. RUTTER:   The proposal to him?

15             MR. STERN:   Let me clarify.

16             MS. RUTTER:   It's vague and ambiguous.

17             MR. STERN:   Let me clarify.

18        Q.   The proposal that you got, was it just for you,

19   or was it for you and Cyndi?

20        A.   It was just for me.

21        Q.   Okay.   Was a separate proposal made to Cyndi?

22        A.   Yes.

23             MS. RUTTER:   Objection.   Calls for speculation.

24   BY MR. STERN:

25        Q.   Did you have any understanding as to what that

1    proposal was?

2        A.   Yes, because I said if -- whatever you give

3    Cyndi, make sure the years are the same with hers than

4    they are with mine.

5        Q.   The years?

6        A.   Yeah, the years of the contract.

7        Q.   Oh, I see.

8        A.   Mm-hmm.

9        Q.   Was there any discussion you had with All Risks

10   about how the compensation work -- would work for you

11   and Cyndi either as you having a certain percentage and

12   she having a certain percentage?

13       A.   On our formula of -- of written business, yeah,

14   I had discussions with All Risks on how it would work if

15   we wrote business.

16       Q.   And it was a formula that would figure out a

17   split between you and her as to who would get what

18   percent of the commission?

19       A.   No.  That's not correct.

20       Q.   Then why don't you describe to me what

21   discussion you had?

22       A.   It was if I did 900,000 in revenue, the

23   first --

24           MS. RUTTER:  Wait, wait, wait, wait.  Hold on.

25   Hold on.

1          I'm going to caution the witness.  That's

2    private information.  You do not need to disclose what

3    your compensation --

4          MR. STERN:  We have a --

5          MS. RUTTER:  -- plan would be.

6          MR. STERN:  No, we have a confidentiality

7    order.  There's no need to address that, and I really

8    think it muddles things if he can't explain how this

9    worked 'cause we all know there's communications you've

10   given me that show a split in percentages and so on, and

11   so I think to have a -- a full understanding so

12   nobody's --

13         MS. RUTTER:  Right, but it --

14         MR. STERN:  -- goes off on a --

15         MS. RUTTER:  -- it -- what we're prepared and

16   what I'm prepared to allow him to testify to is what is

17   in that e-mail document because, as you know, we've

18   redacted compensation information.

19         MR. STERN:  And I happen to disagree with what

20   you did, although it --

21         MS. RUTTER:  Okay.

22         MR. STERN:  -- it is at this point not worth

23   arguing about.  But so that his testimony is not

24   misunderstood, he should give me a complete answer.

25   It's all subject to the confidentiality order, as I

1   understand it.  If you want to make it clear that this

2   is confidential, I have no problem with that.  But I

3   don't want to have confusion as to what this means.  I

4   mean, I think I saw something in here 73 percent,

5   27 percent.  I could have the numbers wrong.  I need to

6   understand what the heck this is, so --

7           MS. RUTTER:  That's fine.  He can speak in

8   terms of percentages.

9           MR. STERN:  Okay.  Well, let's -- let's --

10          MS. RUTTER:  He's not --

11          MR. STERN:  -- take it one step at a time.

12          MS. RUTTER:  He's not going to disclose the

13  terms of --

14  BY MR. STERN:

15      Q.  Do you remember --

16          MS. RUTTER:  -- his agreement.

17  BY MR. STERN:

18      Q.  -- what you were talking about?

19      A.  Yes.

20      Q.  Okay.  Why don't you move forward, please.

21      A.  Can I see the percentage, how it's written?

22      Q.  I'll try and reference an e-mail if I can find

23  it quickly.

24          I will give you a page right now.  We won't

25  mark it yet, but it is All Risks, page 19.  I don't know

1    whether you have a copy handy, but let me just -- where

2    did I put it?

3              There's a page, All Risks 19.  The first

4    paragraph begins "Option 2."  You'll see a 73 to you, 27

5    to redact?

6         A.   Okay.  I know what that is.

7         Q.   Okay.

8         A.   That was a wording in the contract that after

9    year 4 -- year 3, if I were to -- say I do a certain

10   dollar amount, that I would get an extra five points

11   toward my bonus.  And if I didn't do that dollar amount,

12   then the revenue that was produced, we'd be paid

13   accordingly, which would be 73 percent to me and

14   27 percent to Cyndi.

15        Q.   Okay.  Were you -- in your dealings with All

16   Risks up to the time that you indicated you would sign

17   this agreement, were you negotiating for both you and

18   Cyndi?

19              MS. RUTTER:  Objection as to the term

20   "negotiation" as vague and ambiguous and to the extent

21   it calls for a legal conclusion.

22              THE WITNESS:  I negotiated the years.

23   BY MR. STERN:

24        Q.   Did you negotiate any other terms for Cyndi?

25        A.   I negotiated her -- after she had a

MICHAEL P. McGARTH

04/30/08

Page 112

1    conversation with Nick on salary, I negotiated more

2    money for her.

3         Q.   So what do you recall about that?

4         A.   On the salary?

5         Q.   Yeah.   When you --

6         A.   I recall that I saw the number and I didn't

7    like it, and I said I think Cyndi should be paid more.

8         Q.   Did you do that on your own initiative, or did

9    Cyndi say something or what caused you to do that?

10        A.   I did that on my own initiative.

11        Q.   And why?

12        A.   I didn't think it was enough money for her.

13        Q.   Okay.   Going back to the -- the -- you --

14   you -- you have the May 2007 dinner.   Nick indicated

15   he'd get you a proposal.   The proposal you believe came

16   in the day before you went to Hawaii.   Correct?

17        A.   Correct.

18        Q.   And from that point on, did you have any

19   further discussion with Cyndi?

20        A.   I don't recall.

21        Q.   You got the proposal, you reviewed it, and you

22   indicated some time during the period you were in

23   Hawaii, you believe, that you would sign it, correct?

24        A.   Correct.

25        Q.   Were there any changes that you requested be

Page 114

1    BY MR. STERN:

2        Q.   Is that correct?

3        A.   That's correct.

4        Q.   Okay.  Let's look at Exhibit 4, which is your

5    agreement, again, page 4, paragraph 16.  You still have

6    that in front of you?

7        A.   Yes.

8        Q.   The bottom of page 4, it's titled "Voluntary

9    Termination By Employee."  I'll quote:

10           "This Agreement (other than

11           paragraphs 10, 11, 12, 13, and 14 hereof) may

12           be terminate by Employee upon 15 days prior

13           written notice to Crump, or by other written

14           agreement signed by both parties."

15           And then on page -- oh, I think that -- yeah.

16    That's the end.

17           [Did you, when you left Crump, give written

18    notice?

19        A.   No.

20        Q.   Did you give 15 days' notice even if it wasn't

21    in writing?

22        A.   No.  I was asked to leave.

23        Q.   When did you -- did you at some point provide

24    notice that you were leaving Crump?

25        A.   Verbal notice.

MICHAEL P. McGARTH

1    Q.   Verbal notice to who?

2    A.   Peter Scott.

3    Q.   Given when?

4    A.   Sunday.

5    Q.   Sunday what date?

6    A.   June 3rd, 2007.

7    Q.   And when you gave him notice, did you tell him

8    what your last day of work would be?

9    A.   No.

10   Q.   What was your intention as of that point in

11   time as to how long you would continue working at Crump?

12   A.   I just remember our conversation.  Come in

13   Monday morning and let's talk about this.

14   Q.   What was your intention with respect to when

15   you intended to start with All Risks as of the time you

16   gave notice to Peter on Sunday, June 3rd?

17   A.   I know how Peter's reacted in the past, and I

18   figured when him and I talked on Monday, he would tell

19   me to leave.  He's done that in the past to many

20   employees.

21   Q.   So what was your intention as to how long you

22   would work at Crump following the June 3rd notice?

23   A.   I had no intention.

24   Q.   Was it your intention to leave almost

25   immediately?  By that I mean, June 4th or 5th?

## MEMORANDUM OF AGREEMENT

MEMORANDUM OF AGREEMENT dated _June 7_, 1996 between Crump E&S of San Francisco Insurance Services, Inc., a California Corporation (hereinafter "Crump"), and Michael P. McGrath (hereinafter "Employee").

### INTRODUCTION

This Agreement is intended to set forth the terms and conditions of the employment relationship between Crump and Employee. This relationship is based on the agreement and understanding of the parties that Crump is the owner of the Crump Business relating to Crump Customers as these terms are used below, and that these customers comprise a substantial part of the goodwill of Crump. To protect the business and goodwill of Crump and the confidential information belonging to Crump, the parties have agreed to certain limitations on competition and disclosure of confidential information following termination of employment. Such limitations relate solely to Crump Business and Crump Customers, however, and are intended to permit Employee to remain in the insurance and brokerage business, if he so desires.

### AGREEMENTS

Crump and Employee agree as follows:

1.     **EMPLOYMENT COMPENSATION** - Crump agrees to employ Employee to solicit, place, and service property or casualty business, during the term of the Agreement and to pay Employee a base salary of $125,000 per year, with future adjustments in accordance with Crump base salary guidelines. Base salary shall be payable in accordance with Crump regular payroll procedures, and may be changed only by written agreement of the parties.

2.     **PERFORMANCE BY EMPLOYEE** - Employee agrees to devote his entire business time and effort to furtherance of the business of Crump and to perform faithfully to the best of his ability all assignments of work given to him by Crump.

3.     **TERM** - The term of this Agreement shall commence as of the date of this Agreement and shall continue through December 31, 1997, at which time this Agreement will be extended automatically to June 30, 1999, if the combined Net Retained Revenue of Robert Lindner, Employee, and Paul Farbstein ("the Team") exceeds $1,500,000 for the time period July 1, 1996, through December 31, 1997. "Net Retained Revenue" shall be defined as brokerage actually received by Crump, less any return brokerage. This Agreement is at all times subject to earlier termination in accordance with paragraph 7 below.

1

C0001

Δ π EXHIBIT 4
McGrath
Deponent
Date 4/30/08  Rptr SFB
WWW.DEPOBOOK.COM

4..     **BONUS -**

         a.      <u>Signing Bonus</u>. Employee shall receive a one-time signing bonus of $75,000, payable with the first payroll check to be received by Employee. This signing bonus shall be subject to repayment on a pro-rata basis should Employee leave the employment of Crump at his own election, or for any circumstance outlined in paragraph 7 below, prior to July 1, 1999.

         b.      <u>Annual Bonus</u>. Employee shall participate in an annual bonus pool based on the Net Retained Revenue credited to the Team Employee's share of this annual bonus pool shall be determined each year by, and at the discretion of, Employee's immediate supervisor.

5.      **BENEFITS** - Employee shall be eligible to participate at the level of Vice President in any benefit plans and programs in effect from time to time and as amended by Crump, including annual leave entitlement established by Crump, including three weeks vacation which may be carried over from year to year.

6..     **EXPENSES** - Employee will receive reimbursement for all ordinary and necessary business expenses in accordance with Crump's management guide. Employee shall receive an annual automobile allowance of $6,000, payable in equal semi-monthly installments with the Employee's regular payroll check, and shall also be reimbursed for office parking fees.

7.      **TERMINATION** - The term of this Agreement shall be as stated in Paragraph 3. <u>Term</u>, unless terminated by:

         a.      Employee's death or disability (disability, for the purpose of this Agreement, means the inability of Employee due to illness, accident or other physical or mental incapacity, to perform the duties and services provided for hereunder) for a period of ninety (90) consecutive days; or

         b.      Discharge of Employee for cause, which, as used herein, shall mean if Employee: (i) violates any provision of this Agreement; (ii) performs any act which in the judgment of the Crump causes or has the potential to cause harm, injury or damage of any sort to Crump; or (iii) refuses or fails to carry out a resolution of the Board of Directors of Crump, other than for reasons of death or disability as previously described; or

         c.      Conviction of Employee of a misdemeanor or felony; or

         d.      Dereliction of duty, evidenced by an unexplained or unexcused failure of Employee to attend work for a period of ten (10) consecutive work days.

         In the event of termination of this Agreement for any of the reasons set forth in this Paragraph 7, Crump shall be responsible to pay or to provide Employee (or the Employee's lawfully designated beneficiary or to Employee's estate in the event of death) only those portions of any compensation, and/or other benefits due up to and including the effective date of termination of the Agreement, except for those benefits which survive termination pursuant to law.

C0002

Regardless of the reason, cause or occasion for termination, the provisions of Paragraph 8, 10, 11, 12, 13, and 14 shall survive the termination of employment and shall be and remain valid, binding and enforceable after termination.

8.    **CRUMP BUSINESS** - All business and fees including insurance, bond, risk management, self-insurance and other services (collectively, the "Crump Business"), produced or transacted through the efforts of Employee shall be the sole property of Crump Group, Inc. (Crump Group, Inc. and its subsidiary corporations and departments, are herein referred to as "Crump Group"). Employee shall have no right to share in any commission or fee resulting from the conduct of such business other than as compensation referred to in paragraphs 1 and 4.

9.    **PREMIUMS AND COLLECTIONS** - Premiums, commissions or fees on the Crump Group Business produced or transacted through the efforts of Employee shall be invoiced to the customer or account by one of the subsidiaries of Crump Group. All checks or bank drafts received by Employee from any customer or account shall be made payable to such company, and all premium, commissions or fees shall be collected by Employee in the name of and on behalf of such company.

10.    **CONFIDENTIAL INFORMATION** - Employee acknowledges that, in the course of and as a result of his employment hereunder, he will become acquainted with confidential information belonging to Crump Group. This information relates to persons, firms, and corporations which are or become customers or accounts of Crump Group during the term of the Agreement ("Crump Customers"), and sources with which insurance is placed, including but not limited to, the names of customers, policy expiration dates, policy terms, conditions, and rates, familiarity with customer's risks. Employee agrees that during his employment hereunder he will not, without the written consent of Crump, disclose or make any use of such confidential information except as may be required in the course of his employment hereunder. Employee further agrees that upon termination hereunder, and for a period of one year thereafter, he will not disclose or make any use of such confidential information without the prior written consent of Crump.

3

C0003

11.     **PROTECTION OF CRUMP PROPERTY** - All records, files, manuals, lists of customers, blanks, forms materials, supplies, computer programs, and other materials furnished to the Employee by Crump Group shall be and remain the property of Crump Group. Employee shall be deemed the bailee thereof for the use and benefit of Crump and shall safely keep and preserve such property, expect as consumed in the normal business operation of Crump Group. Employee acknowledges that this property is confidential and is not readily accessible to Crump's competitors. Upon termination of employment hereunder, the Employee shall immediately deliver to Crump or its authorized representative all such property, including all copies, remaining in the Employee's possession or control.

12.     **NONCOMPETITION FOR CERTAIN CRUMP CUSTOMERS** - Upon termination of Employee's employment hereunder, Employee agrees that for a period of two years following such termination he will not, without the written consent of Crump, directly or indirectly, solicit insurance wholesale brokerage business for any Account, either personally or in collaboration with others. As used in this Paragraph 12, "Account" shall refer to those insurance or policies that were either: (i) carried on the books of Crump or any subsidiary of Crump Group at any time during the twelve-month period prior to Employee's termination and with respect to which Employee personally performed service or employment duties during the twelve-month period prior to Employee's termination; or (ii) those potential accounts of Crump or any subsidiary of Crump Group, with regard to which Employee personally worked to obtain, secure or develop during the twelve-month period prior to Employee's termination. As used in this Paragraph 12, "insurance wholesale brokerage business", is limited to the lines of insurance coverage and other services that: (i) Crump or any subsidiary of Crump Group placed or provided for such Account during the twelve-month period prior to Employee's termination or (ii) with regard to which Employee had personally done any work during the twelve-month period prior to Employee's termination in connection with any attempt or anticipated attempt by Crump or any subsidiary of Crump Group to provide or place.

13.     **ORGANIZING COMPETITIVE BUSINESSES** - Employee agrees that so long as he is working for Crump he will not engage in business activity competitive with work he performs for Crump.

14.     **SOLICITING COMPANY EMPLOYEES** - Employee agrees that he will not, for a period of one year following termination of employment with Crump, solicit any of Crump Group employees to work for any other competitive company.

15.     **ENTIRE AGREEMENT, SEVERABILITY** - This Agreement sets forth the entire agreement between the Employee and Crump, and supersedes any and all prior agreements and understandings with respect to such employment. If any term of this Agreement is rendered invalid or unenforceable by judicial, legislative or administrative action, the remaining provisions hereof shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

16.     **VOLUNTARY TERMINATION BY EMPLOYEE** - This Agreement (other than paragraphs 10, 11, 12, 13, and 14 hereof) may be terminated by Employee upon fifteen (15) days prior written notice given to Crump, or by other written agreement signed by both parties.

4

C0004



17.    **INJUNCTIVE RELIEF** - This Agreement may be enforced by an injunction by any competent court enjoining and restraining any violation or threatened violation hereof without Crump being required to show any actual damage or to post any bond or other security.

18.    **NOTICES** - All notices and consents provided for herein and all legal process shall be validly given, made or served, it in writing and delivered personally or sent by United States certified or registered mail, postage pre-paid, return receipt requested,

If to Employer:

> Crump Insurance Services, Inc.
> 7557 Rambler Road, Suite 350
> Dallas, Texas 75231-4163
> ATTN: Marcus Payne

If to Employee:

> Michael P. McGrath
> 552 Danby Court
> Petaluma, California 94954

19.    **GOVERNING LAW** - This Agreement shall be construed in accordance with the laws of the State of California.

20.    **NO WAIVER** - No failure of Employee to exercise any right, power or privilege given to Crump under this Agreement or no failure to insist upon strict compliance by Employee with any agreement, covenant, warranty or other obligation under this Agreement or no custom or practice of the parties at variance with the terms hereof shall be construed as waiver or relinquishment of any right granted hereunder to Crump. Waiver by Crump of any particular default by Employee shall not affect or impair Crump's right, power or privilege in respect to any subsequent default of the same or of a different nature, nor shall any delay or omission of Crump to exercise any right, power or privilege arising from such default affect or impair Crump's right, power or privilege as to such default or any subsequent default.

21.    **ASSIGNMENT** - This Agreement shall not be assignable by Employee, but may, with the prior consent of Employee, be assigned by Crump to any of the subsidiaries of Crump Group, Inc. and shall be binding upon and inure to the benefit of Crump's successors and assigns.

22.    **BINDING NATURE OF AGREEMENT** - This Agreement shall inure to the benefit of and be binding upon and enforceable against the heirs, legal representatives and assigns of Employee and the successors and assigns of Crump.

5

C0005

IN WITNESS WHEREOF, the parties hereto by their duly authorized representatives have executed this Agreement as of the date first above written.

CRUMP E&S OF SAN FRANCISCO
INSURANCE SERVICES, INC.


By: _____
Its:    Sr. Vice President


By: _____
        Michael P. McGrath


6

C0006

CONFIDENTIAL: Subject to Protective Order



WOODRUFF
SAWYER &
COMPANY

June 4, 2007

TO Whom It May Concern

RE Brandenburg, Staedler & Moore
Difference in Conditions (Earthquake & Flood) Program
Term:  July 1, 2007 – 2008

Trader's & Pacific Insurance Co. Policy No. CPN10000209-00 - $5M xs $5M
Hudson Specialty Policy No. HS10579 - $5M p/o $10M xs $10M
Underwriters at Lloyd's Policy No. UAL26252 - $5M p/o $10M xs $10M
Essex Insurance Co. Policy No. ESPW4624 - $5M xs $20M
Westchester Surplus Policy No. 12067653A-001 - $10M xs $25M
Empire Indemnity Policy No. 30679JF-1 - $5M xs $35M
Mt. Hawley Insurance Co. Policy No. MDC0302597 - $5M xs $40m
Traders & Pacific Policy No. CPN10000210-00 - $5M xs $45M
Empire Indemnity Insurance Co. Policy No. 30679JF-1 - $20M xs $50M

This will confirm that as of June 4, 2007, we have appointed All Risks Insurance
Services, 101 California Street, Suite 3180, San Francisco, CA 94111 as our
exclusive surplus lines broker of record with respect to the above policies.  This
appointment is immediate and rescinds all previous appointments.  The authority
contained herein shall remain in force until canceled in writing.

This letter constitutes your authority to furnish All Risks Insurance Services with
information they may request to facilitate the transition.

Sincerely,

Linda Donley
Sr. Account Manager
(415) 399-6412
ldonley@wsandco.com

/ld

Insurance Services
Risk Management
Employee Benefits

T 415.391.2141
F 415.989.9923

220 Bush Street, Floor 7
San Francisco, CA 94104

CA License 0329598
AN ASSUREX GLOBAL & IBN PARTNER

www.wsandco.com

Δ π EXHIBIT  8
Deponent  McGrath
Date 4/30/08  Rptr. SFB
WWW.DEPOBOOK.COM

ALL000004

# RLI

RLI Insurance Services
505 14th Street | Suite 1100
Oakland, CA 94612
Phone: 510-891-0118 | Fax: 510-891-0128
www.rlicorp.com

Via Fax: 415-986-4553

June 05, 2007

Cyndi Marty

Crump Ins Svcs Inc-San Fran
160 Spear Street, Suite 1600
San Francisco, CA 94105-0000

**RE: Brandenburg Staedler & Moore**

This is to inform you that we are in receipt of a Broker of Record letter naming another broker in the handling of the captioned account.

If you plan to contest the Broker of Record letter, we must hear from you within 5 days from the date of the letter; otherwise, we will proceed with our negotiations according to the insured's request.

Sincerely,

Criselda Salazar, Operations Assistant



C0037

Re: Brandenburg Staedler & Moore                                    06/05/07 : Page  1 of 1

CONFIDENTIAL: Subject to Protective Order



**WOODRUFF
SAWYER &
COMPANY**

June 4, 2007

TO Whom It May Concern

RE North First Street Properties
Difference in Conditions (Earthquake & Flood)
Mt. Hawley Insurance Co. (75%)/Aspen Specialty Insurance Co. (25%)
Policy No. MCD0300813 - $3,315,125 Limit
Term: July 8, 2007 – 2008

This will confirm that as of June 4, 2007, we have appointed All Risks Insurance
Services, 101 California Street, Suite 3180, San Francisco, CA 94111 as our
exclusive surplus lines broker of record with respect to the above policy. This
appointment is immediate and rescinds all previous appointments. The authority
contained herein shall remain in force until canceled in writing.

This letter constitutes your authority to furnish All Risks Insurance Services with
information they may request to facilitate the transition.

Sincerely,

*Linda Donley*

Linda Donley
Sr. Account Manager
(415) 399-6412
ldonley@wsandco.com

/ld

Insurance Services
Risk Management
Employee Benefits

T 415 391 2141
F 415.989 9923

220 Bush Street, Floor 7
San Francisco, CA 94104

CA License 0329598
AN ASSUREX GLOBAL & IBM PARTNER

www.wsandco.com

Δ π EXHIBIT _10_
Deponent _McGrath_
Date _4/30/08_ Rptr. _SRB_
WWW.DEPOBOOK.COM



**RLI Insurance Services**
505 14th Street | Suite 1100
Oakland, CA 94612
Phone: 510-891-0118 | Fax: 510-891-0128
www.rlicorp.com

Via Fax: 415-986-4553

June 06, 2007

Cyndi Marty

Crump Ins Svcs Inc-San Fran
160 Spear Street, Suite 1600
San Francisco, CA 94105-0000

RE: Menlo Equities LLC

This is to inform you that we are in receipt of a Broker of Record letter naming another broker in the handling of the captioned account.

If you plan to contest the Broker of Record letter, we must hear from you within 5 days from the date of the letter; otherwise, we will proceed with our negotiations according to the insured's request.

Sincerely,

Criselda Salazar, Operations Assistant



C0039

Re: Menlo Equities LLC

CONFIDENTIAL: Subject to Protective Order



**WOODRUFF SAWYER & COMPANY**

June 7, 2007

Re:  Alecta pensionsforsakring, omsesidigt and Alecta Investment Management
     SA, Inc., related entities or subsidiaries
     Excess California Earthquake
     Glenco Insurance Ltd, Policy #306009XQ-1, Policy Term: 7/1/06-07
     Empire Indemnity Ins. Co., Policy #306010XQ-1, Policy Term: 7/1/06-07

To Whom It May Concern:

This will confirm that as of June 7, 2007, we have appointed All Risks Insurance
Services, 101 California Street, Suite 3180, San Francisco, CA 94111 as our
exclusive surplus lines broker of record with respect to the above policies. This
appointment is immediate and rescinds all previous appointments. The authority
contained herein shall remain in force until canceled in writing.

This letter constitutes your authority to furnish All Risks Insurance Services with
information they may request to facilitate the transition.

Sincerely,

Paul Lockie
Vice President
415-402-6545
plockie@wsandco.com

htl
cc: Mercedes Yazdani, Woodruff-Sawyer & Co., SF

Insurance Services
Risk Management
Employee Benefits

T 415.391.2141
F 415.989.9923

220 Bush Street, Floor 7
San Francisco, CA 94104

CA License 0329598
AN ASSUREX GLOBAL & INT'L PARTNER

www.wsandco.com

Δ π EXHIBIT 12
Deponent McGrath
Date 4/30/08 Rptr. SCB
WWW.DEPOBOOK.COM

ALL000002

CONFIDENTIAL

# RLI

RLI Insurance Services
505 14th Street | Suite 1100
Oakland, CA 94612
Phone: 510-891-0118 | Fax: 510-891-0128
www.rlicorp.com

Via Fax: 415-986-4553

June 07, 2007

Cyndi Marty

Crump Ins Svcs Inc-San Fran
160 Spear Street, Suite 1600
San Francisco, CA  94105-0000

RE: Alecta Real Estate USA LLC

This is to inform you that we are in receipt of a Broker of Record letter naming another broker in the handling of the captioned account.

If you plan to contest the Broker of Record letter, we must hear from you within 5 days from the date of the letter; otherwise, we will proceed with our negotiations according to the insured's request.

Sincerely,

Criselda Salazar, Operations Assistant



C0066

CONFIDENTIAL: Subject to Protective Order



**WOODRUFF
SAWYER &
COMPANY**

June 11, 2007

TO  Whom It May Concern

RE  California Pacific Commercial Corporation
Difference in Conditions Program
Mt Hawley Insurance Co. Policy No. MDC0302557 ($2M Primary)
Westchester Surplus Lines Policy No  I20674258 002
($3M xs $2M and $4M xs $20M)
Arch Specialty Insurance Co. Policy No. ESP0016481 00 ($5M xs $5M)
Endurance American Specialty Policy No. CPN10000185700 ($10M xs $10M)
Term:  July 1, 2006 – 2007

This will confirm that as of June 11, 2007, we have appointed All Risks Insurance
Services, 101 California Street, Suite 3180, San Francisco, CA as our exclusive
surplus lines broker of record with respect to the above policies. This appointment
is immediate and rescinds all previous appointments. The authority contained
herein shall remain in force until canceled in writing.

This letter constitutes your authority to furnish All Risks Insurance Services with
information they may request to facilitate the transition.

Sincerely,

*Linda Donley*

Linda Donley
Sr. Account Manager
(415) 399-6412
ldonley@wsandco.com

/ld

Insurance Services
Risk Management
Employee Benefits

T 415 391 2141
F 415 989 9923

220 Bush Street, Floor 7
San Francisco, CA 94104

CA License 0329598
AN ASSUREX GLOBAL & EOS PARTNER

www.wsandco.com



Δ π EXHIBIT  14
Deponent McGrath
Date 4/30/08 Rptr.    SFB
WWW.DEPOBOOK.COM

ALL000003

CONFIDENTIAL: Subject to Protective Order

Page 1 of 3

MN-6-5-07

| | |
|---|---|
| **From:** | Matt Nichols |
| **Sent:** | Tuesday, May 22, 2007 3:44 PM |
| **To:** | Marcus Payne |
| **Subject:** | FW: |

as requested......

**From:** Nick Cortezi
**Sent:** Tuesday, May 22, 2007 12:27 PM
**To:** Matt Nichols
**Subject:** FW:

FYI- will discuss when I return. nick

Nick Cortezi
CEO
All Risks, Ltd.
10150 York Road, 5th Floor
Hunt Valley, MD 21030
Phone- 410-828-5810 ext. 3013
Fax- 410-828-8179
ncortezi@allrisks.com

**From:** Michael McGrath [mailto:mcgrath.m@sbcglobal.net]
**Sent:** Tuesday, May 22, 2007 11:45 AM
**To:** Nick Cortezi
**Subject:** RE:

Nick:
Thought it would easier to see in writing what we would be talking about for us to consider a move.
Thanks again for dinner; we both had a good time.

As mentioned earlier we are set and comfortable for a min of 5-6 years based on acqustion of Bysis and overall plan for JC Flowers.  Our main point besides salary is a committment for 6 years.  Based on our revenue projections for this year and next we would need the following:
6 Year Deal
Mike-Redacted     min
Redacted
· Sign on Bonus—Redacted     (combined) of whichRedacted     's is my deferred compensation plan and shares of JC Flowers.  We would also like to see the compensation plan as the above mentioned salaries are minimum(we fully expect to hit our bonus plan.)

**also have the usual parking, gas, and club dues(Golf) picked up on expense account.**

Does not make sense for us to move anywhere if the years and salaries are not guarenteed.

12/5/2007

Δ π EXHIBIT 16
Deponent McGrath
Date 4/30/08 Rptr SFB
WWW.DEPOBOOK.COM

ALL000009

CONFIDENTIAL: Subject to Protective Order

Couple of thoughts on paper......

Regards,

Mike

*Nick Cortezi <NCORTEZI@allrisks.com> wrote:*

Looking forward to dinner- would yo[Redacted]                    : so that I can work them into the
equation?
Thanks,
Nick

Nick Cortezi
CEO
All Risks, Ltd.
10150 York Road, 5th Floor
Hunt Valley, MD 21030
Phone- 410-828-5810 ext. 3013
Fax- 410-828-8179
ncortezi@allrisks.com

From: Michael McGrath [mailto:mcgrath.m@sbcglobal.net]
Sent: Monday, May 07, 2007 2:52 PM
To: Nick Cortezi
Subject:

Nick:
Good to go with [Redacted] on the 16th at Cosmo's –6ish.
Couple of items

Years–5 year firm/8 preferred(my own comfort)
If bought out I can cash out.(paid in full)
Deferred compensation(you have the amount and shares of current company**need to consider**
Not interested in taking a cut in pay.  The latter amount suggested is min. on our conversation.
Some things to look forward too.  If does not look good then no problem. Let me know so we are not
sitting at the table by ourselves.
Need to look into Redact and guarantee for min of 3 yr. Salary plus bonus.
Otherwise will not be interested.

*Michael McGrath*

Executive Vice President
Crump Insurance Services - San Francisco
415-537-2308(direct)
415-986-4553(Fax)
This email is intended for the addressee shown. It contains information that is confidential and protected
from disclosure. Any dissemination or use of this transmission or its contents by unintended persons is
strictly prohibited. If this email relates to placement of coverage through All Risks, please note that no
coverage will be bound and no changes without a written "Confirmation of Insurance", Binder,
Endorsement or Reinstatement from our office. Coverage cannot be assumed if you do not receive one
of the aforementioned notices.

12/5/2007

ALL000010

CONFIDENTIAL: Subject to Protective Order

Page 3 of 3

12/5/2007

ALL00001



RLI Insurance Services
505 14th Street | Suite 1100
Oakland, CA 94612
Phone: 510-891-0118 | Fax: 510-891-0128
www.rlicorp.com

Via Fax: 415-986-4553

June 05, 2007

Cyndi Marty

Crump Ins Svcs Inc-San Fran
160 Spear Street, Suite 1600
San Francisco, CA  94105-0000

RE: North First Street Properties   MCD0300813

This is to inform you that we are in receipt of a Broker of Record letter naming another broker in the handling of the captioned account.

If you plan to contest the Broker of Record letter, we must hear from you within 5 days from the date of the letter; otherwise, we will proceed with our negotiations according to the insured's request.

Sincerely,

Criselda Salazar, Operations Assistant

Δ π EXHIBIT  20
Deponent  Marty
Date 4/30/08 Rptr. SEB
www.PROEXOK.COM

C0036

CONFIDENTIAL

# RLI

RLI Insurance Services
505 14th Street | Suite 1100
Oakland, CA 94612
Phone: 510-891-0118 | Fax: 510-891-0128
www.rlicorp.com

Via Fax: 415-986-4553

June 11, 2007

Cyndi Marty

Crump Ins Svcs Inc-San Fran
160 Spear Street, Suite 1600
San Francisco, CA  94105-0000

RE: California Pacific Commercial Corp & PM Investment

This is to inform you that we are in receipt of a Broker of Record letter naming another broker in the handling of the captioned account.

If you plan to contest the Broker of Record letter, we must hear from you within 5 days from the date of the letter; otherwise, we will proceed with our negotiations according to the insured's request.

Sincerely,

Criselda Salazar, Operations Assistant



Δ π EXHIBIT 21
Deponent Marty
Date 4/30/08 Rptr. SCB
WWW.DEPOBOOK.COM

C0051