# EXHIBIT L

ROUGH DFT 2-2008-06-10-McGrath-V2

UNCERTIFIED, ROUGH-DRAFT TRANSCRIPT

1                       DISCLAIMER

2           The following is an unedited, uncertified

3    draft transcript which may contain untranslated

4    stenographic symbols, an occasional reporter's note,

5    misspelled proper names, nonsensical word combinations,

6    missing or partial words, and/or words in reversed word

7    order.  All such entries will be corrected on the final,

8    certified transcript, which will be delivered to you in

9    accordance with our standard delivery terms.

10          Because of the need to correct entries prior

11   to certification, this draft is ONLY for the purpose of

12   augmenting counsel's notes and not for use in any court,

13   arbitration, or other formal proceeding or for

14   distribution to any other party.

15                       ---oOo---

16

17   TUESDAY, JUNE 10, 2008                     2:55 P.M.

18               P R O C E E D I N G S

19        (Dylan Carp present in the deposition room.)

20                       ---oOo---

21               MICHAEL P. MCGRATH,

22          having been sworn as a witness by the

23             Certified Shorthand Reporter,

24             testified further as follows.

25                       ---oOo---

ROUGH DFT 2-2008-06-10-McGrath-V2

1      A.   Correct.

2           MS. RUTTER:  This is all cumulative.

3           MR. ASKANAS:  Q.  How many retail brokers'

4  names and addresses did you copy?

5           MS. RUTTER:  Objection to the extent it is

6  asked and answered.

7           He said about 20.

8           MR. ASKANAS:  Q.  Is that right?  About 20?

9      A.   (Witness nods head.)

10     Q.   Yes?

11     A.   Yes.

12     Q.   Were any of the insureds listed?

13     A.   No.

14     Q.   Were any -- was any other information about

15  the retail brokers contained on that contact list, such

16  as financial information, expiration dates, things like

17  that?

18     A.   No.

19     Q.   Or customer preferences?

20          MS. RUTTER:  Vague and ambiguous.

21          THE WITNESS:  No.

22          MR. ASKANAS:  Q.  Or any sort of customer

23  financial information?

24     A.   No.

25     Q.   When you left Crump, what was your job title?

ROUGH DFT 2-2008-06-10-McGrath-V2

1      A.   Executive vice president.

2      Q.   Who did you report to?

3           MS. RUTTER:  Objection.  Cumulative.

4           THE WITNESS:  Peter Scott.

5           MR. ASKANAS:  Q.  Do you know what his title

6    was?

7      A.   President.

8      Q.   Do you know how many direct reports

9    Peter Scott had?

10     A.   How many direct reports?

11     Q.   Yes, in addition to yourself.

12     A.   Ten.

13     Q.   Were they all at the executive vice president

14   level?

15     A.   No.

16     Q.   Were they any of the "C" suite people, like

17   chief executive officer, CFO?

18     A.   No.

19     Q.   Were they vice presidents?

20     A.   Two.

21     Q.   What were the rest -- you had two

22   vice presidents and you as the executive

23   vice president?

24     A.   Administrative assistants, probably four of

25   them; maybe a couple of assistant vice presidents --

18

Page 18

1   Tri-City?

2        A.   No.

3        Q.   Did you ever have any equity interest in

4   Crump?

5        A.   No.

6        Q.   What were your responsibilities at Crump?

7             MS. RUTTER:  Objection.

8             This is cumulative, Counsel.  We went over --

9   Mr. Stern went over this in his deposition.

10            MR. ASKANAS:  I don't think so.  I've gone

11  through it very carefully to make sure that I'm not

12  asking any duplicative questions.

13            MS. RUTTER:  He talked about his duties as a

14  retail broker.

15            MR. ASKANAS:  Q.  Let me ask you this:  Did

16  you manage anyone?

17       A.   At Crump?

18       Q.   Yes.

19       A.   Two and a half people.

20       Q.   And who were those people?

21       A.   Cora De la Cruz, Sue Brandt -- she's part

22  time -- B-r-a-n-d-t -- and Cyndi Marty, M-a-r-t-y.

23       Q.   And these people reported directly to you?

24       A.   Yes.

25       Q.   Could you make decisions with regard to their

ROUGH DFT 2-2008-06-10-McGrath-V2

1    employment, such as work assignments?

2        A.    Yes.

3        Q.    Could you make decisions with regard to giving

4    them performance appraisals?

5        A.    Yes.

6        Q.    How about decisions to discipline them if they

7    weren't performing up to your standards?

8        A.    Yes.

9        Q.    Could you make hiring decisions while you were

10   at Crump?

11       A.    Not solely.

12       Q.    Could you recommend compensation adjustments

13   for the people that you supervised?

14       A.    Recommend, yes.

15       Q.    Could you recommend termination for people

16   that you supervised?

17       A.    Yes.

18       Q.    Did you ever participate in making decisions

19   concerning any of these matters for the people that you

20   supervised?

21       A.    As far as?

22       Q.    Disciplining, hiring, compensation, work

23   assignments.  All the things we just chatted about?

24            MS. RUTTER:  It's overbroad; compound as

25   phrased.

1          THE WITNESS:  Compensation, yes.

2          MR. ASKANAS:  Q.  Other than these two and a

3   half people that you identified, were there any other

4   people that you supervised during your employment at

5   Crump?

6      A.   Any other people I supervised?

7      Q.   Yes.

8      A.   Cumulative?

9      Q.   At any time during your employment at Crump

10   besides these people.

11      A.   Yes.

12      Q.   Okay.  At the time that you left Trump (sic),

13   were --

14      A.   Crump.

15      Q.   -- Crump, were there any other people that you

16   supervised other than these two and a half people?

17      A.   No.

18      Q.   Were there any other people besides these

19   people for whom you could give work assignments?

20      A.   No.

21      Q.   Or discipline?

22      A.   No.

23      Q.   Or recommend discipline or termination?

24      A.   No.

25      Q.   Did you ever see any sort of schematic or flow

22

1   chart or organizational chart of the San Francisco

2   office of Crump Insurance?

3       A.   No.

4       Q.   Do you know whether you were at the top of any

5   organizational structure at Crump?

6           MS. RUTTER:  Vague, ambiguous, calls for

7   speculation.

8           THE WITNESS:  We didn't have an organizational

9   -- what did you -- organizational chart.

10          MR. ASKANAS:  Q.  Were you --

11      A.   I would -- as being an executive --

12      Q.   Yes.

13      A.   -- I would be below the president.  So, I

14  would say I was number two.

15      Q.   Number two in what?

16      A.   Out of ten people.

17      Q.   Ten people representing what?

18      A.   You said "organizational chart"; right?

19      Q.   Yes.

20      A.   Were you referring to being --

21      Q.   Well, you have president; right?  And after

22  that --

23      A.   President, then me, and then two other people

24  as far as -- it was seniority, obviously.  That's what

25  it came down to.  And then all of the administrative

ROUGH DFT 2-2008-06-10-McGrath-V2

1  assistants were underneath them.

2      Q.   Okay.  And then that would also include the

3  remainder of the organization as well in San Francisco?

4  There were other brokers and people like that; correct?

5      A.   Yes, there were two others.

6      Q.   Okay.  So, as to those people that were below

7  you in the structure you just outlined, could you direct

8  their work or give any feedback with regard to their

9  work, give any direction to the assistants or any of the

10  other six people --

11      A.   No.

12      Q.   -- or ten people?

13      A.   No.

14          MS. RUTTER:  Just -- I want to make sure you

15  let him finish his question before you --

16          THE WITNESS:  Sure.

17          MS. RUTTER:  -- answer, so we get a clear

18  record.

19          MR. ASKANAS:  Q.  And did you, in fact,

20  consider yourself the number-two person at the office?

21      A.   Yes.

22      Q.   What did that mean, being the number-two

23  person at the office?

24      A.   Absolutely nothing.

25      Q.   What did you interpret it to mean?

ROUGH DFT 2-2008-06-10-McGrath-V2

1     A.   Nothing.

2     Q.   So, you said that you thought you were the

3  number-two person.

4     A.   Oh, what it meant was if Peter Scott was

5  injured in an automobile accident or was sick for a

6  month, I would be the logical choice to make sure

7  everything went smoothly and people showed up for work.

8     Q.   Did that ever happen where -- maybe he wasn't

9  hurt in a car accident, but he went on vacation or was

10  otherwise at some other --

11     A.   Unbelievably, no.

12     Q.   -- conference?

13     A.   Sorry to interrupt you.

14     Q.   So, that never happened?

15     A.   No.

16     Q.   Was it your understanding if he had gone to

17  some sort of conference or had otherwise been

18  unavailable that you would have filled in for him on an

19  interim basis?

20          MS. RUTTER:   Vague, ambiguous, calls for

21  speculation.

22          THE WITNESS:   It never happened.

23          I don't know.

24          MR. ASKANAS:   Q.   Was that your understanding,

25  that that would be part of your job responsibilities and

☐

1    duties?

2        A.    No, it was not part of my job duties or

3    anything.

4        Q.    Well, you understood if he was injured in a

5    car accident, it would fall to you to run the shop;

6    correct?

7        A.    I would think it would.

8        Q.    Okay.  Did anyone ever tell you that?

9        A.    No.

10        Q.    Would you also think that if you (sic) were

11    otherwise indisposed for any number of reasons that it

12    would fall to you to run the office?

13            MS. RUTTER:   If he was indisposed?

14            MR. ASKANAS:  No, no.  If Peter Scott was

15    indisposed.

16            THE WITNESS:  If something happened to him?

17            MR. ASKANAS:  Q.   Not necessarily if something

18    happened to him like a car accident or if he was ill,

19    like you testified to before.

20            I'm talking about if he was on an extended

21    vacation, at a conference, if he was hiking in Yosemite

22    and didn't have cell-phone access.  Did you have an

23    understanding as to whether you would be responsible

24    for the office in the event that he was unable to be

25    reached?

26

ROUGH DFT 2-2008-06-10-McGrath-V2

1          MS. RUTTER:  Vague, ambiguous, calls for

2   speculation.

3          THE WITNESS:  It never happened and never was

4   discussed.

5          MR. ASKANAS:  Q.  So, you didn't have any sort

6   of understanding one way or another?

7      A.   Never.

8      Q.   Did you set the goals up for the team that you

9   supervised, the two and a half people?

10          MS. RUTTER:  Vague, ambiguous.

11          MR. ASKANAS:  Q.  You know, the targets --

12   production targets, assets-under-management revenue --

13   would you set those targets for the people in your

14   group?

15      A.   Yes.

16      Q.   Did you have discretion to determine what

17   those targets would be?

18      A.   Discretion to -- yes.

19      Q.   Did you have discretion to determine how to

20   achieve those targets, how to direct your people in

21   order to maximize productivity in order to reach your

22   targeted goals?

23      A.   Sure.

24      Q.   Did you have any responsibility for overall

25   planning in the office?

27

ROUGH DFT 2-2008-06-10-McGrath-V2

1          MS. RUTTER:  Objection.  Vague, ambiguous as

2     to "overall planning."

3          THE WITNESS:  No.

4          MR. ASKANAS:  Q.  How about for your own

5     group?

6          MS. RUTTER:  Same objection.

7          MR. ASKANAS:  Q.  Were you responsible for the

8     planning --

9          A.   Yes.

10         Q.   -- of sales within your own group?

11         A.   Yes.

12         Q.   Were you responsible for quality control

13    within your own group?

14         A.   Yes.

15         Q.   Were you responsible for budgeting within your

16    own group?

17         A.   Yes.

18         Q.   Were you responsible for the performance of

19    the people that you supervised?

20         A.   Yes.

21         Q.   How often did you report in or give status

22    reports to Peter Scott?

23         A.   As far as numbers?

24         Q.   Just did you have, like, weekly or monthly

25    updates with him?  Was there anything scheduled?

28