STEPHEN J. HIRSCHFELD (SBN 118068)
JOHN BAUM (SBN 148366)
DENA L. NARBAITZ (SBN 176556)
ANN E. SOTER (SBN 229838)
CURIALE DELLAVERSON HIRSCHFELD
  &amp; KRAEMER, LLP
727 Sansome Street
San Francisco, CA 94111
Telephone: (415) 835-9000
Facsimile: (415) 834-0443

Attorneys for Defendants
MICHAEL P. McGRATH
and ALL RISKS, LTD.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT

| | |
|---|---|
| CRUMP INSURANCE SERVICES, INC., | Case No. C-07-4636 MMC |
| Plaintiff, | **AFFIDAVIT OF DENA L. NARBAITZ IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, SUMMARY ADJUDICATION** |
| vs. | |
| MICHAEL P. McGRATH, an individual, ALL RISKS, LTD., a corporation, and Does 1 through 50, inclusive, | |
| Defendant. | **Date:** October 10, 2008<br>**Time:** 9:00 a.m.<br>**Judge:** Honorable Maxine M. Chesney<br>**CTRM:** 7 |

I, Dena L. Narbaitz, declare:

1.    I am an attorney at law duly licensed to practice law before all courts of the State of California. I am Of Counsel in the law offices of Curiale Dellaverson Hirschfeld & Kraemer, LLP, attorneys of record for Defendants All Risks, Ltd. ("All Risks") and Michael McGrath. I make this Affidavit in support of Defendants All Risks and Michael McGrath's Motion for Summary Judgment or, alternatively, Summary Adjudication.

2.    Attached hereto as <u>Exhibit A</u> are true and correct copies of transcript pages from the Deposition of Glenn Hargrove.

3.    Attached hereto as <u>Exhibit B</u> are true and correct copies of transcript pages from

CURIALE DELLAVERSON HIRSCHFELD & KRAEMER, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

CURIALE DELLAVERSON HIRSCHFELD & KRAEMER, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

the Deposition of John Jennings.

4.    Attached hereto as Exhibit C are true and correct copies of transcript pages from the Deposition of Rick McDonough.

5.    Attached hereto as Exhibit D are true and correct copies of transcript pages from the Deposition of Peter Scott.

6.    Attached hereto as Exhibit E are true and correct copies of transcript pages from the Deposition of Mike McGrath.

7.    Attached hereto as Exhibit F are true and correct copies of transcript pages from the Deposition of Nick Cortezi.

8.    Attached hereto as Exhibit G are true and correct copies of transcript pages from the Deposition of Cythina Marty.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 5ᵗʰ day of September, 2008, in San Francisco, California.

_____
Dena L. Narbaitz

DECL. OF DENA L. NARBAITZ ISO MOTION FOR SUMMARY JUDGMENT
CASE NO.: C-07-4636 MMC

# Exhibit A

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF CALIFORNIA
 2
      CRUMP INSURANCE SERVICES, INC.,  *    Case No. C-07-4636 MMC
 3                                     *
                  Plaintiff,           *
 4                                     *
      vs.                              *
 5                                     *
      MICHAEL P. MCGRATH, an           *
 6    individual, ALL RISKS, LTD., a   *
      corporation, and Does 1          *
 7    through 50, inclusive,           *
                                       *
 8                Defendants.          *

 9

10

11

12    ********************************************************

13            VIDEO DEPOSITION OF GLENN HARGROVE

14    ********************************************************

15

16

17           ANSWERS AND DEPOSITION OF GLENN HARGROVE, produced as

18    a witness at the instance of the Defendants Michael P.

19    McGrath and All Risks, Ltd., taken in the above-styled and

20    -numbered cause on the 17th day of June, 2008, A.D.,

21    beginning at 11:14 a.m., before Lisa Smith, a Certified

22    Shorthand Reporter in and for the State of Texas, in the

23    offices of LBJ Corridor, located at 3010 LBJ Freeway, Suite

24    1200, Dallas, Texas, in accordance with the Federal Rules

25    of Civil Procedure and the agreement hereinafter set forth.
```



CERTIFIED COPY

                                                                    1

Esquire Deposition Services    505 Sansome Street Suite 502    San Francisco, C.A. 94111
Phone (415) 288-4280               1-800-770-3363              Fax (415) 288-4286

00020

```
1       A.  Yes.

2       Q.  And likewise, from the time you became the CEO and

3  president of Crump, you also had responsibility for hiring

4  brokers?

5       A.  Yes.

6       Q.  Now, focussing your attention on the time period

7  when you worked as a broker at Crump, did you have a

8  particular line of insurance that you were responsible for

9  trying to make placements?

10      A.  I did multiple lines, but the predominance of what

11  I did was casualty business.

12      Q.  Okay.  And as a broker, your client base is made

13  up of retailers or retail agents; is that correct?

14      A.  As a wholesale broker, yes.

15      Q.  Okay.  And is it fair for me to use the term

16  retailers and retail agents synonymously?

17      A.  That's -- that's fine, yeah.

18      Q.  Okay.  But that's correct from your understanding

19  of the wholesale insurance industry?

20      A.  That's -- that's how I use it, yes.

21      Q.  Okay.  So I may use them interchangeably,

22  retailers or retail agents, but I just want to make sure

23  we're on the same page as to those terminology.  Okay?

24      A.  That's fine.

25      Q.  All right.  So as a wholesale broker, did you
```

00021

1    develop the network of individual retailers that you worked

2    with?

3        A.    Yes.

4        Q.    And to your knowledge, did those retailers work

5    with other wholesalers at times?

6        A.    Yes.

7        Q.    In other words, those retailers were not --

8        A.    I'm sorry.  Your signal broke up there so I didn't

9    -- I didn't hear the whole question.

10       Q.    I know.  Let me -- let me repeat that.

11              Those retailers that you worked with when you

12   were a broker were not exclusive to you; is that correct?

13       A.    Correct.

14       Q.    In other words, the retailers or the retail

15   agents, to your knowledge, also worked with other wholesale

16   brokers outside of Crump; is that correct?

17       A.    They -- they could have.  Some did, some didn't.

18       Q.    And the names of individuals that are retailers,

19   how did you as a broker go about locating those names?

20       A.    Various methods.

21       Q.    Such as?

22       A.    Everything from Yellow Pages to industry

23   publications to memberships and association groups, word of

24   mouth on the street, a number of different methods.

25       Q.    Okay.  Are you familiar with a document, an

00022

1   insurance directory called the Kershner Directory with a K?

2        A.  Yes.

3        Q.  Okay.  And have you ever used the Kershner

4   Directory?

5        A.  Yes.

6        Q.  And is it fair to describe that as sort of a

7   Yellow Pages of the insurance retailer industry?

8        A.  Yes.

9        Q.  And that is a document that, to your

10  understanding, is -- that Kershner Directory is available

11  to any and all wholesale brokers?

12       A.  To my knowledge, yes.

13       Q.  So given what you've just described in terms of

14  the -- the names of the retailers, I presume that would

15  also include their contact information that was available

16  in these various sources?

17       A.  Such as phone numbers, fax numbers, sure.

18       Q.  Okay.  How about e-mails?

19       A.  I don't know if Kershner lists e-mail addresses or

20  not.  I don't recall.

21       Q.  So this information concerning the contact for the

22  retailers, is it fair to say that that's generally known in

23  the insurance industry?

24       A.  Sure.  There's sources to find it; yes.

25       Q.  Now, to make sure that I -- I properly understand

00030

```
 1      Q.  Okay.  So summing it up, is it fair to say that
 2   you -- when you're trying to get to understand what the
 3   needs are of this particular insured, that you can
 4   essentially pick the brain or request that information
 5   directly from a retailer; is that right?
 6      A.  Yes.
 7      Q.  And/or you can go on various Web sites, whether
 8   they be the underlying insured or other Web sites, others
 9   in the industry to try to obtain that information; is that
10   accurate?
11      A.  Yes.
12      Q.  Now, has it been your experience that individual
13   companies who are looking for insurance sometimes approach
14   more than one retailer to help them?
15      A.  Sometimes, yes.
16      Q.  Are you able to give me, Mr. Hargrove, a
17   percentage of times that you're aware that that occurs
18   generally in the industry?
19      A.  It'd be a guess, but I'd say probably two-thirds
20   of the time on average.
21      Q.  Okay.  And I don't -- I certainly don't want you
22   to guess, but do you feel given your experience in this
23   industry that that's an educated approximation?
24      A.  Sure.
25      Q.  Okay.  And is it likely that more than one
```

00031

1    wholesaler would be approached by a retailer if -- if it's

2    an account that needs coverage from an excess and a surplus

3    -- surplus line of -- a surplus line market?

4         A.   From an individual retailer?

5         Q.   In other words, has it been your experience that a

6    wholesaler or more than one wholesaler may be approached by

7    the retailer when the retailer is looking for excess and

8    surplus lines markets?

9         A.   They may be; correct.

10        Q.   Okay.  Can you give me any percentage in terms of

11   how often that happens?

12        A.   It would be a rough estimate, but probably a third

13   of the time.

14        Q.   Okay.  And you may have answered this before, but

15   let me make sure I have this.  Has it been your experience

16   that retailers go to different wholesalers to get a bid on

17   a particular potential placement?

18        A.   Some do.

19        Q.   And are you able to give a percentage of time, at

20   least with the retailers that you worked with when you were

21   a broker, how often that happened and how often were you

22   kind of, to your knowledge, bidding against other

23   wholesalers?

24        A.   In my personal experience as a broker, probably a

25   fourth of the time.

00032

1    Q.  Okay.  And it's within the retailer's prerogative

2  to decide which wholesale broker to use; correct?

3    A.  Yes.

4    Q.  And in fact, if they wanted to use you at Crump

5  versus another broker at, let's say, AmWINS, that would be

6  the retailer's choice; is that right?

7    A.  The retailers and their client, the insured as

8  well.

9    Q.  So the retailer could choose which or does choose

10  which broker to use?

11    A.  Yes.

12    Q.  Wholesale broker; is that correct?

13    A.  Well, but when you use the term use, the client --

14  the insured always has the ultimate say-so because they're

15  the purchaser of the product.  And if they -- they can and

16  have refused to use wholesalers in certain events as well.

17    Q.  Okay.  Good.  Fair enough.  But it's -- the

18  retailers are the ones that are making the decision at

19  least which wholesale brokers to request a placement from?

20    A.  Correct.

21    Q.  Is that correct?

22        So that -- is it fair to say that retailers

23  are not owned by a wholesale company?

24        MR. ASKANAS:  Objection.  The question is

25  vague and ambiguous.

00034

1   retailers that Crump owned in the period of 2007 that

2   you're aware of?

3                   MR. ASKANAS:  Objection; vague and ambiguous.

4                   THE REPORTER:  I'm sorry, sir.  You're

5   trailing off.  I can't --

6                   MR. ASKANAS:  Okay.  The question is vague

7   and ambiguous, but the witness can answer the question.

8       A.  Other than the ownership by Marsh and the

9   ownership of Sedgewick prior to that or any Marsh or

10  Sedgewick affiliates, no, I'm not aware of any connection

11  between -- legal connection, ownership connection between

12  Crump and any other retailer.

13      Q.  (BY MS. RUTTER) And Crump is considered one of the

14  largest independent wholesaler insurance groups in the US;

15  is that correct?

16      A.  Correct.

17      Q.  And are you aware of a rating by an entity called

18  Business Magazine that placed Crump in its October 2007

19  edition as the largest wholesale insurance broker?

20      A.  Business Insurance Magazine, yes.

21                  MS. RUTTER:  Okay.  Now, there should be a

22  couple of exhibits that were previously sent to the office.

23  And if I can ask the court reporter to show Mr. Hargrove

24  Exhibit No. 2, just Exhibit No. 2.  It should be a one-page

25  document, it's entitled Largest Wholesale Brokers Business

00128

1      A.   Just providing a name and an address and advising

2   them that you've left and moved to another place, I don't

3   think, constitutes solicitation by itself.

4      Q.   (BY MS. RUTTER) During Mr. McGrath's last year at

5   Crump, is it correct that he was named broker of the year?

6      A.   Yes, for 2006.

7      Q.   And do you know -- strike that.

8           At Crump, what -- what generally constitutes

9   somebody being selected as broker of the year?  What is the

10  criteria?

11     A.   Well, we looked at our top performing brokers and

12  we had a prereq rule sort of in the company that we did not

13  award broker of the year twice to somebody that had

14  previously won it.  So we -- the executive committee

15  reviewed a list of the top brokers, excluding those that

16  had already won the award prior to, and we looked at their

17  overall production.  We looked at the growth in their

18  business.  We looked at retention ratios, a whole host of

19  -- team work, attitude, all sorts of attributes and made a

20  determination as to who we felt like was the -- the most

21  outstanding broker for the year.

22     Q.   And is this -- was he broker of the year for

23  California or the whole country?

24     A.   The whole country.

25     Q.   Now, before Mr. McGrath announced that he was

00159

1  conversation with Counsel.

2      A.  Outside of discussions with Counsel, no.

3          MS. RUTTER:  Why don't we take a moment and

4  change the -- I think we need to change the tape.

5          THE VIDEOGRAPHER:  We're going off the

6  record.  The time is 4:19 p.m.  This is the end of Tape No.

7  2.

8          (Break was taken from 4:19 p.m. to 4:22 p.m.)

9          THE VIDEOGRAPHER:  We're back on the record.

10  The time is 4:22 p.m.  This is the beginning of Tape No. 3.

11      Q.  (BY MS. RUTTER) Mr. Hargrove, did you have any

12  discussions with Mr. Scott about a conversation that he had

13  with Mr. McGrath the next day, the business day after that

14  weekend call to let you know that he resigned?

15      A.  I -- I don't recall.

16      Q.  Did -- did Mr. Scott indicate to you that he had

17  asked Mr. McGrath to leave immediately?

18      A.  I do remember him saying that to me, yes.

19      Q.  Was that his decision or was it something that the

20  two of you talked about?

21      A.  I -- I know that was what Peter wanted to do.  I

22  don't know.  I think we discussed it some and I agreed to

23  what Peter's decision was.

24      Q.  Did he tell you why it was that he wanted

25  Mr. McGrath to leave immediately?

00166

1    counsel.

2        Q.  Let me show you what has been previously marked as

3    Exhibit 2 to the deposition of Mike McGrath.  Do you have

4    that in front of you?  It's a two-page letter from Andrew

5    Forstenzer to Mike McGrath dated June 5th, 2007.

6        A.  I have it.

7        Q.  And there is a CC to Bill Finegan at Fulbright and

8    Jaworski -- Fulbright and Jaworski, Glenn Hargrove and

9    Peter Scott at Crump and then All Risks.  Do you recognize

10   this letter, Mr. Hargrove?

11       A.  Yes.

12       Q.  And for the record, it's Bates-numbered C0034

13   through 35, and it was Exhibit 2 to Mr. McGrath's

14   deposition.

15                   Mr. Hargrove, did you have any input into

16   this letter?

17       A.  Not the wording or verbiage of it.  I certainly

18   discussed it with the -- the fact that we would send a

19   letter with Mr. Forstenzer.

20       Q.  And did you approve the sending of this letter?

21       A.  I -- I didn't see the letter prior to it going

22   out.  I instructed Andy to send a letter with discussions

23   of the basic content.

24       Q.  Okay.  If you look at the first full paragraph on

25   the second page, it starts with despite these prohibitions.

00167

1  If you could just read that paragraph first.

2                    MR. ASKANAS:  I'm sorry.  The first full

3  paragraph?

4                    MS. RUTTER:  Page 2.

5                    MR. ASKANAS:  On the second page.

6                    THE WITNESS:  Read -- read the --

7                    MR. ASKANAS:  You don't need to read it

8  aloud.

9                    MS. RUTTER:  No.  Just read it to your --

10  just read it to yourself, sir.

11                    THE WITNESS:  Okay.

12                    MR. ASKANAS:  Just read it to yourself,

13  please.

14        A.  Okay.

15        Q.  (BY MS. RUTTER) Okay.  If you look at again that

16  first full paragraph on Page 2, the second sentence starts,

17  based upon recently received broker of record notification,

18  you are working for a competing business and you are

19  attempting to do business with customers and clients with

20  whom you did business while at Crump for purposes of

21  upcoming July renewals and otherwise.

22                    Other than these broker of record letters

23  that may have come in up into this time, are you aware of

24  any information to show that Mr. McGrath was, quote,

25  attempting to do business with customers and clients?

00168

1              MR. ASKANAS:  Other than the discussions with

2 Counsel.  Other than the discussions you had with Counsel.

3      A.  Outside of discussions with Counsel, no.

4      Q.  (BY MS. RUTTER) Other than the broker of record

5 letters, were you personally aware, not -- not regarding

6 discussions with Counsel, but were you personally aware of

7 any other information that showed whether or not

8 Mr. McGrath was, quote, attempting to do business with

9 customers and clients?

10     A.  No.  Other than the -- the testimony earlier as to

11 the conversation with the Woodruff Sawyer people.

12     Q.  Well, that conversation hadn't taken place yet,

13 had it, sir?

14     A.  Probably not at the time this letter was issued.

15 You're right.

16     Q.  No.  Because this letter was issued the day after

17 Mr. McGrath first left.

18     A.  Right.  So no.  The answer would -- the answer

19 would be no.  Yeah.

20     Q.  And then it states, Crump also has reason to

21 believe that you have used confidential information and

22 trade secrets of the company in furtherance of your

23 competing business.  Let me stop there.

24              Do you know what is being referred to here as

25 confidential information or trade secrets?

```
 1        STATE OF TEXAS )

 2            I, Lisa Smith, a Certified Shorthand Reporter in and

 3        for the State of Texas, do hereby certify that, pursuant to

 4        the agreement hereinbefore set forth, there came before me

 5        on the 17th day of June, A.D., 2008, at 11:14 a.m., at the

 6        offices of LBJ Corridor, located at 3010 LBJ Freeway, Suite

 7        1200, in the City of Dallas, State of Texas, the following

 8        named person, to wit:  GLENN HARGROVE, who was by me duly

 9        cautioned and sworn to testify the truth, the whole truth

10        and nothing but the truth, of his knowledge touching and

11        concerning the matters in controversy in this cause; and

12        that he was thereupon carefully examined upon his oath, and

13        his examination was reduced to writing under my

14        supervision; that the deposition is a true record of the

15        testimony given by the witness, same to be sworn to and

16        subscribed by said witness before any Notary Public,

17        pursuant to the agreement of the parties; and that the

18        amount of time used by each party at the deposition is as

19        follows:

20                Ms. Rutter - 04 hours, 29 minutes,

21                Mr. Askanas - 00 hours, 00 minutes.

22            I further certify that I am neither attorney or

23        counsel for, nor related to or employed by, any of the

24        parties to the action in which this deposition is taken,

25        and further that I am not a relative or employee of any
```

Esquire Deposition Services          505 Sansome Street Suite 502          San Francisco, C.A. 94111
Phone (415) 288-4280                      1-800-770-3363                        Fax (415) 288-4286

Glenn Hargrove                                              June 17, 2008

1      attorney or counsel employed by the parties hereto, or

2      financially interested in the action.

3           I further certify that, before completion of the

4      deposition, the Deponent _____, and/or the

5      Plaintiff/Defendant _____, did _____ did not _____ request

6      to review the transcript.

7           In witness whereof, I have hereunto set my hand and

8      affixed my seal this _____ day of _____, A.D.,

9      2008.

10                          _____

11                          LISA SMITH, CSR 7491
                            Expiration Date: 12/31/2009
12                          Esquire Deposition Services
                            Firm Registration No. 286
13                          1700 Pacific Avenue, Suite 4750
                            Dallas, Texas 75201
14                          (214) 257-1436

15

16

17

18

19

20

21

22

23

24

25

188

# Exhibit B

1         IN THE UNITED STATES DISTRICT COURT
2      FOR THE NORTHERN DISTRICT OF CALIFORNIA
          CASE NO. C-07-4636 MMC

3

4  CRUMP INSURANCE SERVICES, INC.,

5              Plaintiff,              Deposition of:

6              vs.                      JOHN JENNINGS

7  MICHAEL P. McGRATH, an individual,
   ALL RISK, LTD., a corporation,      **CERTIFIED**
8  and Does 1 through 50, inclusive.
                                        **COPY**
9              Defendants.

10 -----------------------------------------------------------

11

12            TRANSCRIPT of testimony as taken by and before

13 ALLYSON MICHELLE CACIOLI, a Shorthand Reporter and Notary

14 Public of the State of New Jersey, at the offices of HOBART

15 WEST, 25A Vreeland Road, Florham Park, New Jersey 07932, on

16 Friday, June 13, 2008, commencing at 1:00 p.m. in the

17 afternoon.

18

19            ESQUIRE COURT REPORTING
20       90 Woodbridge Center Drive, Suite 340
            Woodbridge, New Jersey 07095

21       (732) 283 - 1060      Job# 66367

22

23

24

25

1

00012

1    Tri-City in approximately 1993?

2    A.    Yes, that's accurate.

3    Q.    And you were a manager/broker in the New

4    York City office; is that correct?

5    A.    I started as a broker, and became the head

6    of the Tri-City New York office in, I want to

7    say, around the end of probably 1997.

8    Q.    And then you stayed in that position until

9    you became president at Tri-City?

10    A.    Correct.

11    Q.    Do you recall when you became president of

12    Tri-City?

13    A.    Some time in 2004.

14    Q.    When you were a broker, at Tri-City, did

15    you have a particular line of insurance that you

16    were responsible for?

17    A.    I would have been considered a casualty

18    broker.

19    Q.    Is it accurate that as a broker, a

20    casualty broker in your case, that your clients

21    were made up of retailers?

22    A.    Correct.

23    Q.    And tri-City is also in the wholesale

24    broker industry, correct?

25    A.    It is.

00013

1    Q.    Over the years, I presume you developed a

2    network of individual retailers that you worked

3    with?

4    A.    I did.

5    Q.    And to your knowledge, those retailers

6    would also work with other wholesalers at times;

7    is that correct?

8    A.    Correct.

9    Q.    So in other words, those retailers were

10    not exclusive to you, correct?

11    A.    Correct.

12    Q.    The names and contact information for

13    those retailers is publicly available; is that

14    accurate?

15    A.    In most circumstances, I would think they

16    are.

17    Q.    In other words, you could go on the

18    company web sites and identify a particular

19    retailer, correct?

20    A.    Not in all circumstance.

21    Q.    Well, are you aware of the Kirschner

22    Directory?

23    A.    I am not.

24    Q.    Are you aware of any book or so-called --

25    I refer to it as sort of the yellow pages of your

00015

1    answer the question.

2    Q.   And that was my next phrase, unless he

3    instructs you not to answer, you can go ahead and

4    answer the question, okay?

5    A.    Okay.

6    Q.   Back to the information concerning who

7    these retailers are, is something that is

8    generally known in the wholesale industry,

9    correct?

10        MR. ASKANAS:   Same objection; improper,

11    vague.

12    A.   I mean it's available if you do your

13    homework and seek out that information.

14    Q.   Right, so it's not confidential to a

15    particular wholesaler?

16        MR. ASKANAS:   Objection, that calls for a

17    legal conclusion and misstates his testimony.

18    It's also vague and ambiguous as to time and

19    scope.  You can answer.

20    A.   Yeah, I don't know if it's what you would

21    consider -- I don't know what would be

22    proprietary to an individual wholesaler.  The

23    information isn't domiciled on the wholesalers, I

24    mean, they have to go find the information.

25    Q.   Okay.

00016

1    A.    Anybody who does the homework, I guess,

2    could find out who works where, if they decided

3    to put the time in.

4    Q.    Is it fair to say that, the primary role

5    of a broker is to work with the retailers to

6    obtain placements on various types of insurance

7    for the retailer's clients, is that an accurate

8    description of what a broker's job is?

9    A.    That's accurate.

10    Q.    I know I'm being general, but my

11    understanding is -- and please correct me if I'm

12    wrong -- that as a broker, you work directly with

13    various retailers to try and place lines of

14    insurance, correct?

15    A.    As a wholesale broker, that's exactly what

16    you do, correct.

17    Q.    And to do your job as a broker, in your

18    experience, what information do you need to have

19    in order to make that placement?

20    A.    Name of insured, addresses, descriptions

21    of the business, loss information, potentially

22    financial information.

23    Q.    And the information that you just listed,

24    is that information that the retailers provide

25    you as the broker?

00017

1    A.    Yes.

2    Q.    Do companies who are looking for

3    insurance, in your experience, sometimes approach

4    more than one retail agent?

5    A.    On occasion, yes.

6    Q.    Can you give me any estimate or percentage

7    of time, in your experience, that you've seen

8    this occur?

9    A.    Well, it happens, I mean, it would be just

10    a wild guess at a number.  So I -- and I haven't

11    been --

12        MR. ASKANAS:  We don't want you to guess

13    or speculate.

14    A.    I have seen more than one retailer working

15    on more than one account before.

16    Q.    Well, and the retailer is, in your

17    experience, the retailer is also working with

18    other wholesale brokers in order to get various

19    quotes, correct?

20    A.    Sometimes.

21    Q.    Is it likely that more than one wholesaler

22    would be approached if the account needs

23    coverage, for example, in an excess and surplus

24    line market?

25        MR. ASKANAS:  I'm just going to object;

00018

    1    vague, ambiguous, and calls improper

    2    hypothetical.

    3    A.    It could happen.

    4    Q.    In your experience, have you seen that

    5    happen?

    6    A.    On occasion I've seen that happen.

    7    Q.    And it's within the retailer's prerogative

    8    to decide which broker to go and receive

    9    information concerning a placement?

    10   A.    It is.

    11   Q.    Now Tri-City, as well as Crump, is part

    12   of, I guess, what you can refer to as the

    13   wholesale brokerage industry; is that fair?

    14   A.    That's fair.

    15   Q.    And this is -- at least in the United

    16   States -- is a relatively small industry of

    17   wholesalers?

    18        MR. ASKANAS:    Objection as to vague and

    19   ambiguous as to "relatively small."

    20   A.    There are thousands of wholesalers in the

    21   country, so I don't know if you would consider it

    22   small.

    23   Q.    Well, Crump is considered one of the

    24   largest, independent national wholesaler

    25   insurance groups in the U.S., correct?

1                        CERTIFICATE

2

3           I HEREBY SWEAR that the witness was duly sworn by me

4    and that the deposition is a true record of the testimony

5    given by the witness.

6

7           It was requested before completion of the deposition

8    that the witness, JOHN JENNINGS, have the opportunity to

9    read and sign the deposition transcript.

10                                                  JUN 2 6 2008

11           _____

12                        Allyson Michelle Cacioli
                          Court Reporter
13                        Notary Public

14

15

16

17

18

19                        (The foregoing certification of the

20    transcript does not apply to any reproduction of the same by

21    any means, unless under the direct control and/or

22    supervision of the reporter.)

23

24

25

                                                              83

# Exhibit C

1

2              IN THE UNITED STATES DISTRICT COURT

3            FOR THE NORTHERN DISTRICT OF CALIFORNIA

4                          --oOo--

5                                              **CERTIFIED**

6    CRUMP INSURANCE SERVICES, INC.,    )       **TRANSCRIPT**

                                        )

7                        Plaintiff,     )

                                        )

8            vs.                        )   No. C-07-4636 MMC

                                        )

9                                       )

     MICHAEL P. MCGRATH, an             )

10   individual, ALL RISKS, LTD., a     )

     corporation, and Does 1            )

11   through 50, inclusive,             )

                                        )

12                       Defendants.    )

     _____)

13

14

15              DEPOSITION OF RICK MCDONOUGH

16   DATE:      June 20, 2008

17   TIME:      12:59 p.m.

18   LOCATION:  Curiale Dellaverson Hirschfeld & Kraemer

                727 Sansome Street

19              San Francisco, CA

20

21   REPORTED BY:  Kenneth T. Brill

22                 Registered Professional Reporter

23                 Certified Shorthand Reporter No. 12797

24

25   Page 1 - 78

                                                        1

00026

1    Q.    -- S-W-E-T-T?

2    A.    Yeah, I think so.

3    Q.    When you were -- well, strike that.

4          Do you consider yourself an officer of Crump

5    corporation in terms of its management structure?

6    A.    No.

7          MR. ASKANAS:    Objection to the extent it calls

8    for a legal conclusion.

9    BY MS. RUTTER:

10   Q.    Do you consider Mr. Scott an officer of the

11   corporation in terms of its management structure?

12         MR. ASKANAS:    Same objection.    Improper

13   foundation.

14   BY MS. RUTTER:

15   Q.    You can go ahead and answer.

16         MR. ASKANAS:    You can answer unless I say

17   don't answer the question.

18         THE WITNESS:    Got you.

19         MR. ASKANAS:    I'm objecting.

20         THE WITNESS:    Rephrase the question, and then

21   I'll answer.

22   BY MS. RUTTER:

23   Q.    Let me preface it, that's another --

24         MR. ASKANAS:    Admonition.

25   BY MS. RUTTER:

00027

1    Q.   -- admonition, thank you.  Sometimes it gets

2  confusing for witnesses, if I ask a question, your

3  counsel may object to those question, and those

4  objections are noted for the record.

5         So unless and until he would instruct you not

6  to answer, those are sort of magic words, you can go

7  ahead and answer the question.  So having said that, let

8  me rephrase the question.

9         Do you believe that Mr. Scott is an officer of

10  the corporation of Crump in terms of its management

11  structure?

12    A.   I do not know.

13    Q.   But you yourself as executive vice president

14  do not consider yourself an officer of the crump

15  corporation in terms of management?

16    A.   I --

17         MR. ASKANAS:  Objection, calls for legal

18  conclusion.  You can answer.

19         THE WITNESS:  I do not consider myself what

20  you said.

21  BY MS. RUTTER:

22    Q.   An officer?

23    A.   An officer.

24    Q.   Okay.  Now, in terms of your role as a broker,

25  is it fair for me to understand that the -- the

00028

1    customers, or your clients that you deal with are other

2    retailers; is that correct?

3        A.    Correct.

4        Q.    And over the years, from 2001 to present, you

5    have developed a network of retailers that you have

6    worked with, is that fair?

7        A.    Yes.

8        Q.    And to your knowledge, do those retailers also

9    work with other wholesalers outside of Crump at times?

10       A.    Yes.

11       Q.    In other words, those retailers are not

12   exclusively working with you at Crump; correct?

13       A.    Correct.

14       Q.    And the names and the contact information for

15   those retailers is something that is available through a

16   variety of sources; correct?

17       A.    Correct.

18       Q.    And can you give -- identify those sources for

19   me?

20       A.    Google.

21       Q.    Good old Google, okay.

22       A.    Yellow pages.  Yahoo.

23       Q.    How about on the -- on the individual

24   retailers' websites, have you ever searched for

25   retailers that way?

00029

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | Okay.  What about calling 411? |
| 3 | A. | Yes. |
| 4 | Q. | What about the Kirschner Directory, have you |

5  ever heard of that?

| 6 | A. | Yes. |
| 7 | Q. | Have you ever used the Kirschner Directory? |
| 8 | A. | No. |
| 9 | Q. | Let me see if -- I'm going to show you -- I'm |

10  going to show you an actual Kirschner Directory book,

11  and then I have -- let me go ahead and mark this as an

12  exhibit, since I'm referring to it.  Exhibit 3.

13                         - - -

14               (Whereupon the document was marked,

15               for identification purposes, as

16               Defendant's Exhibit Number Three.)

17                         - - -

18  BY MS. RUTTER:

19      Q.  And, Mr. McDonough, this is just a two-page --

20  I believe two-page document.  It's a photocopy of the

21  cover of the red book Kirschner, as well as the table of

22  contents of Kirschner's book.

23               Have you ever seen this book before?

24  A.  Yes.

25      Q.  All right.  And the book -- the actual book

00030

```
 1   that your counsel is now flipping through, but that you

 2   looked at, is a red covered book, approximately what,

 3   maybe an inch?

 4             MR. ASKANAS:  Three by five.

 5   BY MS. RUTTER:

 6       Q.    Three by five, but about an inch thick.  Have

 7   you ever utilized that book in your services as a

 8   wholesale broker?

 9       A.    Yes.

10       Q.    And to your knowledge, did Mr. McGrath utilize

11   that book?

12       A.    I do not know.

13       Q.    Okay.  And if I can just direct your

14   attention, if you'd look at the actual book, just to

15   pages 241 to, I think, 471, so 241 to 471, I just want

16   to know generally what that section represents.

17       A.    It's --

18             MR. ASKANAS:  Well, I think what she means

19   generally.

20             THE WITNESS:  It's a listing.

21             MR. ASKANAS:  It says agents and brokers in

22   Northern California.  So -- what the last page you

23   mentioned?

24             MS. RUTTER:  I think it -- to 471, I think

25   that's that whole section.
```

00031

```
 1              MR. ASKANAS:  Looks like agents and brokers.
 2  BY MS. RUTTER:
 3      Q.  Okay.  Take what you need in terms of looking
 4  at just the contacts that are in there, and I want to
 5  ask you, are there -- does that section identify
 6  retailers?
 7      A.  Yes.
 8      Q.  And that provides contact information for
 9  various retailers by geographic area, is that your
10  understanding?
11              MR. ASKANAS:  I just want to object, the
12  document speaks for itself.
13              THE WITNESS:  Rephrase your question.
14  BY MS. RUTTER:
15      Q.  That that section refers to various retailers
16  by geographic area?
17      A.  Yes.
18      Q.  And is it fair to say that your primary role
19  as a broker is to work with retailers in order to do
20  placements for various types of insurance for the
21  retailers clients?
22      A.  Correct.
23      Q.  And to do your job, what information do you as
24  a broker need to have in order to attempt that
25  placement?
```

00032

1      A.    We need to have a submission from the retail

2  broker.

3      Q.    And is that in writing, Mr. McDonough?

4      A.    Yes.

5      Q.    And what information does the retailer provide

6  you in that submission?

7      A.    An application.  Loss information, financials.

8      Q.    Does the submission also provide you the

9  expiration date of the insured's policy?

10     A.    Not necessarily.

11     Q.    Do you need an expiration date in order to do

12  your job to make a placement?

13     A.    No.

14     Q.    What else is provided by the retailer in that

15  submission, other than what you've already told me?

16     A.    Website information.

17     Q.    Is there information provided about the

18  underlying insured?

19     A.    Underlying insured?

20     Q.    In other words, the actual company or entity

21  that's being insured, that's the client of the retailer;

22  correct?

23     A.    Correct.

24     Q.    All right.  So is information about who the

25  insured is, is that usually provided in a submission?

00033

1     A.   Correct.

2     Q.   All right.  In any of the risks that the

3   insured is looking to have insured?

4     A.   Correct.

5     Q.   Any other information in that submission

6   provided by the retailer to you?

7     A.   Information that's on the application.

8     Q.   Such as what?

9     A.   Effective date.  Mailing address.

10    Q.   And is there any other information that you

11  need in order for you to do your job and go out and find

12  a placement?

13    A.   Once I have a complete submission, that's all

14  I need.

15    Q.   Okay.  And all that information, again, it

16  comes from the retailer; correct?

17    A.   No.

18    Q.   Oh, I'm sorry, I thought I understood you to

19  say that this was information that was provided on a

20  submission?

21    A.   My -- to clarify the website, I may go to

22  their website and glean additional information to put my

23  submission together.

24    Q.   Sure.  Okay.  Setting aside that, all the

25  information you need is provided on that submission by

00034

1   the retailer?

2       A.   Correct.   Correct.

3       Q.   Has it been your experience that at times

4   retailers will send these submissions out to various

5   wholesale brokers?

6       A.   Yes.

7       Q.   In other words, trying to compete and get the

8   best deal?

9       A.   Yes.

10       Q.   Can you give me any estimate in terms of what

11   percentage of time that occurs?

12           MR. ASKANAS:   Don't guess or speculate.   If

13   you have an estimate, you can give it.

14           THE WITNESS:   That would be a -- I don't know.

15   BY MS. RUTTER:

16       Q.   Okay.

17       A.   I have not been a retail broker, I do not know

18   what would be a fair assumption.

19       Q.   I appreciate that.   Are there certain -- in

20   your experience, are there certain retailers that tend

21   to bid wholesale brokers against each other?

22       A.   Yes.

23       Q.   And which retailers would those be?

24       A.   Which -- rephrase the question.

25       Q.   Sure.   The question was are there certain

00050

1  that question again, so we make sure we have a -- we had

2  a lot of corrects going back and forth.

3          Mr. Court reporter, could you read back my

4  original question, please.

5                      - - -

6              (The court reporter read back as

7              follows:

8                  "QUESTION:  At any point in time,

9              did you have any discussion with Mr.

10             McGrath about any employee moving to All

11             Risks?")

12                              - - -

13             THE WITNESS:  No, I did not have any

14  discussion with Mr. McGrath regarding an employee moving

15  to All Risks.

16  BY MS. RUTTER:

17     Q.   Thank you.

18          Now, after Mr. McGrath left, let's say in the

19  couple of weeks, two, three weeks after Mr. McGrath left

20  Crump, are you aware of whether Peter Scott engaged in

21  any special efforts to reach out to any of the retailers

22  that Mike had worked with?

23             MR. ASKANAS:  Objection to the term "special

24  efforts" as vague and ambiguous.  Go ahead.

25             THE WITNESS:  I need you to clarify what you

00069

1   forwarded this indication or quote to his home e-mail

2   address?

3        A.    I do not know.

4        Q.    Do you know where Mr. McGrath was on or around

5   Thursday, May 31st, 2007?

6        A.    I do not know.

7        Q.    Do you recall Mr. McGrath taking a vacation

8   for his wife's 40th birthday on or around this time?

9        A.    I don't recall that it was around this time,

10  but I do recall that there was a vacation.

11       Q.    And they -- a group went to Hawaii for the

12  vacation; correct?

13       A.    Correct.

14       Q.    Okay.  Do you recall whether Mr. McGrath ever

15  told you that -- that he was trying to continue to

16  service some outstanding clients during that week that

17  he was on vacation?

18       A.    I -- there was no discussion about it.

19       Q.    Okay.  Are you aware of whether Crump has ever

20  filed any other lawsuit against any broker who has left

21  to go and work for a competitor?

22       A.    No.

23       Q.    Are you aware of why Crump decided to proceed

24  in this lawsuit against Mr. McGrath?

25       A.    I do not know the motivation behind it.

00070

```
 1      Q.  · He was broker of the year for Crump the year
 2  before he left; correct?
 3      A.   He was the broker of -- yes, for the year
 4  preceding that period, yes.
 5      Q.   But he was named broker of the year in 2007?
 6      A.   The actual ceremony was 2007; correct.
 7      Q.   And that's not just for the San Francisco
 8  office, that's for the entire Crump --
 9      A.   Correct.
10      Q.   -- organization; is that correct?
11      A.   Yes.
12      Q.   Do you have any opinion as to whether or not
13  Crump appeared to be embarrassed that Mike as their top
14  broker of the year was leaving to go and work for a
15  competitor?
16          MR. ASKANAS:  Objection to the extent that
17  opinion testimony is irrelevant.
18  BY MS. RUTTER:
19      Q.   Go ahead, you can answer.
20      A.   I do not have the -- rephrase the question so
21  I answer it properly.
22      Q.   Sure.  Let me actually ask a different
23  question, same genre.  Let me ask a different question.
24          You've been working at this company for
25  approximately eight years; right; is that correct?
```

00074

1              THE WITNESS:  His actual work at All Risks, I

2    don't know anything about his work at All Risks.

3    BY MS. RUTTER:

4        Q.    So you don't -- you're not aware of what

5    placements he has made while at All Risks?

6        A.    I am not aware of what business he has bound.

7        Q.    Okay.  And you're not aware of what retailers

8    he has worked with at All Risks during the last year?

9        A.    I am aware of some.

10       Q.    Okay.  And do you see -- or do you have any

11   personal knowledge as to whether or not Mr. McGrath

12   inappropriately solicited any business?

13             MR. ASKANAS:  Objection to the extent it calls

14   for a legal conclusion.

15   BY MS. RUTTER:

16       Q.    And I had an ending to that question, so let

17   me restate it.

18             Do you have any personal knowledge as to

19   whether or not Mr. McGrath inappropriately solicited any

20   business while working at All Risks?

21             MR. ASKANAS:  Same objection.

22             THE WITNESS:  Rephrase the question again,

23   please.  Sorry.

24   BY MS. RUTTER:

25       Q.    Do you want it reread?

00075

```
 1        A.    Just reread.

 2        Q.    Okay.  If you could do that, sir.

 3              (Read back).

 4              MR. ASKANAS:  Same objection.

 5              THE WITNESS:  Yes.

 6  BY MS. RUTTER:

 7        Q.    Okay.  And what personal knowledge do you

 8  have?

 9        A.    We received broker of record letters

10  appointing All Risks on business that he had written.

11        Q.    Okay.  What was unusual about that?

12        A.    The -- we deal with the same specific

13  retailer, and I do a portion of one account, and he did

14  the other portion.

15        Q.    Okay.

16        A.    And that retailer informed me that Mike would

17  be handling that account going forward -- the property

18  side.

19        Q.    And that is the retailers' choice to decide

20  which broker they want to --

21        A.    Correct.

22        Q.    Let me just finish.

23        A.    Not finished, sorry.

24        Q.    That is the retailer's decision to decide

25  which broker they want to have place their business;
```

00076

1  correct?

2      A.    Correct.

3      Q.    So, other than the fact that there were some

4  change in broker letters, changing from Crump to All

5  Risks, do you have any personal knowledge as to whether

6  or not Mike McGrath inappropriately solicited any such

7  business?

8      A.    I do not.

9      Q.    Do you have any personal knowledge as to

10  whether Mike McGrath used any Crump documents to obtain

11  any such business?

12      A.    I do not have personal knowledge.

13      Q.    Okay.  Do you have any personal knowledge as

14  to whether or not Mike McGrath used any information from

15  Crump in order to obtain any business while at All

16  Risks?

17      A.    I -- I do not.

18      Q.    Okay.

19          MS. RUTTER:  All right.  Thank you.  I have

20  nothing further.  I thank you again for your time.

21              (Whereupon, the deposition was

22              adjourned at 2:27 p.m.)

23                      --oOo--

24

25

1                    CERTIFICATE OF REPORTER

2

3           I, KENNETH T. BRILL, a Certified Shorthand

4    Reporter, hereby certify that the witness in the

5    foregoing deposition was by me duly sworn to tell the

6    truth, the whole truth, and nothing but the truth in the

7    within-entitled cause;

8           That said deposition was taken down in

9    shorthand by me, a disinterested person, at the time and

10   place therein stated, and that the testimony of the said

11   witness was thereafter reduced to typewriting, by

12   computer, under my direction and supervision;

13          I further certify that I am not of counsel or

14   attorney for either or any of the parties to the said

15   deposition, nor in any way interested in the event of

16   this cause, and that I am not related to any of the

17   parties hereto.

18

19

20

21                    DATED: July 8, 2008.

22

23

24   KENNETH T. BRILL, CSR No. 12797

25

                                                          78

# McDONOUGH DEPOSITION EXHIBIT 3

# The RED BOOK
# Kirschner's
### Insurance Directories®
A publication of The National Underwriter Company

**Northern California**
April 2002



We're the
*local* resource with
*a world* of specialty
*insurance* experience.

## Swett & Crawford
*www.swett.com*

Sacramento (916) 351-1720 • San Francisco (415) 956-3236

CA Lic. #0532269



PENGAD 800-631-6989

EXHIBIT
D-3
KTB 6/24/08

# KIRSCHNER'S Insurance Directories
## Northern California April 2002 Edition

**CALFORNIA DEPARTMENT OF INSURANCE**
Offices and Personnel ............................................................................

**SERVICE BUYERS' GUIDE**
Insurance Industry Allied Businesses ........................................................ (

**INDUSTRY ABBREVIATIONS** ......................................................... 1(

**INSURANCE DESIGNATIONS** ......................................................... 2(

**COVERAGE AND POLICY GLOSSARY** .............................................. 21

**INSURANCE SOFTWARE** ............................................................... 22

**BUREAUS AND ASSOCIATIONS**
Associations, Bureaus and Organizations ................................................ 37

**MARKETS**
Insurers, Managing General Agents ........................................................ 53

**LLOYD'S CORRESPONDENTS** ...................................................... 53

**SURPLUS LINE INSURERS (LESLI)** ............................................... 159

**SURPLUS LINE BROKERS** ........................................................... 161

**RISK PLACEMENT INDEX** ........................................................... 163

**RISK PLACEMENT CATAGORIES** .................................................. 177

**AGENTS AND BROKERS** ............................................................. 233
San Francisco/Marin (Area Code 415) ..................................................... 241
Peninsula (Area Code 650) ..................................................................... 242
East Bay (Area Codes 510/925) ............................................................... 265
Northwestern California (Area Code 707) ................................................. 283
Sacramento (Area Code 916) .................................................................. 324
Northeastern California (Area Code 530) .................................................. 343
Central California (Area Codes 209/559) .................................................. 369
South Central California (Area Codes 661/805) ......................................... 387
South Bay/West Central (Area Codes 408/831) ......................................... 426

**INDEPENDENT ADJUSTERS** ......................................................... 437

**AREA CODE MAP LOCATOR** ......................................................... 473

**INDEX OF ADVERTISERS** ............................................................. 490
........................................................................................................ 492

Kirschner's Insurance Directory assumes no liability for errors or omissions in the compiling or printing of this directory since it is not an official record but a service designed to be generally helpful to the insurance industry.

# Exhibit D

```
 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                     ---oOo---

 4

 5   CRUMP INSURANCE SERVICES, INC.,                 COPY

 6                      Plaintiff,

 7            vs.                        No. C-07-4636 MMC

 8   MICHAEL P. McGRATH, an individual,
     ALL RISKS, LTD., a corporation,
 9   and Does 1 through 50, inclusive,

10                      Defendants.

11   _____

12

13

14                   Deposition of

15               PETER QUINLAN SCOTT

16               Friday, April 4, 2008

17

18

19

20

21

22

23

24      REPORTED BY: JEANNETTE SAMOULIDES, CSR NO. 5254

25
```

                                                              **1**

00017

1    were deposed in similar to this, the allegations in

2    this case?  In other words, a claim that an employee

3    had violated some trade secret or taken confidential

4    information?

5        A.    No.

6        Q.    Have you ever been involved either --

7    strike that.

8              Do you understand the general nature of

9    the allegations in this case?

10       A.    Yes.

11       Q.    Okay.  Have you ever been involved in any

12   similar-type case, either on the receiving end of a

13   claim or initiating a claim involving trade secrets

14   or confidential/proprietary information?

15       A.    No.

16       Q.    Now, you're currently employed by Crump;

17   is that correct?

18       A.    Yes.

19       Q.    All right.  And what is your current

20   position?

21       A.    I'm manager of the San Francisco office

22   and casualty broker.

23       Q.    I'm sorry, casualty program?

24       A.    Broker.

25       Q.    Oh, broker.

00020

1       A.      Majority of the time.

2       Q.      Was Mr. Hahn your supervisor when you left

3    Tri-City?

4       A.      He was president of the company.  I

5    believe that -- let me think about this.  I believe

6    Ed Ulshafer was my supervisor at the time that I

7    left.

8       Q.      And what was Mr. Ulshafer's position?

9       A.      He was a partner in the firm.

10      Q.      Were both these gentlemen located in

11   San Francisco?

12      A.      Yes.

13      Q.      Was it -- is it fair to say that the

14   business at Tri-City, that you were in the insurance

15   wholesale brokerage business?  Is that the general

16   description of the business?

17      A.      Yes.

18      Q.      Okay.  So you would then go out and --

19   well, strike that.

20              Who were your clients, and I don't need

21   specific names at this point, but describe the

22   clients that you were serving when you were working

23   at Tri-City?

24      A.      Retail insurance brokers.

25      Q.      Okay.  And are those also known as retail

00021

1  agents?

2        A.    Yes.

3            Q.    Or retailers?

4        A.    Yes.

5            Q.    Okay.  So if I use that terminology,

6    whether it's retailers or retail agents, that's the

7    same as retail insurance brokers?

8        A.    I would say so, yes.

9            Q.    Okay.  So we're all on the same page if I

10    use that terminology "retailers"?

11        A.    Yes.

12            Q.    Just to short change things -- not short

13    change, but short circuit I should say.

14            So you would get information from a

15    retailer in terms of a particular insured needing

16    a -- in your case, a casualty insurance plan,

17    correct?

18        A.    Yes.

19            Q.    Okay.  And it would be your

20    responsibility, then, to go out and try and find the

21    most competitive line of insurance; is that fair?

22            MR. PITHA:  I just object, vague as to

23    "competitive."

24            MS. RUTTER:  Q.  Well, you're trying to

25    find the best policy that you could take back to the

00024

1     Q.    So how long have you been in the casualty

2   broker industry?

3     A.    1985.

4     Q.    And the first position was with whom?

5     A.    Alexander Howden.

6     Q.    Okay.  Give me a little bit of background,

7   if you would, in terms of your educational --

8     A.    I went to Dawson College in Montreal,

9   Canada, and from there I went to work in London at

10  Alexander Howden in a training program.

11    Q.    Okay.

12    A.    And then started in the insurance business

13  with them, with Alexander Howden.

14    Q.    In 1985?

15    A.    Yes.

16    Q.    Okay.  And when did you graduate from

17  Dawson College?

18    A.    I didn't.  I went into the insurance

19  business.

20    Q.    Okay.  Do you have any licenses or any

21  other degrees or certifications?

22    A.    I have insurance licenses.

23    Q.    Okay.  So take me through how it would

24  work -- and again, I'm focusing at this point on

25  Tri-City -- in terms of a retailer coming to you

00025

1    requesting that you submit a proposal?  How does that

2    work?

3        A.   The retailer would phone you up and say

4    that they need assistance with a certain coverage,

5    and you let them know if you could help them or not.

6        Q.   Okay.  So what type of information would

7    they gave you?

8        A.   A submission.

9        Q.   Okay.  And is this in writing?

10       A.   Yes.

11       Q.   Okay.  And it has things like what?

12       A.   Application; loss information; brochure,

13   if applicable; financials; underlying program if it's

14   an umbrella; general information about an insured.

15       Q.   Does it have information concerning the

16   amount that they're willing to pay in terms of a

17   premium?

18       A.   In some cases.

19       Q.   Does it have the policy expiration date of

20   their current policy?

21       A.   The accord application has the policy

22   period on it.

23       Q.   The what accord?

24       A.   Application has the policy period on it.

25       Q.   And that is an application that was given

00026

1   to you by a retailer?

2      A.   Yes.

3      Q.   So you get all your information from this

4   retailer; is that fair?

5      A.   From a retailer, yes.

6      Q.   Okay.  And then you have direct contact

7   with potential carriers that you work with?

8      A.   Yes.

9      Q.   Okay.  And then do you take that

10  information and verbally communicate that to

11  potential carriers or do you do it in writing?

12     A.   In writing.

13     Q.   Okay.  And what is that process called, if

14  anything?

15     A.   Submitting a submission to an insurance

16  carrier.

17     Q.   Okay.  And then you get a response back

18  from the insurance carrier?

19     A.   Yes.

20     Q.   Okay.  And then what do you do with that

21  information?

22     A.   You give the information to the retail

23  broker.

24     Q.   And then what occurs next in this process?

25     A.   Of obtaining a quotation or -- what's your

00027

1    question, please?

2        Q.    You get the information from the carrier

3    in response to submitting, essentially, a proposal or

4    a submission I think you referred to it?

5        A.    From the carrier you submit whatever

6    information they give you back to the retail broker.

7        Q.    Okay.  And so you give that back to the

8    retail broker, and then does the retail broker make

9    the decision in terms of which policy or which

10   carrier to go with?

11       A.    I believe they would discuss it with the

12   person buying the insurance and they'd make the

13   decision.

14       Q.    Okay.  And then are you eventually

15   notified by the retailer that, "Hey, we want to go

16   with this particular proposal"?

17       A.    Yes.

18       Q.    Okay.  And, again, I'm just asking very

19   generally, are you potentially bidding against other

20   brokers?

21           In other words, does the retailer -- when

22   the retailer comes to you and says, "Peter, give me

23   submission on X, Y and Z," is the retailer also going

24   out to other brokers to see if they can get the best

25   deal?

00081

    1    A.    Yes.

    2    Q.    Okay.  And then you've also identified

    3    information about the insured, the nature of

    4    placement, correct?

    5    A.    Yes.

    6    Q.    And any information received from the

    7    retail brokers regarding that placement, correct?

    8    A.    Yes.

    9    Q.    Such things as the current insurance

   10    carrier that the policy is currently with, correct?

   11    A.    And the submission, which would be the

   12    information that the retailer gives you.

   13    Q.    Okay.  Anything else?

   14    A.    Not that I can think of.

   15    Q.    Okay.  Now, this information is -- that

   16    you've identified here as confidential or proprietary

   17    is all information that you're able to obtain from

   18    the retail agent, correct?

   19    A.    Yes, or the insurance carrier.

   20    Q.    Okay.  So this is not information that

   21    only Crump maintains, correct?

   22    A.    Correct.

   23    Q.    So anyone in this industry that would have

   24    access to the retail agent could obtain this

   25    information you've identified here for me, correct?

00082

```
 1              MR. PITHA:  I'm just going to object as
 2  vague.
 3              THE WITNESS:  Can you repeat the question,
 4  please?
 5              MS. RUTTER:  Sure.
 6        Q.  Anyone that's in your industry that has
 7  access to a retail broker could obtain this list of
 8  information that you've identified, correct?
 9        A.  If they were willing to release it to
10  them, yes.
11        Q.  If "they" meaning the retail broker was
12  willing to release it, correct?
13        A.  Or the insurance carrier.
14        Q.  Or the insurance carrier.
15        A.  Right.
16        Q.  In other words, you wouldn't need to go to
17  an employee at Crump to get this information,
18  correct?
19        A.  Correct.
20              MS. RUTTER:  All right.  And let me show
21  you what we'll mark as Defendants' Exhibit 3.
22              (Defendants' Exhibit 3 marked for
23               identification.)
24              MS. RUTTER:  Q.  And what I've done,
25  Mr. Scott, is I'm showing you the actual Red
```

00083

 1   Krischner Book, and what we've marked as Defendants'

 2   Exhibit 3 is simply the cover of this book and the

 3   one page table of contents, which you're free to look

 4   at in terms of the original.

 5            Let me just ask you, is this the sort of

 6   Yellow Pages of the insurance industry that you were

 7   referring to earlier, this Krischner book?

 8        A.   Yes.

 9        Q.   And is this something that is published on

10   an annual basis to your knowledge?

11        A.   I don't know.

12        Q.   Okay.  If you look at the one that I have

13   here, and as I said we've got the cover page and

14   table of contents, Exhibit 3, it's dated, I believe,

15   April of 2002, and it's identified for Northern

16   California.

17            Does that refresh your recollection at all

18   whether or not this is something that's put out on an

19   annual --

20        A.   I don't know when they publish it.

21        Q.   Okay.  And is this a document that you've

22   had occasion to refer to or use in your practice as a

23   wholesaler?

24        A.   I may have used it.  I don't currently use

25   it.  As I said before, I usually dial 411 if I need

00136

1   All Risks?

2       A.   I don't know offhand.

3       Q.   Can you give me a ballpark?

4       A.   No.

5       Q.   Has that been compiled in any way?

6       A.   I'm not sure if it's complete at this

7   time, but it can be.

8       Q.   When I refer to "business," we're talking

9   about the commissions that would have been earned on

10  these accounts, correct?

11      A.   Yes.  Commission or fee.

12      Q.   And do you know if these were all yearly

13  expiration policies, in other words, they expire

14  every year?

15      A.   I would assume so unless it's a three-year

16  program.

17      Q.   Are most of the policies annual policies?

18      A.   Yes.

19      Q.   Okay.  And so after June of 2008 these

20  policies would have expired or will expire?

21      A.   Some of them.  Some might be longer.

22      Q.   Okay.  And once a policy expires, it's

23  fair game in terms of other wholesale brokers to go

24  after that business?

25           MR. PITHA:  Object as to "fair game."

00137

1          THE WITNESS:  What do you mean by that?

2          MS. RUTTER:  Q.   Well, if a policy

3  expires that Crump has placed, the retail broker then

4  can go to any other wholesale broker for the renewal

5  of that policy, right?

6      A.   Yes, they can go to any wholesaler or

7  insurance carrier directly.

8      Q.   Okay.  So you're not claiming that

9  policies that will be expiring a year after

10  Mr. McGrath leaves or has left Crump are policies

11  that necessarily would have been -- would have

12  remained with Crump, correct?

13     A.   I'm not sure.  You'd have to ask our

14  attorney.

15     Q.   Well, I don't get to depose your attorney

16  unfortunately.

17     A.   I'm not sure what the time frame would be.

18     Q.   Okay.  Let's assume the policy was an

19  annual policy, and that policy, let's say, expires in

20  June of 2008.

21          That policy is up for renegotiation by the

22  retail broker with any wholesaler, correct?

23     A.   Depends or direct market.

24     Q.   Okay.  And so as you sit here today, are

25  you on behalf of Crump claiming any damages for any

**DEPOSITION OF PETER QUINLAN SCOTT**

1          I, the undersigned, a Certified Shorthand

2    Reporter in the State of California, hereby certify

3    that the witness (if applicable) in the foregoing

4    deposition was by me duly sworn to testify to the

5    truth, the whole truth, and nothing but the truth in

6    the within-entitled cause; that said proceeding was

7    taken at the time and place therein stated; that the

8    testimony of said witness was reported by me, a

9    disinterested person, and was thereafter transcribed

10   under my direction into typewriting; that the

11   foregoing is a full, complete, and true record of the

12   said testimony; and that the witness (if applicable)

13   was informed of his/her opportunity to read and, if

14   necessary, correct said deposition and to subscribe

15   the same.

16          I further certify that I am not of counsel

17   or attorney for either or any of the parties in the

18   foregoing proceedings and caption named, or in any

19   way interested in the outcome of the cause named in

20   said caption.

21

22   Date: April 16, 2008

23

24   Jeannette Samoulides

25   JEANNETTE SAMOULIDES, CSR #5254

                                                    **203**

1          UNITED STATES DISTRICT COURT

2      IN THE NORTHERN DISTRICT OF CALIFORNIA

3             ---oOo---

4

5   CRUMP INSURANCE SERVICES, INC.,     COPY

6             Plaintiff,

7        vs.         No. C-07-4636 MMC

8   MICHAEL P. McGRATH, an individual;
     ALL RISKS, LTD., a corporation,
9   and DOES 1 - 50 inclusive,

10          Defendants.

11 _____

12

13         Deposition of

14      PETER QUINLAN SCOTT

15    Thursday, June 19, 2008

16

17

18

19         Volume II

20     (Pages 205 - 308)

21

22

23

24   REPORTED BY: JEANNETTE SAMOULIDES, CSR NO. 5254

25

205

00232

1       A.   I don't recall any specific occasions

2   discussing anything concerning Mr. McGrath with just

3   Glenn Hargrove.  I believe that each time it was on a

4   conference call with our corporate counsel Andy

5   Forstenzer.

6       Q.   Do you recall ever going to Mr. Hargrove

7   and stating that you had some concerns that

8   Mr. McGrath may be in violation of his agreement with

9   Crump, and Mr. Hargrove suggesting that you go to

10  Mr. Forstenzer about that?

11      A.   That's potentially possible, yes.

12      Q.   You just don't recall it?

13      A.   Correct.

14      Q.   Now, directing your attention to Cyndi

15  Marty.

16           Prior to her working for Crump, did you

17  know where she worked?

18      A.   Yes.

19      Q.   And where was that?

20      A.   Marsh McLennan.

21      Q.   Okay.  And do you know how long she worked

22  at Marsh?

23      A.   No.

24      Q.   Do you know if it was a -- for a

25  significant period of time, in other words, over 10

00233

1  years?

2      A.    I'd say five to ten years potentially.

3      Q.    Did you interview her when she -- when she

4  was being hired by Crump?

5      A.    Mike McGrath interviewed her and then I

6  had a meeting with Mike and Cyndi.

7      Q.    As part of the interview process?

8      A.    Yes.

9      Q.    And did you -- did you know generally,

10  either from that meeting or from another source, how

11  long she had been in the industry, in the insurance

12  industry?

13     A.    I don't recall from the meeting, but I

14  know that Cyndi's been in the insurance business at

15  least 20 years.

16     Q.    Okay.  And did you know anything about her

17  reputation in the industry?

18     A.    Yes.

19     Q.    And how would you describe her reputation

20  in the industry?

21     A.    She has a good reputation.

22     Q.    And is she well-known in the industry for

23  being a good insurance professional?

24           MR. ASKANAS:  Objection.  Calls for

25  speculation; no foundation.

00267

1           MS. RUTTER:  No, Counsel, I'm not going to

2   give you a second.

3           MR. ASKANAS:  I don't want you to

4   regurgitate what you've already asked him.  So --

5           MS. RUTTER:  And I'm not going to take

6   time on the record for you to sit and read

7   Mr. Scott's deposition.  If you wanted to do that,

8   you could have certainly done that before.

9       Q.  Mr. Scott, what did Mr. McGrath do wrong

10  in terms of the change in these Broker of Record

11  letters?

12          MR. ASKANAS:  Go ahead and answer.

13          The question's been asked and answered and

14  calls for a legal conclusion.

15          THE WITNESS:  What did he do wrong?  Well,

16  he had a noncompetition of business from Crump for a

17  year, so he should not have solicited or worked on

18  that business for a period of a year.

19          MS. RUTTER:  Q.  So is it --

20      A.  Second --

21      Q.  I'm sorry, go ahead.

22      A.  Secondly, his agreement said that he was

23  not to take any employees.  What else did he do

24  wrong?

25      Q.  Well, let's stick with the -- whether or

00268

```
 1   not you thought it was wrong for him to take -- to

 2   continue to work on retailer -- with retailers that

 3   he had worked with before.

 4              The fact that these Broker of Record

 5   letters were received, you're making an assumption

 6   that Mr. McGrath solicited that change from Crump to

 7   All Risks?

 8              MR. ASKANAS:  I don't understand the

 9   question.

10              Could you repeat it, Ms. Court Reporter.

11              THE REPORTER:  "Well, let's stick with

12              the -- whether or not you thought it was

13              wrong for him to take -- to continue to

14              work on retailer -- with retailers that he

15              had worked with before.

16                  The fact that these Broker

17              of Record letters were received, you're

18              making an assumption that Mr. McGrath

19              solicited that change from Crump to

20              All Risks?"

21              THE WITNESS:  There was a change from

22   Crump to All Risks based on those letters, yes.

23              MS. RUTTER:  Q.   Okay.  And I understand

24   that.

25              But you're making an assumption that
```

00269

1  Mr. McGrath requested that the change be made,

2  correct?

3       A.   I'm not making any assumptions, other than

4  we received the Broker of Record letters on those

5  policies.

6       Q.   Okay.  And so you don't know whether or

7  not the change was initiated by someone other than

8  Mr. McGrath, correct?

9       A.   Correct.

10       Q.   As a broker, a wholesale broker, it's

11  their job to go out and meet with retailers, correct?

12       A.   One of them, yes.

13       Q.   Okay.  And one of their jobs is to try and

14  urge the retailer to work with that particular

15  wholesaler, correct?

16       A.   Yes.

17       Q.   So is it your testimony that any broker

18  who leaves Crump to go to another wholesale broker

19  can never go back to that prior retailer to encourage

20  them to work with them?

21       A.   No.

22       Q.   That's not your testimony?

23       A.   No.

24       Q.   Because that's not what you did when you

25  went from Tri-City to Crump, is it?

**DEPOSITION OF PETER QUINLAN SCOTT, VOLUME II**

1         I, the undersigned, a Certified Shorthand

2    Reporter in the State of California, hereby certify

3    that the witness (if applicable) in the foregoing

4    deposition was by me duly sworn to testify to the

5    truth, the whole truth, and nothing but the truth in

6    the within-entitled cause; that said proceeding was

7    taken at the time and place therein stated; that the

8    testimony of said witness was reported by me, a

9    disinterested person, and was thereafter transcribed

10   under my direction into typewriting; that the

11   foregoing is a full, complete, and true record of the

12   said testimony; and that the witness (if applicable)

13   was informed of his/her opportunity to read and, if

14   necessary, correct said deposition and to subscribe

15   the same.

16        I further certify that I am not of counsel

17   or attorney for either or any of the parties in the

18   foregoing proceedings and caption named, or in any

19   way interested in the outcome of the cause named in

20   said caption.

21

22       Date: June 26, 2008

23

24

25       JEANNETTE SAMOULIDES, CSR #5254

308