# Exhibit E

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA


CRUMP INSURANCE SERVICES, INC.,

      Plaintiff,

    vs.                       No. C-07-4636 MMC

MICHAEL P. MCGRATH, an individual,
ALL RISKS, LTD., a corporation,
and Does 1 through 50, inclusive,

      Defendants.

# CERTIFIED
# COPY

---

VIDEOTAPED DEPOSITION OF MICHAEL P. McGRATH

San Francisco, California

Wednesday, April 30, 2008


Reported by:
SUZANNE F. BOSCHETTI
CSR No. 5111

Job No. 85930A

00024

1      A.   Yes.

2      Q.   Okay.  And just confirm to me that e-mail

3  address, mike.mcgrath@allrisks.com is accurate as --

4      A.   Yes.

5      Q.   -- of that time?

6      A.   Yes.

7      Q.   But again, you don't recall that you ever

8  received this e-mail, Exhibit 3, correct?

9      A.   No.

10      Q.   My statement was correct?

11           You don't recall ever receiving --

12      A.   I don't recall.

13      Q.   Thank you.  Okay.

14           Have you now described for me the documents

15  that you reviewed when you prepared for this deposition?

16  You had mentioned reviewing e-mails, your All Risks

17  employment contract, your Crump 1996 agreement.

18      A.   Yes.

19      Q.   Have we now covered everything that you

20  reviewed?

21      A.   Yes.

22      Q.   Okay.  In connection with this lawsuit, you

23  were asked to produce your Crump employment contract.

24           Do you remember being asked to produce that in

25  a document request?

00025

1       A.   Yes.

2       Q.   Okay.  And my recollection is that you

3    responded that you did not have a copy, correct?

4       A.   Correct.

5       Q.   Did you at any point in time keep a copy of

6    your Crump 1996 employment contract?

7       A.   No.

8            MR. STERN:   Let's mark as Exhibit 4 a copy of

9    what's called Memorandum of Agreement dated June 7,

10   1996.  It bears the number C001 through 06.

11           (Deposition Exhibit 4 marked by the court

12            reporter.)

13   BY MR. STERN:

14       Q.   Would you confirm to me that this is the

15   employment contract that you had with Crump?

16       A.   Yes, that is the contract I had with Crump.

17       Q.   And that's your signature on page 6, correct?

18       A.   Correct.

19       Q.   Was this entered into on or about the date

20   that's indicated on the first page, that is, June 7th,

21   1996?

22       A.   Yes.

23       Q.   And you understood that this set forth the

24   terms of the employment during the entire period that

25   you were with Crump except as amended by supplemental

00026

1   amendments changing your compensation; is that correct?

2        MS. RUTTER:  Objection to the extent it's

3   overbroad and to the extent it calls for a legal

4   conclusion.

5   BY MR. STERN:

6        Q.  You can answer.

7        A.  Don't know.

8        Q.  Did you have any understanding one way or other

9   as to the terms of your employment?

10        MS. RUTTER:  Objection.  It's overbroad.

11   BY MR. STERN:

12        Q.  You can answer.

13        A.  If you can repeat the question, please?

14        Q.  Sure.

15        Did you have any understanding as to what the

16   terms of your contract --

17        A.  Yes.

18        Q.  -- were with Crump?

19        A.  Sorry to interrupt.  Yes.

20        Q.  Let me -- let me take it a little slower and

21   see if maybe we can move through this.

22        When did you begin with Crump?

23        A.  June 7th, 1996.


24        Q.  And at that time, you entered into the written

25   agreement that we see, Memorandum of Agreement,

00047

1           THE WITNESS:  No.

2    BY MR. STERN:

3       Q.  Okay.  And -- and did you understand that to be

4    referring to -- and let me point out, at the beginning

5    of the paragraph, it begins by saying "all records,

6    files, manuals, lists of customers" and then it goes on

7    with more.

8           Did you understand that to be what was being

9    referred to as the property?

10      A.  Yes.

11      Q.  Okay.  After you left -- let me back up.  Start

12   over.

13          When you left Crump, did -- did you have in

14   your possession anything that was, under this

15   paragraph 11, property of Crump?

16      A.  Yes.

17      Q.  What did you have?

18      A.  I had old -- I worked at home, on Fridays

19   usually, and I had old Win Broker lists of accounts.

20      Q.  At home?

21      A.  Yes.

22      Q.  Did you have anything else covered by this

23   paragraph as of that time?

24      A.  No.

25      Q.  What did you do with those lists of accounts?

00048

```
 1      A.  All recycled.

 2      Q.  What does that mean?

 3      A.  I got rid of them.

 4      Q.  Were these -- how were they kept?

 5      A.  In a huge pile on my right -- on my desk on the

 6  right side.

 7      Q.  So they were -- they were printed out on paper?

 8      A.  Yes.

 9      Q.  Did you have them in any other medium such as

10  in a computer?

11      A.  No.

12      Q.  When you say recycled, how was that handled?

13      A.  In my blue thing outside.

14      Q.  Oh, they were just thrown away into --

15      A.  Yeah.

16      Q.  -- the recycling --

17      A.  Yes.

18      Q.  Through the tra- -- your normal trash --

19      A.  Yeah.

20      Q.  -- pickup?

21      A.  Yes.

22      Q.  Okay.  Was anything done to shed them or

23  otherwise make them --

24      A.  No.

25      Q.  -- nondis- -- nonunderstandable?
```

00049

```
 1      A.  No.

 2      Q.  Describe for me what these were, the -- the Win

 3  Broker lists?

 4      A.  They have a -- if I recall correctly, they have

 5  a list of the account, the effective date, the premium.

 6      Q.  So the account.  Effective date of what?

 7      A.  When it's effective, when the account is

 8  effective.  The premium is on it with the commission

 9  that was made the prior year.

10          And what I used these lists for when I was

11  working was so I know, if somebody called me, one of my

12  clients, I would have that readily available.  Because

13  you could not get Win Broker at home unless you had your

14  laptop, which I never brought my laptop home.  I kept it

15  in the office.

16      Q.  So when you say it had the account, the

17  effective date, premium, the commission, effective date

18  of an insurance policy?

19      A.  Of the -- yes, yes.

20      Q.  And would it also show an expiration date?

21      A.  The effective date, expiration, that'd be the

22  same.

23      Q.  The same but a year later?

24      A.  Yeah.  So it'd be-- it would show up 8/1/06.

25  Then that means I know it comes up 8/1/07.
```

00050

```
 1      Q.  For renewal?

 2      A.  Yes.

 3      Q.  And you say it -- it reflected -- did it

 4  reflect the types of insurance that were covered?

 5      A.  Yes.  Yes.

 6      Q.  So can you give me an example of the

 7  information one particular type of -- of customer might

 8  have that you would have on Win Broker?

 9      A.  Yeah.  It would say DIC including earthquake.

10      Q.  DIC meaning --

11      A.  I'm sorry.  Difference in conditions.  It's

12  just -- it's an acronym for a -- for an earthquake

13  policy.

14      Q.  Okay.  It would have the name of your insured?

15      A.  Yes.

16      Q.  Would it show who the retail broker was that

17  provided --

18      A.  Yes.

19      Q.  -- that?

20      A.  Yes.

21      Q.  So you had that information.

22          With respect to the retail broker, did it just

23  show their name, or would it show some contact

24  information such as an address or a phone number?

25      A.  Just their name.
```

00051

1      Q.   Okay.   It would show the effective date of the

2  particular coverage, listing the type of coverage,

3  correct?

4      A.   Mm-hmm.

5           MS. RUTTER:   Yes.   Is that a yes?

6           THE WITNESS:   Oh, yes.

7           MR. STERN:   Thank you.

8           MS. RUTTER:   Answer audibly.

9  BY MR. STERN:

10     Q.   The premium and the commission for the prior

11  year that was then in effect --

12     A.   Yes.

13     Q.   -- correct?

14          Any other information that was included?

15     A.   No.

16     Q.   Was that information essentially everything you

17  would need to know to know what that particular customer

18  had in the way of insurance that you had for that

19  customer at Crump?

20     A.   No.

21     Q.   What wasn't included?

22     A.   The values.

23     Q.   Of the underlying property?

24     A.   Yeah, the values of the -- the actual values of

25  the account, the coverages.

00052

1        Q.  The coverages were not included in that?

2        A.  No.  I wouldn't know if they had building laws.

3   I wouldn't know if they had -- if they had EQSL.  I'd

4   only know that they had earthquake or maybe they had

5   flood.

6        Q.  Why would -- did Win Broker not contain the

7   information on all the coverage that that customer had

8   through Crump?

9        A.  Win Broker might have but not the expiration

10  lists.

11       Q.  Oh, this is what you call an expiration list?

12       A.  Yes.

13       Q.  What is that?

14       A.  Where it shows that the -- it'll show the

15  account, what -- like a -- for instance -- what's today?

16  Today we are in April.  It will show my -- it will show

17  May.  That's an expiration list.  What I called it.  I

18  don't know if Crump called it that, but I used it as,

19  oh, I got nine accounts coming up in May.  And so if I

20  was at home and somebody called me on it or sent me an

21  e-mail, I know when it came up.

22       Q.  When you say you had these, did you keep --

23  well, about how high a stack was it when you --

24       A.  Oh.

25       Q.  -- got rid of it?

00053

```
 1        A.   Maybe this high.

 2        Q.   Okay.   You -- describe for the court

 3   reporter --

 4        A.   Sure.

 5        Q.   -- what you're showing me.

 6        A.   About two and a half, three inches.

 7        Q.   And what would that represent in terms of the

 8   time period, the number of months?

 9        A.   Probably the last six -- six months maybe.

10        Q.   So as -- and when did you actually get rid of

11   these lists that you had from Crump?

12        A.   Either the day before I started at All Risks or

13   the day of All Risks.

14        Q.   Did you make any use of them prior to the time

15   that you threw them away, any use of them with respect

16   to All Risks?

17        A.   No.

18        Q.   So, for instance, you didn't look at them to

19   try to figure out which accounts you might want to

20   contact when you went to All Risks?

21        A.   No.

22        Q.   Did you -- when -- when, prior to throwing them

23   out, did you last look at any of that list, what you

24   call the expiration list from Win Broker?

25        A.   Probably early May.
```

00054

1      Q.  Why do you think that's when you last looked at

2   them?

3      A.  Because I think that was the last day I worked

4   at home for Crump.

5      Q.  I thought you said you worked usually on

6   Fridays at home?

7      A.  Yes.

8      Q.  Was there some reason you didn't do it in

9   May 2007 other than the first week -- well, I'm sorry --

10   other than in early May?

11      A.  I recall I went to Hawaii for a week in May,

12   and my memory serves me, I do not believe I would have

13   worked from home when I was going to be out ten days.  I

14   usually -- I wouldn't be at home 'cause I wouldn't --

15   then I'm home way too much, and then going on vacation

16   for eight or nine days wouldn't make any sense.

17      Q.  I -- I brought with me a copy of a calendar

18   that is for 2007.  Why don't I hand this to you.  We

19   don't need to mark it.

20      A.  Okay.

21      Q.  And I will just confirm for you, you'll note

22   2007, June 4th was a Monday, and that -- on this

23   calendar, and that is, to the best of your recollection,

24   accurate, correct?

25      A.  Yes.

00059

1          "Employee further agrees that upon

2      termination hereunder, and for a period of

3      one year hereafter [sic], he will not

4      disclose or make any use of such confidential

5      information without the prior written consent

6      of Crump."

7          Again, just to put it in context, you don't

8   recall there being any questioning of you by anyone at

9   All Risks as to whether you had any continuing

10  obligations to Crump after you were to terminate with

11  Crump?

12      A.  I don't recall.

13      Q.  Did -- was there any discussion at all with All

14  Risks about whether or not you were entitled to use any

15  information that you had from Crump if you went over and

16  became employed by All Risks?

17      A.  No.  The only thing that All Risks said to me

18  was any information -- 'cause they have hired a lot of

19  people from other brokerages, high-powered brokers

20  across the country -- was any information I had prior to

21  them -- me starting with them, make sure it was not in

22  any -- in my possession.

23      Q.  Who told you that?

24      A.  Nick Cortezi and Matt Nichols.

25      Q.  Tell me, as best you recall, what you were told

00060

1   with respect to that.

2        A.   Sure.   Just to make sure I did not have

3   anything because, as a wholesale broker, you don't need

4   anything because most of the accounts are in people's

5   heads anyway.   And you only have a limited number of

6   retailers, so what Matt and Nick let me know on the

7   conference call that I had with them sometime in May --

8   I don't recall the date -- May of 2007 is any

9   information I had, to make sure that I didn't have it

10   when I started with All Risks.   And the reason they said

11   that is because I was awarded Broker of the Year in 2007

12   by Crump, and even though they didn't say this, I

13   believe they knew that or they had a feeling that Crump

14   would not just let me walk out the door.

15        Q.   And did you -- well, you told us that you had

16   the Win Broker information at home and you got rid of

17   that.

18             Was there any other information that you had,

19   not necessarily at home, but that you had in your

20   possession with respect to Crump information?

21        A.   No.

22        Q.   Do you recall that you e-mailed to your wife's

23   e-mail address a -- some information, I believe, dealing

24   with -- was it Alecta?

25        A.   Yes, the account Alecta.

00061

```
 1      Q.  You recall that?

 2      A.  Yes.

 3      Q.  When did you do that?

 4      A.  It was actually -- I had forgotten I had done

 5   that.  I was -- during Peter Scott's deposition was the

 6   first that that was brought up that I had done that.

 7      Q.  You did do that?

 8      A.  Based on the e-mail, yes.  And then I sat back

 9   and remembered.  I remember doing that.

10      Q.  What do you remember?

11      A.  I remember the access point for Crump on the

12   business services through the hotel I was at was not --

13   it's -- it's a -- it was -- it was a -- I'm trying to

14   look for the right word.

15          The remote access for the e-mail for Crump was

16   poor at best.  And I tried to open up -- I was working

17   in an account, making sure as I was going along, because

18   I still was obviously making sure my brokers were still

19   happy.  And I had a quote from RLI insurance on Alecta

20   which I could not open.  And the only way I could open

21   it -- in fact, it froze up like for five, ten minutes

22   while I was sitting in there.

23          So I forwarded it off to our home e-mail

24   address, which my wife and I shared.  It was that Yahoo

25   account.  And the reason I did that, 'cause then I'm
```

00062

1   able to open up the Word document to take a look at

2   the -- the -- the quote.  It turned out it wasn't a good

3   quote, but if it was a good quote, I most likely would

4   have probably called up Cyndi Marty and said, hey, let

5   them know that these people have quoted and give them,

6   you know, preliminary terms so they can see about how

7   much their insurance was going to cost.

8        Q.  When you say it wasn't a good quote, what do

9   you -- what do you mean?

10       A.  I remember opening the RLI quote and saying,

11  this is not what I asked him to do.  And it was just

12  a -- it was just a horrible quote.

13       Q.  So I want to make sure I understand.

14           You had asked for a quote of a particular type

15  of insurance?

16       A.  Earthquake.

17       Q.  And the quote was not of that type?

18       A.  It was a quote that wasn't anywhere near the

19  price that I needed, and it was also an attachment to

20  the policy where it didn't make any sense to use.

21       Q.  Do you recall the date that you forwarded this

22  information on -- it was Alecta, correct?

23       A.  Mm-hmm.

24       Q.  Yes?

25       A.  Yes.  I'm sorry.

00065

1   Alecta policy, correct?

2       A.  Correct.

3       Q.  And you had gotten a quote, correct?

4       A.  Mm-hmm.  Yes.

5       Q.  Did Crump ever provide insurance based upon

6   either that quote or some subsequent work trying to

7   provide that type of insurance?

8           MS. RUTTER:  Objection to the extent it calls

9   for you to speculate.

10          THE WITNESS:  Don't understand your question.

11  BY MR. STERN:

12      Q.  Okay.  Was insurance ultimately provided to

13  that customer?

14          MS. RUTTER:  Speculation.

15          THE WITNESS:  Yes.

16  BY MR. STERN:

17      Q.  And was it provided by All Risks?

18      A.  Yes.

19      Q.  And was it provided by All Risks after you went

20  over to All Risks?

21      A.  Yes.

22      Q.  And did you do anything at All Risks to get

23  that business?

24      A.  Sent him an e-mail and let him know where I

25  was.

00066

```
  1     Q.  Sent an e-mail to who?

  2     A.  Paul Lockie, L-o-c-k-i-e.

  3     Q.  L-o-c --

  4     A.  -- k-i-e.

  5     Q.  And he was where?

  6     A.  Woodruff Sawyer, the retailer.

  7     Q.  And when did you send it?

  8     A.  June 5th.

  9     Q.  2007?

 10     A.  Yes.

 11     Q.  Do you have a copy of that e-mail?

 12     A.  Not on me.  It's in my computer.  I don't know

 13  if I have a copy.

 14     Q.  Where was it sent from?

 15     A.  All Risks' computer.

 16     Q.  And tell me, as best you recall, what the

 17  e-mail said?

 18          MS. RUTTER:  Counsel -- why don't you go ahead

 19  and answer.  After you answer the question, I just --

 20  we've been going over an hour --

 21          MR. STERN:  Oh.

 22          MS. RUTTER:  -- so I'd like to --

 23          MR. STERN:  I'm sorry.

 24          MS. RUTTER:  -- take a break.

 25  BY MR. STERN:
```

00067

1      Q.  Just finish the answer to that question.

2      A.  Sure.  Dear Paul, I just want to let you know

3  I'm now at All Risks Insurance Brokers, and I would have

4  said 101 California Street, Suite 3100, San Francisco,

5  California, 999 -- and then my phone number is 343-2400.

6  Look forward to doing business with you in the future.

7  Regards, Mike.

8          MR. STERN:  Okay.  Let's take a break.  What do

9  you want five minutes?  Seven minutes?

10         MS. RUTTER:  Sure.

11         VIDEO OPERATOR:  The time is 10:18.  We're

12  going off the record.

13         (Recess.)

14         VIDEO OPERATOR:  The time is 10:36.  We are

15  back on record.

16  BY MR. STERN:

17     Q.  Before we took the break, you had described to

18  me the substance of an e-mail you said you had sent to

19  Paul Lockie at Woodruff Sawyer, and I'll characterize it

20  as essentially just announcing your new business

21  affiliation with All Risks with the contact information,

22  address and phone number, correct?

23     A.  Yes.

24     Q.  Did it contain any other information?

25     A.  No.

00068

```
 1      Q.  Did you send similar messages to anyone else?

 2      A.  Yes.

 3      Q.  Who?

 4      A.  Linda Donley.

 5      Q.  And with what company?

 6      A.  This is all Woodruff Sawyer.

 7      Q.  Okay.

 8      A.  Brett Lawrence.

 9      Q.  And give me the business affiliation of the

10   people you mentioned?

11      A.  Sure.  They're all brokers at Woodruff Sawyer.

12      Q.  You mentioned Paul, Linda, Brett?

13      A.  Brett Lawrence, yeah.

14      Q.  Anyone else?

15      A.  Steve Gately.

16      Q.  Anyone else?

17      A.  Judy Haines.

18      Q.  Give me as complete an answer as you can

19   remember.

20      A.  Kristy Furrer with a K.  Last name's

21   F-u-r-r-e-r.  Robin Fisher.  Probably lastly would be

22   Chuck Schumacher.

23      Q.  And are all these people with Woodruff Sawyer?

24      A.  Yes.

25      Q.  Did you send any similar type of e-mail to
```

00069

1   anyone else --

2        A.   Yes.

3        Q.   -- when you relocated to All Risks?

4        A.   Yes.

5        Q.   Who?

6        A.   Rob Machacek.  It's Rob, and it's Machacek,

7   M-a-c-h-a-c-e-k.  And Steve Aguilar.  They're with HUB

8   International, H-U-B.

9        Q.   Steve Aguilar?

10       A.   Aguilar, A-g-u-i-l-a-r.

11       Q.   Anyone else?

12       A.   Roberta Blanchette.  And she's at Willis.

13       Q.   W-i-l-l-i-s?

14       A.   Yes.

15       Q.   Did you send any other type of communication to

16  anyone else notifying them that you were now at All

17  Risks?  And we're talking the time frame, you know,

18  essentially June 2007.

19       A.   When you say any other type of communication --

20       Q.   Right.

21       A.   Just an e-mail.

22       Q.   And did it go to anyone else who you haven't

23  mentioned?

24       A.   I would have to look at my log.  Those -- we --

25  those would probably be my main -- my main contacts.

00070

1    Q.  How did you know how to communicate with the

2  various people you mentioned?

3    A.  E-mail.

4    Q.  How did you know how to get in contact with

5  them through the e-mail?  Did you have their addresses?

6    A.  Yes.

7    Q.  Where did you get that?

8    A.  From my address book.

9    Q.  This was a personal address book or what?

10    A.  Business.

11    Q.  And where did -- where was that normally kept

12  before you left Crump?

13    A.  In -- where did I -- where did I get the list

14  of e-mail addresses?

15    Q.  Where was the list kept before you left

16  Trump -- Crump?

17        MS. RUTTER:  Better get your client right.

18        MR. STERN:  Yeah.

19        THE WITNESS:  Where was the list kept?  Oh, in

20  my Outlook at Crump.

21  BY MR. STERN:

22    Q.  On their computer system?

23    A.  Yes.

24    Q.  Did you take a copy of that with you -- I mean,

25  did you download it somehow or what?

00071

```
 1    A.  Yes.

 2    Q.  Tell me what you did.

 3    A.  On Sunday I went in and wanted to get some

 4  pictures.  I went into Crump's office, 2007.

 5    Q.  That would be the 3rd of June?

 6    A.  Yes.

 7        And I knew it would be hard to resign, and I

 8  wanted to get some of the personal stuff out.  And the

 9  one -- I had appointments with doctors, and I had some

10  personal e-mail stuff, so I -- I actually downloaded, I

11  believe, the calendar and the e-mail -- my e-mail

12  addresses, which has personal and business in there.

13    Q.  Did -- did you take the entire database that

14  was your e-mail addresses?

15        MS. RUTTER:  Objection.  Vague and ambiguous as

16  to "database."

17        THE WITNESS:  About six pages, five pages.

18  BY MR. STERN:

19    Q.  When printed out --

20    A.  Yes.

21    Q.  -- five pages?

22    A.  Yes.

23    Q.  Okay.  Describe to me what you did in terms of

24  downloading the information, the calendar and the e-mail

25  addresses.  Describe to me what exactly you did.
```

00072

 1       A.  Sure.  I opened up Outlook.  Went in -- there's

 2  an icon below.  It says address -- or contacts.  I'm

 3  sorry.  Clicked on the contacts and printed it.

 4       Q.  Printed onto paper?

 5       A.  Yes.

 6       Q.  And what information did you print?

 7       A.  It printed e-mail addresses of everybody I

 8  had -- you know, anybody I had on the -- on the e-mail.

 9       Q.  And about how many names or contacts were there

10  in that grouping?

11       A.  I would say 50.

12       Q.  Only 50 contacts in the entire list?

13       A.  Yeah.  I use business cards to e-mail most of

14  the time, but the important and personal that I had on

15  there was, if I had a friend or something like that, I'd

16  put them on -- if I -- if I e-mailed them more than --

17       Q.  When you say it was -- I think you said about

18  six pages when you printed it?

19       A.  Yeah.

20       Q.  Was it one person per line so that you had 50

21  or 60 on a page or -- let me -- let me fix that -- 50 or

22  60 lines on a page?

23       A.  No.  I would -- I remember it being 10 to 15 on

24  each, how it -- how it printed out.

25       Q.  Per page?

00083

1          And I said, I know.

2          And he goes, well, you left Tri-City.

3          I said, I know.

4          And then we started talking more.  And I said,

5   gosh, I know.  The culture over Tri-City, I'm not so

6   sure about, I told Nick.

7          And then we had -- we started to have

8   discussions more of, you know, you interested in -- in

9   talking to us again.

10          And I remember saying sure, absolutely.

11      Q.  So when was that that you indicated interest in

12   talking again?

13      A.  Whenever the merger was.  And I'm -- I'm

14   guessing, I would say --

15          MS. RUTTER:  Well, don't guess --

16          THE WITNESS:  Okay.

17          MS. RUTTER:  -- but you can give --

18          THE WITNESS:  Well --

19          MS. RUTTER:  -- approximation.

20          THE WITNESS:  Approximate -- approximate time

21   would be middle of March of '07.

22   BY MR. STERN:

23      Q.  Yeah, let me -- let me give you a further

24   instruction.  Sometimes you say, "I'm guessing."

25          We don't want what would be a guess.  For

00084

1   instance, if I asked you what kind of car do I drive,

2   you have no basis whatsoever for knowing that, I assume.

3   You've never seen me before today. You certainly

4   haven't seen me with my car because I didn't bring it up

5   here. So that would be a pure guess, right?

6        A.   Correct.

7        Q.   By the same token, a conversation you had with

8   someone is, in fact, something you knew something about.

9   You may have a weak recollection. So you can give me an

10  approximate date -- maybe. Maybe not. But that's not a

11  guess. You understand the distinction? One may be a

12  frailty of your memory. The other is just I have no

13  basis whatsoever.

14        So if it's an approximation, give me your best

15  approximation. If you have none, tell me, "I have none,

16  I just can't remember."

17        But, for instance, March 2007 is your best --

18        A.   Approximation.

19        Q.   -- approximation. Okay.

20        Now, March 2007 is your best recollection of

21  about when the merger took place with Tri-City; is that

22  right?

23        A.   Yes.

24        Q.   Okay. And tell me, as best you recall, the --

25  with as much detail as possible, what that conversation

00085

1   was that you had with Nick following that Tri-City

2   merger or purchase, I guess?

3       A.  My recollection of the conversation was that

4   Nick said that you and Peter Scott, Sheryl Smith, Joe

5   Mallory, five or six employees were all ex-Tri-City and

6   you left Tri-City for a reason.  You know, I -- I think

7   it's time that you and I talk again.

8           That's my recollection.

9       Q.  And you indicated that might make sense,

10  correct?

11      A.  Yes.

12      Q.  And what happened next?

13      A.  I think -- I believe he said I would -- I would

14  like to fly out and meet you in person.

15      Q.  And is that what happened?

16      A.  Yes.

17      Q.  So Nick came out to San Francisco.  And what's

18  your best recollection of when that took place?

19          And you're welcome to again look at the 2007

20  calendar if that might jog your memory.

21      A.  Approximately April.

22      Q.  Do you have any documentation that shows any of

23  these dates or events?

24      A.  No.

25      Q.  So on approximately April 2007, Nick Cortezi

00086

1  flew out to San Francisco and you and he got together?

2      A.  Yes.

3      Q.  Anyone else present?

4      A.  No.

5      Q.  And where did you get together?

6      A.  I believe we had dinner at Cosmopolitan Cafe.

7      Q.  And was that the only meeting you had at that

8  time frame?

9      A.  Yes.

10      Q.  And what was discussed?

11      A.  General business conditions.  Would I be

12  interested in working for All Risks to start up a

13  property brokerage operation out in California.

14      Q.  Did All Risks at that point in time do property

15  brokerage in California?

16      A.  Very limited.

17      Q.  What else was discussed in that dinner meeting

18  in approximately April?

19      A.  Who was on my team.

20      Q.  And did you tell him any names?

21      A.  Yes.

22      Q.  Who did you tell him was on the team?

23      A.  Cyndi Marty, Cora De La Cruz.  C-o-r-a and a

24  D-e, L-a, C-r-u-z.

25      Q.  Correct.

00087

```
 1      A.  And then Sue Brandt.

 2      Q.  Sue Brandt?

 3      A.  Yeah.  S-u -- Brandt is B-r-a-n-d-t.

 4      Q.  Anyone else?

 5      A.  No.

 6      Q.  Did you provide him any information with

 7  respect to whether you thought any of these people would

 8  be interested in perhaps going to All Risks?

 9      A.  No.

10      Q.  Did he ask anything about these people?

11      A.  I can't recall.

12      Q.  Did he ask you anything about what jobs they

13  performed or how they fit in on your team?

14      A.  He asked about Cyndi and her background in

15  insurance.

16      Q.  What do you recall him asking?

17      A.  I recall him asking how long she had been with

18  Crump.  And I remember I told him less than a year and

19  she was at Marsh prior to that for ten years.  That's

20  basically how I introduced Cyndi to almost everybody.

21      Q.  Did you indicate to him at all any information

22  about any of these people, for instance, what they did

23  as part of your team?

24          MS. RUTTER:  Objection to the extent it's been

25  asked and answered.
```

00088

1              THE WITNESS:  Just would be to Cyndi.  I told

2   the other two were assistants, but Cyndi was a broker.

3   BY MR. STERN:

4       Q.  Had he heard of Cyndi or known anything about

5   her?  Did he indicate?

6       A.  He did not indicate.

7       Q.  And you say he -- you described her as a broker

8   with Crump less than a year, prior with Marsh.  Did you

9   give him any other information about her?

10      A.  I can't recall.

11      Q.  Did you give any statement such as she's good,

12   she's crap, she's --

13      A.  Yeah.

14      Q.  -- would be a valuable asset?  Anything along

15   that line?

16      A.  Yes.  I said she's a good broker.

17      Q.  Anything else?  Any additional information?

18      A.  No.

19      Q.  Did he ask how he could get in touch with her?

20      A.  No.

21      Q.  Did you provide any information to him so that

22   if he desired, he could follow up with her?

23      A.  No.

24      Q.  You recall anything else that was discussed

25   with respect to either who was on your team or Cyndi

00089

1  Marty or any of these people?

2      A.  No.

3      Q.  About how long did you spend discussing that

4  topic?

5          MS. RUTTER:  What topic?  Objection.  Vague.

6  BY MR. STERN:

7      Q.  The team, the people, Cyndi.  Yeah.

8      A.  I don't know.

9      Q.  More than five minutes?

10     A.  Less than five minutes.

11     Q.  What else did you discuss at this dinner

12  meeting with Nick that you believe took place in

13  April 2007?

14     A.  Oh, the culture at All Risks.  What his vision

15  was for the next ten years.  His personal life.  I

16  wanted to see if he was a good family man, which I knew

17  he was.  I could just tell.  We talked about Marcus

18  Payne.  We both had a fondness for Marcus.  I don't

19  recall anything else.

20     Q.  And was Marcus still working -- consulting with

21  him --

22     A.  Yes.

23     Q.  -- with All Risks?

24     A.  Yes.

25     Q.  Is Marcus still consulting with All Risks?

00090

```
 1      A.   Yes.

 2      Q.   Anything else you recall about that meeting

 3   with Nick in April of 2007 when he came out to

 4   San Francisco?

 5      A.   No.

 6      Q.   So it was just that dinner meeting, and the

 7   total meeting -- the total dinner was what?  An hour?

 8   Two?

 9      A.   Yeah, two.

10      Q.   And it -- everything -- your entire meeting

11   took place at that one location --

12      A.   Cosmo Cafe.

13      Q.   -- Cosmo Cafe?

14      A.   Yes.

15      Q.   Then what happened next with respect to you

16   ultimately moving to All Risks?

17      A.   We had another dinner in May that Nick had set

18   up with myself, and he had called Cyndi and set it up

19   for the same night.

20      Q.   Together?

21      A.   Yes.

22      Q.   One dinner?

23      A.   Yes.

24      Q.   After the April dinner at Cosmo Cafe, did you

25   have any communication with Nick about Cyndi before you
```

00093

 1  BY MR. STERN:

 2      Q.  Okay.  If I understood you, and maybe I didn't,

 3  you said that Cyndi had mentioned to you that she'd

 4  gotten a call from Nick Cortezi, and I think you said

 5  she didn't know anything about Nick or All Risks,

 6  correct?

 7      A.  Correct.

 8      Q.  And you smiled at her and told her she should

 9  pay attention to it, or something to that effect,

10  correct?

11      A.  I think I said she should -- you should listen.

12      Q.  You should listen.

13          And you said the conversation was in late April

14  or May, right?

15      A.  I --

16          MS. RUTTER:  I don't think he --

17          THE WITNESS:  -- didn't say --

18          MS. RUTTER:  -- said when that conversation --

19          THE WITNESS:  I don't -- I don't know when it

20  happened.

21  BY MR. STERN:

22      Q.  Okay.

23      A.  Yeah.

24      Q.  But in any event, that wasn't the call where a

25  dinner was set up, that -- this dinner in May that you,

00105

1       Q.   Okay.  And do you know, was there any

2    communication between Nick and Cyndi after that?

3           MS. RUTTER:  After the dinner?

4           MR. STERN:  Yeah.

5           THE WITNESS:  Yes.

6    BY MR. STERN:

7       Q.   Tell me what took place after that dinner with

8    respect to you and Cyndi ultimately going to All Risks

9    as employees?

10          MS. RUTTER:  Objection.  The question's

11   overbroad.  It calls for a narrative.

12   BY MR. STERN:

13      Q.   Go ahead.

14      A.   Can you ask it again?

15      Q.   Yeah.  You had the dinner.  Nick was going to

16   put together a proposal.

17          What happened after that?

18      A.   I received a proposal in the mail -- or was it

19   faxed?  I think it was e-mailed to my home address the

20   day before I left for Hawaii.

21      Q.   And what did you do with it?

22      A.   I printed it off, and I remember just tucking

23   it away 'cause I was packing for Hawaii and I was going

24   to look at it while I was in Hawaii.

25      Q.   And then what happened next with respect to the

00106

1   ultimate move to All Risks?

2        A.  I moved -- I'm sorry?

3        Q.  You went off to Hawaii?

4        A.  Yes.

5        Q.  Did you respond at all to the offer at that

6   point?

7        A.  Yes.  I signed it -- I don't remember when I

8   signed it.  I remember either having a verbal

9   conversation with All Risks saying I'm going to sign it.

10  I don't recall if I signed it in Hawaii or when I got

11  back.

12       Q.  Did you date it when you signed it, whatever

13  day it was?

14       A.  I'm sure I did.

15       Q.  And what was the "it" that you said you would

16  sign?

17       A.  The contract.

18       Q.  So you believe you had signed it by some -- you

19  say you signed it in Hawaii?

20            MS. RUTTER:  Objection to the extent it

21  misstates his testimony.

22            THE WITNESS:  I don't know.

23  BY MR. STERN:

24       Q.  Okay.  But you indicated at least while you

25  were in Hawaii you told them you would sign it?

00107

1      A.  Yes.

2      Q.  Okay.

3      A.  Yes.

4      Q.  So that would be anytime from May 25th to

5   June 2nd, 2007?

6      A.  Yes.

7      Q.  And who did you tell you would sign?

8      A.  I can't recall if it was either Nick or Matt.

9      Q.  Did you have any communications with Cyndi

10  prior to coming back from Hawaii with respect to the

11  proposal?

12          MS. RUTTER:  Which proposal?

13          MR. STERN:  The one from All Risks.

14          MS. RUTTER:  The proposal to him?

15          MR. STERN:  Let me clarify.

16          MS. RUTTER:  It's vague and ambiguous.

17          MR. STERN:  Let me clarify.

18      Q.  The proposal that you got, was it just for you,

19  or was it for you and Cyndi?

20      A.  It was just for me.

21      Q.  Okay.  Was a separate proposal made to Cyndi?

22      A.  Yes.

23          MS. RUTTER:  Objection.  Calls for speculation.

24  BY MR. STERN:

25      Q.  Did you have any understanding as to what that

00110

1  understand it.  If you want to make it clear that this

2  is confidential, I have no problem with that.  But I

3  don't want to have confusion as to what this means.  I

4  mean, I think I saw something in here 73 percent,

5  27 percent.  I could have the numbers wrong.  I need to

6  understand what the heck this is, so --

7           MS. RUTTER:  That's fine.  He can speak in

8  terms of percentages.

9           MR. STERN:  Okay.  Well, let's -- let's --

10          MS. RUTTER:  He's not --

11          MR. STERN:  -- take it one step at a time.

12          MS. RUTTER:  He's not going to disclose the

13  terms of --

14  BY MR. STERN:

15      Q.  Do you remember --

16          MS. RUTTER:  -- his agreement.

17  BY MR. STERN:

18      Q.  -- what you were talking about?

19      A.  Yes.

20      Q.  Okay.  Why don't you move forward, please.

21      A.  Can I see the percentage, how it's written?

22      Q.  I'll try and reference an e-mail if I can find

23  it quickly.

24          I will give you a page right now.  We won't

25  mark it yet, but it is All Risks, page 19.  I don't know

00111

1   whether you have a copy handy, but let me just -- where

2   did I put it?

3            There's a page, All Risks 19.  The first

4   paragraph begins "Option 2."  You'll see a 73 to you, 27

5   to redact?

6       A.  Okay.  I know what that is.

7       Q.  Okay.

8       A.  That was a wording in the contract that after

9   year 4 -- year 3, if I were to -- say I do a certain

10  dollar amount, that I would get an extra five points

11  toward my bonus.  And if I didn't do that dollar amount,

12  then the revenue that was produced, we'd be paid

13  accordingly, which would be 73 percent to me and

14  27 percent to Cyndi.

15      Q.  Okay.  Were you -- in your dealings with All

16  Risks up to the time that you indicated you would sign

17  this agreement, were you negotiating for both you and

18  Cyndi?

19           MS. RUTTER:  Objection as to the term

20  "negotiation" as vague and ambiguous and to the extent

21  it calls for a legal conclusion.

22           THE WITNESS:  I negotiated the years.

23  BY MR. STERN:

24      Q.  Did you negotiate any other terms for Cyndi?

25      A.  I negotiated her -- after she had a

00112

1   conversation with Nick on salary, I negotiated more

2   money for her.

3       Q.   So what do you recall about that?

4       A.   On the salary?

5       Q.   Yeah.   When you --

6       A.   I recall that I saw the number and I didn't

7   like it, and I said I think Cyndi should be paid more.

8       Q.   Did you do that on your own initiative, or did

9   Cyndi say something or what caused you to do that?

10      A.   I did that on my own initiative.

11      Q.   And why?

12      A.   I didn't think it was enough money for her.

13      Q.   Okay.   Going back to the -- the -- you --

14   you -- you have the May 2007 dinner.   Nick indicated

15   he'd get you a proposal.   The proposal you believe came

16   in the day before you went to Hawaii.   Correct?

17      A.   Correct.

18      Q.   And from that point on, did you have any

19   further discussion with Cyndi?

20      A.   I don't recall.

21      Q.   You got the proposal, you reviewed it, and you

22   indicated some time during the period you were in

23   Hawaii, you believe, that you would sign it, correct?

24      A.   Correct.

25      Q.   Were there any changes that you requested be

00114

1  BY MR. STERN:

2      Q.  Is that correct?

3      A.  That's correct.

4      Q.  Okay.  Let's look at Exhibit 4, which is your

5  agreement, again, page 4, paragraph 16.  You still have

6  that in front of you?

7      A.  Yes.

8      Q.  The bottom of page 4, it's titled "Voluntary

9  Termination By Employee."  I'll quote:

10         "This Agreement (other than

11      paragraphs 10, 11, 12, 13, and 14 hereof) may

12      be terminate by Employee upon 15 days prior

13      written notice to Crump, or by other written

14      agreement signed by both parties."

15         And then on page -- oh, I think that -- yeah.

16  That's the end.

17         Did you, when you left Crump, give written

18  notice?

19      A.  No.

20      Q.  Did you give 15 days' notice even if it wasn't

21  in writing?

22      A.  No.  I was asked to leave.

23      Q.  When did you -- did you at some point provide

24  notice that you were leaving Crump?

25      A.  Verbal notice.

00115

1        Q.   Verbal notice to who?

2        A.   Peter Scott.

3        Q.   Given when?

4        A.   Sunday.

5        Q.   Sunday what date?

6        A.   June 3rd, 2007.

7        Q.   And when you gave him notice, did you tell him

8   what your last day of work would be?

9        A.   No.

10       Q.   What was your intention as of that point in

11  time as to how long you would continue working at Crump?

12       A.   I just remember our conversation.  Come in

13  Monday morning and let's talk about this.

14       Q.   What was your intention with respect to when

15  you intended to start with All Risks as of the time you

16  gave notice to Peter on Sunday, June 3rd?

17       A.   I know how Peter's reacted in the past, and I

18  figured when him and I talked on Monday, he would tell

19  me to leave.  He's done that in the past to many

20  employees.

21       Q.   So what was your intention as to how long you

22  would work at Crump following the June 3rd notice?

23       A.   I had no intention.

24       Q.   Was it your intention to leave almost

25  immediately?  By that I mean, June 4th or 5th?

00116

1       A.  I figured his intention would be to get me out

2  of there as soon as possible.  But my intention -- I

3  didn't have an intention.

4       Q.  Did you intend to remain for the full 15 days

5  if he desired?

6       A.  Didn't even think about it.

7       Q.  You didn't think about it?

8       A.  No.  I didn't.

9       Q.  Not at all?

10      A.  No.  Because I knew he would tell me to get

11  out, which he did.

12      Q.  Did you understand that even if he told you to

13  get out, that your obligation to Crump was to not start

14  working elsewhere until the 15-day notice period had run

15  unless there was a written agreement signed by both

16  parties?

17          MS. RUTTER:  Objection to the extent it lacks

18  foundation and also to the extent it calls for a legal

19  conclusion.

20          THE WITNESS:  No.

21  BY MR. STERN:

22      Q.  Okay.  You didn't look at your contract before

23  you gave notice that you were leaving Crump, right?

24          MS. RUTTER:  Objection to the extent it

25  misstates his testimony.  He testified he didn't even

00126

1      Q.  -- brokers, right?

2      A.  Absolutely, yes.  Yes.

3      Q.  You would agree that as of April 30th, you had

4    serious interest in All Risks, didn't you?

5          MS. RUTTER:  Objection.  Vague and ambiguous as

6    to "serious interest" and to the extent it's been asked

7    and answered.

8          THE WITNESS:  No.

9    BY MR. STERN:

10     Q.  Okay.  Let's look at Exhibit 6, the Broker

11   Compensation Agreement, and I'm going to read from the

12   first paragraph.  It says, quote:

13          "In consideration of the terms,

14          provisions, and covenants of the Memorandum

15          of Agreement ('Memorandum'), dated as of

16          June 7, 1996, by and between Crump Insurance

17          Services Inc. ('Company') and Mike McGrath,

18          Employee."

19          And then it continues.  It says, "attached as

20   Exhibit A."

21          Do you know whether that June 7, 1996 agreement

22   was attached as Exhibit A?

23     A.  It was not.

24     Q.  It was not.

25          You understood this was referring to what we've

00153

1     A.  I knew you'd ask me that.  I want to say Menlo

2  Equities.  I venture -- I think they were June 4th.

3     Q.  So if I'm understanding you, at no point in

4  time did you ever ask any of the retail brokers to

5  appoint All Risks as the broker of record in place of

6  Crump, correct?

7     A.  That's correct.

8     Q.  And that in every occasion -- let me ask.

9         In every occasion where All Risks got appointed

10  to replace Crump as broker of record with respect to

11  when you moved over to All Risks, it was suggested by

12  the retail broker that that take place?

13     A.  Yes.

14     Q.  And which retail brokers -- well, let's strike

15  that.

16         Let's mark as Exhibit 8 document All Risks

17  No. 4.

18         MS. RUTTER:  Is it Exhibit 4?  Did you say

19  Exhibit 4?

20         MR. STERN:  No, it's --

21         MS. RUTTER:  Oh, I'm sorry.

22         MR. STERN:  The number.

23         MS. RUTTER:  Oh, Bates number.

24         MR. STERN:  Bates number.  I'm sorry.  Yeah.

25         (Deposition Exhibit 8 marked by the court

00159

1     Q.  And did you have any discussion at all about

2  potential employment with Cyndi during that period from

3  the time the proposal was made until the time you gave

4  your notice, June 3rd?

5          MS. RUTTER:  Objection.  Asked and answered.

6  It's cumulative.

7          THE WITNESS:  I recall a conversation I had the

8  day before I left for Hawaii, saying I'd received my

9  offer via e-mail.  Did she receive hers?

10  BY MR. STERN:

11     Q.  And what did she tell you?

12     A.  She wasn't home yet.  She didn't know.  That

13  would have been 2007, 24th of May.

14     Q.  Did she at some point in time indicate to you

15  that she had decided to leave Crump and go to All Risks?

16     A.  On that Sunday, I told her I was going to

17  resign.  She told me she liked what she saw and she was

18  going to resign as well.

19     Q.  So on June 3rd, she told you she planned to

20  resign.

21          Did she indicate when?

22     A.  She was going to resign -- yeah, I mean, the

23  same day I was going to do it, which was Monday,

24  June 4th.

25     Q.  Do you know whether she actually resigned

00184

1    Q.  And it's dated May 22nd, 2007, correct?

2    A.  Correct.

3    Q.  It says, "Any word from Mr. McGrath yet?"

4        Do you see that?

5    A.  Yes.

6    Q.  Do you know what that's referring to?

7    A.  It must be any -- no, I don't know what it's

8  referring to.

9            MR. STERN:  Okay.  Let's mark as next

10  Exhibit 18, which will be All Risks 18, 19, 20 and 21.

11            (Deposition Exhibit 18 marked by the court

12            reporter.)

13  BY MR. STERN:

14    Q.  This is an e-mail chain.

15        And are these e-mails that you've seen before

16  today?

17    A.  Yes.

18    Q.  When did you first see them?

19    A.  Either that Wednesday or Thursday.

20    Q.  Which Wednesday or Thursday?

21    A.  Of May 23rd, 2007.

22    Q.  Okay.  If you go -- the fourth page is

23  essentially blank, so go to the third page, if you will.

24        The very first e-mail appears to be dated

25  May 7th, 2007, correct?

00187

1          The redacted is again to Cyndi, isn't it?  It's

2     referring to Cyndi, so long as you and Cyndi generate

3     more than?

4          MS. RUTTER:  Objection to the extent it calls

5     for you to speculate.  It's also privacy, which is why

6     it was redacted in the first place, but --

7          THE WITNESS:  I don't know.

8     BY MR. STERN:

9          Q.  Was there ever anyone else involved as

10    potentially moving to All Risks other than yourself and

11    Cyndi?

12         A.  No.

13         Q.  Did you ever try to bring over any other Crump

14    employee to All Risks?

15         MS. RUTTER:  Whoa.  Objection.  Lacks

16    foundation he tried to bring over anybody.

17    BY MR. STERN:

18         Q.  Did you?

19         MS. RUTTER:  Misstates testimony.

20         THE WITNESS:  No.

21         MR. STERN:  Okay.  Let me mark as --

22         (Off the record.)

23         MR. STERN:  Let me mark as Exhibit 19 document

24    C 40 through 47.

25         (Deposition Exhibit 19 marked by the court

1            I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby certify:

3            That the foregoing proceedings were taken

4    before me at the time and place herein set forth; that

5    any witnesses in the foregoing proceedings, prior to

6    testifying, were duly sworn; that a record of the

7    proceedings was made by me using machine shorthand

8    which was thereafter transcribed under my direction;

9    that the foregoing transcript is a true record of the

10   testimony given.

11           Further, that if the foregoing pertains to

12   the original transcript of a deposition in a Federal

13   Case, before completion of the proceedings, review of

14   the transcript [ X ] was [  ] was not requested.

15           I further certify I am neither financially

16   interested in the action nor a relative or employee

17   of any attorney or party to this action.

18           IN WITNESS WHEREOF, I have this date

19   subscribed my name.

20

21   Dated: _____ MAY 1 3 2008 _____

22

23   _SUZANNE F. BOSCHETTI_

24   SUZANNE F. BOSCHETTI
     CSR No. 5111

25

# McGRATH DEPOSITION EXHIBIT 4

## MEMORANDUM OF AGREEMENT

MEMORANDUM OF AGREEMENT dated *June 7*, 1996 between Crump B&S of San Francisco Insurance Services, Inc., a California Corporation (hereinafter "Crump"), and Michael P. McGrath (hereinafter "Employee").

### INTRODUCTION

This Agreement is intended to set forth the terms and conditions of the employment relationship between Crump and Employee. This relationship is based on the agreement and understanding of the parties that Crump is the owner of the Crump Business relating to Crump Customers as these terms are used below, and that these customers comprise a substantial part of the goodwill of Crump. To protect the business and goodwill of Crump and the confidential information belonging to Crump, the parties have agreed to certain limitations on competition and disclosure of confidential information following termination of employment. Such limitations relate solely to Crump Business and Crump Customers, however, and are intended to permit Employee to remain in the insurance and brokerage business, if he so desires.

### AGREEMENTS

Crump and Employee agree as follows:

1.    **EMPLOYMENT COMPENSATION** - Crump agrees to employ Employee to solicit, place, and service property or casualty business, during the term of the Agreement and to pay Employee a base salary of $125,000 per year, with future adjustments in accordance with Crump base salary guidelines. Base salary shall be payable in accordance with Crump regular payroll procedures, and may be changed only by written agreement of the parties.

2.    **PERFORMANCE BY EMPLOYEE** - Employee agrees to devote his entire business time and effort to furtherance of the business of Crump and to perform faithfully to the best of his ability all assignments of work given to him by Crump.

3.    **TERM** - The term of this Agreement shall commence as of the date of this Agreement and shall continue through December 31, 1997, at which time this Agreement will be extended automatically to June 30, 1999, if the combined Net Retained Revenue of Robert Lindner, Employee, and Paul Farbstein ("the Team") exceeds $1,500,000 for the time period July 1, 1996, through December 31, 1997. "Net Retained Revenue" shall be defined as brokerage actually received by Crump, less any return brokerage. This Agreement is at all times subject to earlier termination in accordance with paragraph 7 below.

1

C0001

Δ π EXHIBIT 4
*Mc Grath*
Deponent
Date *4/30/08* Rptr *SFB*
WWW.DEPOBOOK.COM

# McGRATH DEPOSITION EXHIBIT 6

or otherwise while using Company equipment. In addition, users must refrain from visiting sites that could be deemed inappropriate to fellow employees. Examples of sites in this category would be ones that promo violent behavior, engage in sexually or racially offensive comments, jok and/or radical political viewpoints, or include content that would violate Crump's Anti-Discrimination or Sexual Harassment Policies.

- It is a violation of Company policy to use the Internet for excessi personal use. The expectation in this area is similar to personal pho calls. We expect users to display good judgment. Limited or occasior personal use is acceptable, but that usage should in no way affect t productivity of an individual. Management reserves the right to restrict . personal usage for an individual who abuses this privilege. Abuse of t Internet may result in disciplinary action, up to and including terminatior

### Non-Smoking Policy

Crump provides a smoke-free environment for all employees, and all Compa facilities are smoke-free workplaces. Smoking is absolutely prohibited anywhere · Company premises. This policy applies to third parties such as vendors and clier as well as employees. Any individual who has a complaint regarding a violation this policy should contact his/her manager or Human Resources without fear retaliation.

### Media Relations

Responding effectively to media inquiries can enhance the public understanding our business and Crump as a whole. Employees must consult with Corpora Marketing or Communications before responding to any media inquiries.

# Chapter 7: Leaving Crump

### Resignations

Should you decide to voluntarily leave your position with Crump, we ask that yo provide your manager with at least two weeks' advance notice and a writte resignation letter. Employees who are leaving Crump will be paid for any earne but unused PTO days with two weeks advance notice of resignation, ar

adjustments will be made for PTO taken but unearned. For additional discussion please also refer to PTO Policy.

Crump reserves the right to determine whether an employee must work during tl notice period he/she provided, or must stop working but be paid the amount he/sl would have earned during the notice period. For example, if an employee resig and gives two (2) weeks' notice, Crump may elect to pay the employee for the tv (2) week period rather than have the employee continue to work for that tin frame. If, however, Crump learns that an employee who was not required to wo his/her entire notice period engaged in activities contrary to the interests of Crum such as solicitation of clients or colleagues, Crump reserves the right not to pay tl individual for those portions of the notice period he/she did not actually work.

Exit Interviews

If circumstances permit, the Human Resources Department will arrange an e interview with you before you leave Crump. This interview will cover the reaso for separation; how benefits will be affected; your PTO account; outstanding ca advances and other relevant matters. A representative from the Human Resourc Department will ask you about your career with Crump and for your suggestio regarding how to improve the work environment.

Retirement

For those employees who reach retirement age with us, we urge you to provi your manager with a minimum of two (2) months' notice of your anticipat retirement date. This will ensure that we are able to complete all appropria retirement forms and begin your entitled benefits as quickly as possible. If y have any questions regarding retirement, please contact the Human Resourc Department.

Severance Pay Plan

Please consult Human Resources for the Severance Pay Plan applicable to you.

C0153

CONFIDENTIAL

*Crump Group Employee Handbook*

*This page intentionally left blank.*

*Crump Group Employee Handbook*

C0154

## BROKER COMPENSATION AGREEMENT

In consideration of the terms, provisions, and covenants of the Memorandum of Agreement (the "Memorandum"), dated as of <u>June 7, 1996</u>, by and between Crump Insurance Services, Inc. (the "Company") and <u>Mike McGrath</u> ("Employee") attached as Exhibit A, commencing <u>January 1, 2007</u> and continuing during the term of this Agreement, Employee will receive compensation consisting of a Base Salary (or Actual Salary if adjusted as described below) and where applicable, a Bonus and a Deferred Cash Bonus, all subject to the terms and conditions set forth herein and based upon the formula described below.

1.    Base Salary

            (a)      Employee's Base Salary shall be an amount as is mutually agreed between the parties, and will be payable in equal periodic installments in accordance with the Company's customary payroll practices for similarly situated employees.

            (b)      The amount of Employee's Base Salary is set forth in attached Schedule 1.

2.    Bonus

            (a) In addition to the Base Salary, Employee may be eligible to receive a Bonus. The amount of any Bonus payable shall be determined by a formula that multiplies Employee's "Actual Salary" by an "Agreed Multiple" to establish a "Bonus Threshold" – then deducts certain "Credits" to derive an "Adjusted Bonus Threshold". Company will then apply certain "Percentage Incentives" to Revenue in excess of the "Adjusted Bonus Threshold" to determine the Bonus amount. For purposes of this Agreement, Employee's "Actual Salary" equals the Base Salary as adjusted for any raise awarded during the applicable calendar year. Calculation of the Bonus is as follows:

            (i)      "Revenue" equals the total of all commissions and fees paid to and retained by the Company attributable to accounts accurately booked by Employee during calendar year 2007;    excluding contingent commission payments and profit sharing agreements, provided, however,

                (A) The Company may, in its sole discretion (1) deduct from Revenue all or any portion of bad debt charged to an account booked by Employee and included in these calculations or (2) in the event that the Company deems the bad debt to result primarily from the act or omission of Employee, offset all or any portion of such bad debt against any Bonus otherwise payable hereunder;

C0007



Δ π EXHIBIT  6
                McGrath
Deponent_____
Date 4/30/08  Rptr. SEB
WWW.DEPOBOOK.COM

provided, that the aggregate deductions in (1) and (2) above shall not exceed the total amount of such bad debt; and provided further that,

(B) Error and Omission ("E&O") claim payments and costs to defend E&O claims on accounts handled by Employee may also, at the Company's sole discretion, be deducted from the calculation of Revenue or be offset against any Bonus otherwise payable hereunder.

(ii)    The "Agreed Multiple" is a multiple of Employee's Actual Salary. Company will multiply Actual Salary by the Agreed Multiple to provide a "Bonus Threshold".

(iii)    From the Bonus Threshold, Company will in its sole discretion, but based upon performance rating criteria described in attached Exhibit B, determine and deduct both Office and Company "Credits" based upon profit center and overall company performance, to derive a lower "Adjusted Bonus Threshold". So long as (1) Employee's Revenue exceeds $300,000 ("Eligible Revenue") and (2) Employee is an employee of the Company on the date on which bonuses are paid by the Company, Employee will be eligible to receive a Bonus

(iv)    The amount of any Bonus for Revenue above the Adjusted Bonus Threshold will be calculated according to the following scale:

(A)    For revenue of 750,000 and less, Company will subtract Adjusted Bonus Threshold from $750,000 or Revenue, whichever is less, and multiply the remaining amount by a Bonus percentage of 25%;

(B)    Revenue in excess of $750,000 but less than $1.0 million (provided, however, Company will subtract the results of (iv)(A) above if a negative number) will be multiplied by a Bonus percentage of 28%;

(C)    Revenue in excess of $1.0 million but less than $2.0 million will be multiplied by a Bonus percentage of 30%; and

(D)    Revenue in excess of $2.0 million will be multiplied by a Bonus percentage of 35%.

The total Bonus payment will equal the sum of A, B, C & D above.

(b)    Bonus payments will be made in a lump sum on or about February 28 of the year following the year in which they are earned (i.e. on or about 2/28/08 for 2007 Bonuses), but no later than March 31 of that following year (the "Qualification Date"). However, Company intends to make an advance payment

C0008

of up to 80% of any Bonus earned as of June 30 of the current calendar year on or about September 1 of that current calendar year unless it is advised in advance, in writing, by the Employee that he/she does not wish to receive such advance payment.

      (c)    Notwithstanding the foregoing, in the event of termination of Employee's employment prior to the Qualification Date due to Employee's death, disability (defined as Employee's inability to fully discharge his or her duties under the Memorandum by reason of illness, injury or incapacity for a period of 60 consecutive days) or retirement, the Company will pay a Bonus equal to the amount earned to date through the end of the calendar month in which the Employee's death, disability or retirement occurs, so long as the Employee was otherwise eligible to receive a Bonus according to the formula set forth above.

3.    Deferred Cash Bonus.

      (a)    In addition to Actual Salary and Bonus as described above, Employee may also be eligible to receive a Deferred Cash Bonus.

      (b)    Deferred Cash Bonuses shall equal an additional 3% of Revenue between $750,000 and $1.5 million and 5% of Revenue in excess of $1.5 million and shall be payable as follows:

          (i)    Company will pay interest on any Deferred Cash Bonus at a rate not less than 2% per annum. Company may, at it's sole discretion offer to employee certain investment options for the Deferred Cash Bonus in lieu of the 2% per annum amount.

          (ii)    Payment of a Deferred Cash Bonus (including accrued interest earned) will be made 2 years (the "Deferred Cash Bonus Payment Date") from the date on which any final Bonus award is paid for the applicable calendar year and will be paid to Employee in cash on that Deferred Cash Bonus Payment Date.

      (c)    Notwithstanding the foregoing:

          (i)    Any Deferred Cash Bonus will be forfeited in its entirety if Employee resigns prior to the Deferred Cash Bonus Payment Date or is terminated for cause.

          (ii)    If an Employee dies or becomes permanently disabled prior to the Deferred Cash Bonus Payment Date, Company shall make payment of the Deferred Cash Bonus to Employee or to Employee's Estate, as applicable, within thirty days following the date of permanent disability or death.

C0009

(iii)    If an Employee takes early, normal or deferred retirement, the Deferred Cash Bonus will be paid upon retirement.

(iv)    If an Employee is terminated without cause -- the Deferred Cash Bonus will be paid upon termination.

4.    Employee's employment by the Company shall be "at will" and either Employee or the Company may for any reason terminate Employee's employment at any time.

5.    Except as may be modified herein, the terms, provisions, covenants, conditions and agreements contained and set forth in the Memorandum shall continue unmodified and the Memorandum shall remain in full force and effect in accordance with its terms.

6.    The term of this agreement shall be from January 1, 2007 through December 31, 2007.

IN WITNESS WHEREOF, the parties have duly executed this Broker Compensation Agreement as of this _____ day of _____, 2007.

CRUMP INSURANCE SERVICES, INC.

By: _____

Title: CEO

_____

Employee

C0010

## SCHEDULE 1 – Calendar Year 2007

### [EMPLOYEE NAME]

Base Salary = __$200,000__

Agreed Multiple = __2.8__

C0011

**EXHIBIT B**

Description of applicable Performance Rating Criteria

**Criteria**

**1. Gross Revenue & Production Revenue in comparison to Budget, Goals and Year over Year.**

**2. Net Revenue & Expense Controls in comparison to Budget, Goals and Year over Year.**

**3. Quality control factors, receivables, bad debt, E&O.**

**4. Talent Development, Employee Satisfaction, Customer Service & Market Relations.**

**5. Advancement of corporate direction, "One Crump", collaborative efforts, serving as a company resource and utilization of company resources.**

**Scores:**
**5% – Excellent – well exceeded all targets**
**4% – Good – met all objectives exceeded some**
**3% – Average – met most objectives**
**2% – Fair – met some objectives, short on others**
**1% - Poor – failed to meet many objectives, some progress**
**0% – Failed to meet majority or all objectives, no progress**

**Average the results of the 5 Criteria above to arrive at a percentage amount between 0-5%**

C0012

# McGRATH DEPOSITION EXHIBIT 18

CONFIDENTIAL: Subject to Protective Order

Page 1 of 4

**NC-6-5-07**

| | |
|---|---|
| **From:** | Nick Cortezi |
| **Sent:** | Wednesday, May 23, 2007 4:57 PM |
| **To:** | Matt Nichols |
| **Subject:** | would you proof this overnight and give me some feedback? Rough Draft |

Mike-
You have a deal.
We will guarantee you and [Redacted] at the following salaries for 6 years:

You-[Redacted]
[Redacted]

The employment contract will require you to exercise your best efforts on our behalf, and the only provisions that might waive our obligation to pay would be disability (we would put the same long term disability in place that you have now- let us know the details), death (we will put insurance policies in place to offset our obligation to you which would pay your estates in the event that you expire before the agreement does), and for cause (which will be described in detail and relate specifically to illegal or criminal actions that either of you may take which jeopardize your abilities to work in the business). [Redacted] will report to you, and the one codicil is that her guarantee will able to be waived by you in the event that you determine that she is not meeting your expectations.

We will pay a sign on bonus of [Redacted] in the form of an interest free loan to you which will be forgiven over the next 6 years at [Redacted] per year. In the event that you leave the contract either voluntarily or as a result of the disability, death of for cause, you will have to repay us the portion of the note which has not been forgiven.

We will pick up reasonable parking, gas, club dues, etc. I trust that you will be fair with us.

Your role will be Property Practice Leader- West Coast. Redact will join us as a Senior Broker. We don't do the title thing and we recognize our brokers as Brokers or Senior Brokers. Once an individual broker exceeds[Redacted] h retained, they are made a VP of the company in an non administrative sense, but in the interests of fairness, they have to do it while at All Risks.

From a P&L standpoint, you will be a carve out direct to Home office. This insulates you and Paul from the pressure on his P&L in the first years. When things work out financially over the coming years, we will look to roll it into the San Fran P&L, so that it is a win win for everyone.

Our office at 101 California has two great offices available for you and Redacte best views in the company, countrywide).

Bonus over and above salary will be earned as follows:

Year 1- 25% of Revenues over $
Year 2- 25% of Revenues over $[Redacted]
Year 3- 25% of Revenues over $
Support salaries and support bonus would be subtracted from Bonus amounts to determine the final bonus amount. We would not be deducting for reasonable travel and entertainment.

Years 4,5,6 we have two options that we can make available to you-

Option 1-
We guarantee your salaries 100%. Years 4,5,6 your bonus is based on the Broker Bonus plan (which is in force countrywide). A copy is attached. In essence we would pay you 45% of revenues less Redacted (your and Redacte fixed costs) less support costs (your additional support salaries and support bonus)- any overage would be your bonus. In no event would this number be less than the Redacted that represents your salaries combined. Note that our bonus plan increases the % paid to you to 47.5% once your exceed Redacted and this goes back to the first dollar. When you break 2MM, this generates immediate and meaningful impact.

12/4/2007



Δ π EXHIBIT __18__
Deponent_McGrath_
Date_4/30/08_Rptr._SEB_
WWW.DEPOBOOK.COM

ALL000018

# Exhibit F

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                    ---oOo---

4    CRUMP INSURANCE SERVICES,      )
     INC.,                          )
5                                   )
            Plaintiff,              )
6                                   )
7    vs.                            )
                                    )
8    MICHAEL P. McGRATH, an         )
     individual, ALL RISKS, LTD.,   )
     a corporation, and Does 1      )
9    through 50, inclusive,         )
                                    )
10          Defendants.             )
                                    )
11   _____)

**CERTIFIED COPY**

J|G Jane GROSSMAN
R|S REPORTING Services

No. C-07-4636 MMC

12

13

14

15        DEPOSITION OF NICHOLAS DOMINIC CORTEZI, II

16                  June 10, 2008

17

18

19             Taken before JANE GROSSMAN

20                  CSR No. 5225

21

22

23        JANE GROSSMAN REPORTING SERVICES
           Certified Shorthand Reporters
24         1939 Harrison Street, Suite 460
             Oakland, California 94612
25                (510) 444-4500

00103

1    what it says.

2            MS. RUTTER:  No.  That's the allegation, that

3    she asked.

4            MR. ASKANAS:  The allegation she asked?

5            MS. RUTTER:  You guys are alleging that

6    Ms. Marty asked an assistant to download information to

7    bring to All Risks.

8            MR. ASKANAS:  Okay.

9            MS. RUTTER:  That's an allegation.

10           She never testified that --

11           MR. ASKANAS:  All right.

12           MS. RUTTER:  -- she did that.

13           MR. ASKANAS:  Q.  Is that your understanding?

14    A.    Is what my understanding?

15    Q.    That Ms. Marty never asked her assistant to

16    download information with regard to policy expiration

17    dates.

18    A.    If she --

19           MS. RUTTER:  Objection.  Vague as to time.

20           MR. ASKANAS:  Q.  At any time.

21    A.    If she did, it would have been in relation to

22    her role at Crump, correct.

23    Q.    If she had brought that information from Crump

24    to All Risks, would that have been a violation of your

25    instructions to her?

00104

1       A.    Yes.

2       Q.    Have you ever spoken to Cynthia Marty about

3    that?

4             MS. RUTTER:   Objection.  Vague, ambiguous as

5    to "about that."

6             MR. ASKANAS:   Q.   You understand what I

7    mean --

8       A.    I --

9       Q.    -- by "about that"?

10      A.    I spoke with Cyndi and Mike specifically

11   before they came on board that they were to leave

12   everything behind at Crump.

13      Q.    Okay.  Well, what about -- did you ever speak

14   to them since the inception of this litigation outside

15   the presence of counsel?

16      A.    Most of the conversations that I've had with

17   them have been in the presence of counsel.  And it's

18   hard for me to recall which ones may have been outside.

19            But I'll try to answer your question if you'll

20   ask it again.

21      Q.    Okay.  The question is, Have you ever

22   discussed with Cynthia Marty or Mike McGrath since the

23   inception of this lawsuit whether they brought any

24   customer-expiration-date lists from Crump to All Risks?

25      A.    I believe that I have, yes.

00110

1   expedition.

2          It was -- I don't know that Mike was aware

3   that I was talking to her at the time or I intended to

4   talk to her.

5          Q.   Did Mike McGrath ever tell you anything about

6   Cyndi Marty in terms of her compensation at Crump?

7          A.   No, not that I can recall.

8          Q.   Did Mike McGrath ever tell you anything about

9   Cynthia Marty in terms of her production abilities?

10         A.   Not that I remember.

11         He spoke highly of her as an individual and --

12   and clearly he thought highly of her.

13         Q.   When did he tell you that?

14         A.   In conversations that we had along the way

15   over the course of the past year and a half.

16         Q.   Were those -- did you have those conversations

17   with him before you met Cyndi Marty?

18         A.   I don't remember.

19         Q.   Did you have those conversations with him

20   before you called Cyndi Marty?

21         A.   I don't remember.

22         Q.   Did Mike McGrath tell you anything about

23   Cyndi Marty in terms of her competency as a producer?

24         A.   I don't remember anything specific.  Just

25   clearly he thought highly of her.

00111

1        Q.    Did Mike McGrath tell you anything about

2    Cyndi Marty in terms of her -- of whether he wanted her

3    as part of his team?

4        A.    I'm sorry?  Did Mike --

5        Q.    McGrath tell you anything about her in terms

6    of whether he wanted her as part of his team.

7        A.    If he joined All Risks?

8        Q.    Yes.

9        A.    No.

10       Q.    Did you have an understanding that if

11   Cynthia Marty joined you, she would join you as part of

12   Mike McGrath's team?

13       A.    I wasn't certain at the time that we were

14   going to be able to hire Mike McGrath.

15            I would have been glad to have hired Cyndi if

16   we were unable to get Mike.

17            So, in the early stages of my discussions with

18   her, there was no -- there was no preset arrangement

19   that we had in mind.

20       Q.    Did you initiate contact with Cynthia before

21   you initiated contact with Mike McGrath the second time?

22            I know there was the first time it didn't come

23   to fruition.  Then you picked up discussions.

24       A.    I -- I don't remember.  It may have been

25   concurrent.

00112

1      Q.    Sir, is it your testimony today that you

2  would have initiated contact with Cynthia Marty even

3  if Mike McGrath were not interested in joining you?

4      A.    Yes.

5      Q.    And why is that?

6      A.    Because I had heard through the marketplace

7  that she's a very talented broker.

8      Q.    But you don't recall who you heard that from?

9      A.    Probably from a number of people.

10      Q.    Can you give me --

11      A.    That's her reputation.

12      Q.    Can you give me some names?

13            THE VIDEOGRAPHER:  You're getting in the

14  picture.

15            MR. ASKANAS:  Sorry about that.

16            THE WITNESS:  I don't know that I can give you

17  specific names.  But I can tell you that we were in the

18  course of -- of interviewing people with Marsh at the

19  time from San Francisco.  And I don't remember their

20  names, unfortunately.  But I think some of them had

21  worked with Cyndi and recommended her.

22            I can tell you that we talked to a number of

23  our insurance carriers who operate in this area, and I'm

24  certain that we heard favorable things from them.

25            MR. ASKANAS:  Q.  So, was it -- was it just a

00120

1    Q.   Now, do you recall participating in this

2   e-mail chain?

3    A.   Yes, somewhat.

4    Q.   Okay.  Prior to today, when was the last time

5   you saw this e-mail chain?

6    A.   I don't remember.  I -- I haven't -- I haven't

7   looked at this in a long time.

8    Q.   Is it fair to say -- I'm just trying to

9   refresh your recollection.

10        Have you looked at it since the inception of

11   this litigation?

12    A.   I don't believe I've reviewed it, no.

13    Q.   Okay.  Now, the question I asked you was, Did

14   Mike McGrath ask you -- I'm sorry.

15        Did you ask Mike McGrath to help arrange a

16   meeting with Cynthia Marty?

17    A.   No.

18    Q.   Can you tell me how this dinner came to be?

19    A.   I called -- as I recall, I called Mike and

20   invited him to dinner.  We were in discussions with him.

21        And I called Cyndi and invited her to dinner.

22   We were in discussions with her at that point, and she

23   seemed interested.

24    Q.   And is it your testimony that at that time

25   when you invited both these people to dinner, you had

00121

1   not told the other that you were recruiting them both?

2        A.    At the point of invitation?

3        Q.    Yes.

4        A.    I can't remember at what stage I told them

5   specifically.  I don't know that when I set it up I had

6   told them.

7             But at some stage, I certainly would have

8   shared with them that the other was going to be there.

9   I just don't remember when that happened.

10       Q.    Well, Cynthia Marty testified that she was

11   surprised and shocked to see Mike McGrath at dinner.

12            Do you see that?

13            MS. RUTTER:  Objection to the extent it

14   misstates her testimony.

15            THE WITNESS:  Could I -- could I see it?

16            I don't remember reading that.

17            MR. ASKANAS:  Q.   Is it your testimony today

18   that, in fact, you did tell her in advance that she was

19   going -- that Mike Duffy (sic) was going to be -- excuse

20   me -- Mike McGrath was going to be at the dinner?

21       A.    My testimony is I can't remember exactly when

22   it was that I shared it with them, but I thought it was

23   in advance of the dinner.

24       Q.    Let me ask you this:  When did you first ask

25   -- when did you first tell Mike McGrath that you were

00133

1      A.    No, I don't remember asking him specifically

2   for his revenues.

3      Q.    Did Mr. McGrath tell you that you had to hire

4   Marty if you wanted to hire him?

5      A.    No.

6      Q.    When did you understand that Mr. McGrath and

7   Ms. Marty worked together at Crump in that

8   partnership-type relationship?

9      A.    At some point over the four to six months

10  preceding the date at which they joined us.

11     Q.    Mr. McGrath's e-mail to you -- I'm looking at

12  the bottom of page -19 on the Bates stamp.

13     A.    Okay.

14     Q.    And this was his response to your last e-mail.

15           "Nick:

16           "Thought it would be easier to see in

17           writing what we would be talking about for

18           us to consider a move."

19           Do you see that?

20     A.    Yes.

21     Q.    Do you know what he meant by "us"?

22     A.    I don't know.  I don't know.

23     Q.    He says:

24           "Thanks again for dinner; we both had a

25           good time."

00134

```
 1              Do you know what he means by "we"?
 2       A.    This -- this was -- well, I don't know.
 3              What was the date of the dinner?
 4       Q.    Well, the dinner --
 5       A.    Was this before --
 6       Q.    It seems to set it up on May 16th.
 7              I don't know when the dinner was.  It just
 8  says -- the first e-mail was:
 9              "Good to go with...at Cosmo's on the
10              16th -- 6ish (sic)."
11       A.    So --
12       Q.    And then you respond:
13              "Looking forward to dinner..."
14              And then this response on May 22nd:
15              "Thanks again for dinner; we...had a good
16              time" -- "we both had a good time."
17       A.    So, this would have been after having dinner
18  with the two of them.
19              I'm not sure exactly what it referred to.
20       Q.    "The two of them" meant Cynthia Marty and
21  Mike McGrath; correct?
22       A.    Yes.
23       Q.    It says:
24              "As mentioned earlier we are set and
25              comfortable for a minimum (sic) of 5 to
```

00136

1       Q.    At this time did you know how much

2    Mike McGrath was earning at All Risks (sic)?

3       A.    At Crump?

4       Q.    At Crump.  I'm sorry.

5       A.    I'm -- I'm guessing he had told me --

6             MS. RUTTER:  Well, we don't want you to guess.

7             THE WITNESS:  I'm sorry.

8             MS. RUTTER:  Nobody wants you to guess.

9             THE WITNESS:  At some point in or around

10   there I became aware of what Mike was making based on

11   conversations with him.  It may have been concurrent

12   with this; it may have been prior to this (indicating

13   document).  But it would have been either concurrent

14   with this or prior to.

15            MR. ASKANAS:  Q.  He would have told you,

16   correct, at some point?

17      A.    Yes.

18      Q.    Okay.  At some point did you have an

19   understanding as to what Cynthia Marty was earning at

20   Crump?

21      A.    Yes.

22      Q.    And how did you come to that understanding?

23      A.    I asked her.

24      Q.    When did you ask her?

25      A.    I believe it was on the telephone.  It may

00137

 1   have been after dinner with Mike.  It probably was

 2   shortly thereafter.

 3        Q.   It would have been shortly after the dinner

 4   that you had at Cosmos -- the three of you?

 5        A.   I believe so, yes.

 6        Q.   So, you -- your testimony today is you did not

 7   have any discussion with her at that dinner or

 8   beforehand about what her compensation was?

 9        A.   I can't remember if we discussed her

10   compensation level in the conversations that we had in

11   advance of that dinner or not.

12        Q.   Did you know --

13        A.   We may well have.

14        Q.   Did you know Mike -- did you know

15   Mike McGrath's compensation in advance of that dinner?

16        A.   Approximately, yes.

17        Q.   Okay.  I mean, knowing what the person's level

18   of compensation was would be something important in

19   determining whether you wanted to recruit them; correct?

20        A.   We would assume that their compensation level

21   would be reflective of their role in the industry.  And

22   the -- in general, most brokerage operations pay in and

23   around the same structure.

24             We were familiar with Crump's compensation

25   model.  It's fairly well known in the insurance

00138

1  industry.

2          So, I think we would have gone in with the

3  ability to meet their financial needs being really not

4  our concern.

5      Q.   So -- so, is it your testimony that you had

6  done some maybe back-of-the-envelope -- I don't want to

7  say that.  That's not your testimony.

8          But had you done some back-of-the --

9  back-of-the-envelope calculations as to what you thought

10  Cynthia Marty and Mike McGrath were earning prior to

11  meeting with them at dinner?

12      A.   I don't remember doing those calculations, no.

13          It may have been a sort of mental arithmetic.

14  They'd be in this range, between here and here, but...

15      Q.   But you -- but you'd had those discussions

16  before the dinner specifically with regard to

17  Mike McGrath in terms of his compensation?

18      A.   Over the course of several years.

19      Q.   But you don't recall having those

20  conversations with Cyndi Marty prior to the dinner?

21          MS. RUTTER:  Objection.  Asked and answered.

22          THE WITNESS:  I don't remember whether we

23  discussed her compensation level in the conversations

24  leading up to the dinner or after the dinner.  I

25  remember getting a sense of where she was from her

00139

```
 1   telling me, but I don't remember whether it was before
 2   or after the dinner.
 3              MR. ASKANAS:   Q.   Was it your impression that
 4   both Cyndi and Marty (sic) knew that they would be at
 5   the dinner together?
 6        A.    Cyndi and Mike?
 7        Q.    Mike, yes.
 8              MS. RUTTER:   Objection.  Vague, ambiguous,
 9   calls for speculation.
10              THE WITNESS:   I don't know.
11              I -- I -- looking back on it, I'm fairly -- I
12   thought that I had a specific discussion with them that
13   we were coming together at the dinner --
14              MR. ASKANAS:   Q.   I mean, did they say --
15        A.    -- shortly before, because I wouldn't have
16   wanted to ambush them and just have them run into one
17   another.
18        Q.    So, you don't recall any sort of like, "Wow, I
19   didn't expect to see you here" type, you know, exchange
20   between them?
21        A.    I don't remember whether or not that exchange
22   took place or not.
23        Q.    The -- the note from you (sic) goes on to say:
24              "Our main point besides salary is a
25              commitment for 6 years.  Based on our
```

CERTIFICATE OF REPORTER

1

2      I, JANE GROSSMAN, a Certified Shorthand

3   Reporter, hereby certify that the witness in the

4   foregoing deposition was by me duly sworn to tell the

5   truth, the whole truth, and nothing but the truth in the

6   within-entitled cause;

7      That said deposition is a true record and was

8   taken in shorthand by me, a disinterested person, at the

9   time and place therein stated, and that the testimony of

10   said witness was thereafter reduced to typewriting, by

11   computer, under my direction and supervision;

12      That before completion of the deposition,

13   review of the transcript [X] was [ ] was not requested.

14   If requested, any changes made by the deponent (and

15   provided to the reporter) during the period allowed are

16   appended hereto.

17      I further certify that I am not of counsel or

18   attorney for any of the parties to the said deposition,

19   nor in any way interested in the events of this cause,

20   and that I am not related to any of the parties thereto.

21

22      Dated:  June 19, 2008

23

24   _____

25   JANE GROSSMAN, CSR No. 5225

DEPOSITION OF NICHOLAS DOMINIC CORTEZI, II

# Exhibit G

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA


CRUMP INSURANCE SERVICES, INC.,

     Plaintiff,

   vs.                     No. C-07-4636 MMC

MICHAEL P. MCGRATH, an individual,
ALL RISKS, LTD., a corporation,
and Does 1 through 50, inclusive,

     Defendants.

CERTIFIED
COPY

---


VIDEOTAPED DEPOSITION OF CYNTHIA MARTY

San Francisco, California

Wednesday, April 30, 2008


Reported by:
SUZANNE F. BOSCHETTI
CSR No. 5111

Job No. 85930B

00018

1           VIDEO OPERATOR:  Thank you, thank you.

2   BY MR. STERN:

3       Q.  When had you first learned that there might be

4   an opportunity for you at All Risks?

5       A.  Early part of June.

6       Q.  June 2007?

7       A.  Yes.

8       Q.  And what is it you learned at that point in

9   time?

10      A.  I -- that Nick -- I -- that Nick was looking to

11  open an office out here, and he wanted -- learned of my

12  name, someone in the industry out here, and he wanted to

13  talk to me.

14      Q.  Did he say how he learned of your name?

15      A.  No.

16      Q.  Did he say anything that led you to believe

17  that Mike McGrath had given your name?

18      A.  No.

19      Q.  Did you ever find out how Nick Cortezi knew of

20  you?

21      A.  No.  He nev- -- no.  I never -- never did.

22      Q.  Who first contacted you?  Mr. Cortezi?

23      A.  Yes.

24      Q.  And how did he contact you?

25      A.  By telephone.

00019

```
 1      Q.  And when was that?  Early June, you say?

 2      A.  I think -- no, it wouldn't have been early

 3  June.  It would have been early May.  I'm sorry.

 4      Q.  Okay.

 5      A.  It would have been the early part of May.

 6  My -- my apologies.

 7      Q.  So when you said early June --

 8      A.  That was incorrect, yes.

 9      Q.  Okay.  So early May, you received a phone

10  call --

11      A.  Yes.

12      Q.  -- to you at home?

13      A.  In the office.

14      Q.  Just, as far as you could tell, out of the

15  blue?

16      A.  Yes.

17      Q.  Did you ask him how he located you --

18      A.  No.

19      Q.  -- how he heard of you?

20      A.  No.

21      Q.  Were you surprised?

22      A.  I get headhunter calls all the time, so it's

23  just like okay.  Just here's another one.  And then I

24  didn't even realize till later in the conversation that

25  he -- he was the principal, that it wasn't a headhunter
```

00022

1  to me.  At least in our conversations, he was.

2     Q.  Did you tell anyone about either of these phone

3  conversations?

4     A.  I did mention it to Mike.  I said --

5     Q.  Mike McGrath?

6     A.  Mike McGrath.  Yeah.

7        Usually when we get these calls from

8  headhunters, we would just mention it to each other.

9  And I'd say, okay, Mike, you're going to love this one.

10  I just got a call from someone I've never even heard of

11  before.  I said, some company by the name of All Risks.

12        I wasn't even sure at that point if it was a

13  headhunter or a company.

14        And he says, well, what are you going to do?

15        I said, I don't know.  I said, probably talk to

16  the guy.  I always like to keep my interview skills up.

17     Q.  Had you previously, when contacted by

18  headhunters or people that seemed to be interested in

19  maybe giving you a job, met with them on occasion?

20     A.  On occasion, yes.

21     Q.  Okay.

22     A.  Yes.

23     Q.  Did Mike say anything else about --

24     A.  No.

25     Q.  -- this Nick fellow or All Risks or anything?

00023

1     A.  No.

2     Q.  Did he comment in any respect?

3     A.  Not that I can remember.

4     Q.  Okay.  So he just really asked, what are you

5  going to do?

6     A.  Mm-hmm.  Yeah.  That -- that's it.  Yeah,

7  pretty much.

8     Q.  And what did you tell him in response to the

9  specific query, that you thought you'd meet with this

10  person?

11     A.  Tell who?

12     Q.  I'm sorry.

13     What did you tell Mike McGrath when you

14  mentioned to him that you got this call from this fellow

15  at All Risks and he said, well, what are you going to

16  do?  You responded --

17     A.  At that point I wasn't too sure, but, you know,

18  probably meet with him.

19     Q.  And did he encourage you to do that or say

20  anything further?

21     A.  No.  He goes, okay.  Pretty much.

22     Q.  Looking at the calendar, does it jog your

23  memory as to when either of these phone calls with Nick

24  took place in May 2007?

25     A.  The early part.  That's all I can remember is

00025

```
 1        A.   After the first.

 2        Q.   Okay.   So we have a first call, what you said

 3   to Mike McGrath --

 4        A.   Yes.

 5        Q.   -- in a conversation, and then the second

 6   call --

 7        A.   Yes.

 8        Q.   -- where you indicated to -- to Nick you'd meet

 9   with him.

10        A.   Yes.

11        Q.   And did he at that time set up a specific

12   appointment?

13        A.   Not at that time, no, that I -- no.

14        Q.   How was it handled then?  He called you.  Said

15   he'd be in town to meet.  You indicated you would.

16        A.   Yeah.

17        Q.   What took place?

18        A.   I can't remember exactly.  We ended up going to

19   dinner sometime in the middle of May.  I'm not sure the

20   exact date, but sometime in the middle of May we went to

21   dinner.

22        Q.   Where?

23        A.   Cosmo's, Cosmopolitan Cafe.

24        Q.   Do you know what table number you sat at?

25        A.   I wish I did.
```

00026

1       Q.  Nice table?

2       A.  By a window.

3       Q.  4.

4       A.  There really is a table number there?

5            MS. RUTTER:  We learned something.

6   BY MR. STERN:

7       Q.  So in that second call, did he tell you the

8   date he was coming to San Francisco?

9       A.  He must have because we had a dinner set up,

10  so --

11      Q.  Was the dinner set up during this second call?

12      A.  You know what, I don't remember.

13      Q.  Okay.  So he might have called back?

14      A.  Yeah, or -- yeah.  I don't remember.  I'm

15  sorry.

16      Q.  But one way or another, in the next few days

17  anyway --

18      A.  Yes.

19      Q.  -- you got a dinner set up with Nick Cortezi?

20      A.  Yes.

21      Q.  And after the second call, did you have any

22  communication with Mike McGrath about the fact that you

23  had set up this dinner?

24      A.  Not that I recall.

25      Q.  Did Nick indicate that he just wanted to meet

00027

1  with you when you had dinner?

2       A.  That I -- I think -- I'm pretty sure, yes.

3       Q.  And is that what happened?

4       A.  No.

5       Q.  What happened?

6       A.  When we -- I went to dinner.  Mike actually was

7  there at the -- was there or was going at the same time.

8       Q.  Mike McGrath?

9       A.  Mike McGrath that day.  Yeah.  And he said, you

10  know, we're -- I'm having dinner with Nick tonight, and

11  I said so am I.

12            I think we might have -- gosh.  I'm trying to

13  remember.  I might have -- an e-mail or something.  God,

14  what happened?  I'm sorry.  I don't remember exactly how

15  it was.

16       Q.  When was it you first learned that it was not

17  going to be you and Nick for dinner, but it would be

18  you, Nick and Mike McGrath?

19       A.  I don't know if it was -- I don't think it was

20  the exact date of the dinner, but it wasn't too much

21  prior to that.

22       Q.  And who was it who told you that it would be

23  the three of you and --

24       A.  You know, I don't -- I don't remember.  It

25  could have been Nick, and it could have been Mike.  I'm

00036

```
 1   but he -- at the time that we spoke, he'd had a company

 2   already that he wanted to start the brokerage end of.

 3         Q.   There was an All Risks office in the

 4   San Francisco area --

 5         A.   Yes.

 6         Q.   -- right?

 7              Where was it located?  Did you know or did he

 8   tell you?

 9         A.   I didn't know then, no.

10         Q.   And did he discuss at all where you might fit

11   in if you went over to All Risks?

12         A.   He wanted me to be a senior property broker.

13         Q.   Did he indicate whether he would have interest

14   in you alone?

15         A.   I'm not --

16         Q.   Yeah, let me clarify.  Mike was there.  Mike --

17         A.   Right.

18         Q.   -- was your supervisor.

19         A.   Right.

20         Q.   Did he indicate whether or not he would be

21   interested in you even if Mike didn't go over?

22         A.   That was my impression.

23         Q.   So that --

24         A.   Yeah, that he wanted --

25         Q.   The -- the opportunity was for you alone or
```

00037

1  both of you?

2      A.  Yes.

3      Q.  But it wasn't necessarily only you would be

4  included only if Mike went?

5      A.  Oh, no.  No.

6      Q.  Okay.  What did he say along the lines of what

7  opportunity there was for you?

8      A.  That it was a startup, that just the growth was

9  there.

10     Q.  Was there any questioning of him with respect

11  to whether or not there was a job for you if Mike didn't

12  go or vice versa, there was a job for Mike even if you

13  didn't go?

14     A.  No.

15     Q.  So nobody -- nobody asked the question of --

16     A.  No.

17     Q.  -- what he had in mind in terms of whether he

18  was looking for both of you?

19     A.  No.

20     Q.  What, if anything, did Mike say during that

21  dinner?

22     A.  Very little that I recall.  I think Nick did

23  most of the talking.  I don't think I said very much,

24  either.

25     Q.  Did -- was there any discussion about how much

00042

1          Did you ever learn that Mike had given him your

2     name?

3          A.   No.

4          Q.   Did you ever learn that before that dinner at

5     Cosmo that Mike had had a number of meetings with Nick

6     Cortezi?

7          A.   No.

8               MS. RUTTER:  Objection to the extent it lacks

9     foundation, to the extent it misstates --

10    BY MR. STERN:

11         Q.   Did --

12              MS. RUTTER:  -- her testimony.

13    BY MR. STERN:

14         Q.   Did you ever learn that Mike had been back to

15    the All Risks office in the Baltimore area before you

16    had that Cosmo meeting?

17         A.   No.

18         Q.   Okay.  Did Mike ever tell you for how long he

19    had been at least aware of All Risks or courted by All

20    Risks in terms of possibly joining them?

21         A.   No.

22         Q.   Before you accepted your job at All Risks, did

23    you go back to their office in Baltimore?

24         A.   No.

25         Q.   You've been back since, haven't you?

00043

```
 1        A.  Not -- no.

 2        Q.  Oh.

 3        A.  No.  I've been to Baltimore for a meeting, but

 4   I've never been to the All Risks offices.

 5        Q.  Other than Nick Cortezi, did you deal with

 6   anybody else at All Risks up till the time you actually

 7   accepted your employment there?

 8        A.  No.

 9        Q.  Did you and Mike discuss that dinner you had

10   had with Nick after you had the dinner?

11        A.  Yes.

12        Q.  What did you discuss?

13        A.  I confirmed with him that this was something

14   that, you know -- that he was, you know -- that he was

15   thinking about this too, you know, just what was going

16   on, and that's pretty much it.

17            I said -- you know, I said I didn't want any

18   misreads on the same thing.  You know, you could have

19   let me know, though, just what was going on.  I would

20   have appreciated it.

21            And he said, no, I -- he couldn't do that.

22        Q.  Why?

23        A.  Because I asked him -- I said, you could have

24   let me -- I did -- I did say that.  I said, you could

25   have let me know what was going on here.
```

00044

1          He says, nope.  You have to make your own

2    decisions on this.

3          Because we were just walking back -- I was

4    walking back to BART.

5      Q.  After the dinner?

6      A.  After dinner, yeah.

7      Q.  Excuse me.  And as best you recall, I know

8    we -- the document didn't refresh your recollection that

9    it was May 16th.

10          When do you believe it was in May?  Can you

11   give me a time frame or narrow it down?

12     A.  I know it was -- I figured it has to be the

13   middle of May because it was before Mike went on

14   vacation.  He had a vacation the end of June.  It was

15   before then.  But the exact date or time, I just -- I'd

16   have to look at my calendar to know that, but I don't

17   rem- -- just middle of May is all I remember.

18     Q.  Okay.  And after -- after the dinner, how were

19   things left with Nick coming out of that dinner?

20     A.  He was -- as far as I was concerned, he said he

21   was going to go back and work up something and put it

22   before me, and then just see what I thought of it.

23     Q.  Had you provided him any information either at

24   the dinner or before or shortly after it with respect to

25   what you would be interested in in terms of a salary or

00046

1       Q.   About how soon after your dinner at Cosmo did

2   you get a proposal from Nick?

3       A.   It was -- if I'm remembering correctly, it was

4   at least a week afterwards, but I don't know the dates

5   on that.

6       Q.   When you had this dinner, I gather that it was

7   left that a package -- a proposal, should I say, would

8   be provided to you.

9           Was there anything of a similar nature that was

10  to be provided to Mike?

11      A.   Not that was discussed there.

12      Q.   Okay.  So you didn't know whether or not a

13  proposal was going to be made to him as well?

14      A.   No.

15      Q.   Did you ever learn -- prior to when Mike

16  McGrath got back from Hawaii, did you ever learn that a

17  proposal had been made to him as well?

18      A.   Prior to him getting back from Hawaii?  No.

19      Q.   Okay.  So he didn't call you right before he

20  left for Hawaii and tell you that he had gotten a

21  proposal?

22      A.   Not that I recall, no.

23      Q.   And so you got a proposal after this dinner,

24  and about when do you think it was?  You said I thought

25  about a week after the --

00047

1    A.  I'm thinking it was about a week afterwards.  I

2    think so.

3    Q.  And what did you do once you got the proposal?

4    A.  I read through it and thought, wow, this is

5    pretty nice, and just thought about it because Mike was

6    getting ready to take off on vacation.  So I didn't get

7    a chance to talk to him or find out anything like that.

8    Q.  So you think you got your proposal before Mike

9    had left?

10   A.  I have no idea.

11   Q.  Did you along the way talk to Mike about your

12   proposal before you accepted it?

13   A.  No.

14   Q.  Never?

15   A.  Not that I -- no.  I was -- it was a nice

16   just if it was nice.  It was nice.

17   Q.  When did you decide you were going to accept

18   the All Risks employment proposal?

19   A.  It was probably -- it was while Mike was in

20   Hawaii.  I thought I got to let him know when he's

21   getting back that I'm going to do this.

22   Q.  So you made the decision to leave Crump without

23   knowing that Mike was going to leave Crump?

24   A.  Yes.  I wasn't sure.  I had no idea what he was

25   doing.  No idea.

00048

1      Q.  Did you -- did you tell anyone that you had

2  made the decision to go to All Risks after you made that

3  decision?

4      A.  No.

5      Q.  Ultimately you told Peter?

6      A.  Right.  Well, I told Mike, when -- Mike called

7  me when he got back from Hawaii on Sunday, that he was

8  going to accept -- he had received -- that he was going

9  to accept the offer and go to All Risks.

10          And I said that's a relief because that's the

11  decision I came to because I can't afford to turn this

12  deal down.

13          That was on -- when he got back from Hawaii he

14  called.

15      Q.  You say Sunday.  Based on looking at the

16  calendar, are you able to tell me what Sunday it was?

17  And I'll just point out that Sunday -- the last two

18  Sundays in May are the 20th and May 27th.  Then we have

19  Sunday, June 3rd, June 10th and 17th.

20      A.  I -- I know that I went in on that date.  It

21  was the day -- it was June 3rd that I talked to him

22  because I know I went in on the 4th and gave Peter.  So

23  it was June 3rd is when I talked to him.

24      Q.  You talked with Mike McGrath on June 3rd?

25      A.  On Sunday, yes.

00065

1   East Coast.

2      Q.  And then you went into work --

3      A.  Yeah.

4      Q.  -- and gave notice so --

5      A.  Yeah.

6      Q.  -- essentially one right after the other?

7      A.  Yes, yes.

8      Q.  And did you tell All Risks when you would

9   start?

10      A.  I said that I was going to give Crump as much

11   notice as I needed to.

12      Q.  And what did Nick say?

13      A.  He said that -- what work -- whatever worked

14   for me he would support.

15      Q.  So you accepted a job, but didn't say when

16   you'd start?

17      A.  I said I was hoping that it would be in two

18   weeks, but I was going to work with them.

19          At that point I knew Mike was leaving, and they

20   were behind the eight ball, and there was a huge Marsh

21   book renewal, and I wasn't going to leave my former

22   clients in the lurch.  That wasn't going to happen.  It

23   was just -- you know, I told Mike -- I said I need to

24   find out what's going on with -- with my clients.

25      Q.  So you told Peter Monday, came back Tuesday,

00066

1  said you're still --

2      A.  Mm-hmm.

3      Q.  -- of the same mind.  Told by Peter and Glen,

4  think it over, we'll give you two weeks to --

5      A.  Yes.

6      Q.  -- think about it, and then if you're still of

7  that mind, you can give your notice --

8      A.  Yes.

9      Q.  -- and that's what you did.

10     A.  Absolutely.

11     Q.  So you kept coming to work through the 15th?

12     A.  Yes.  Through the whole month.

13     Q.  And when did you give notice, in essence, that

14  I really mean it, I'm out of here?

15     A.  Peter wouldn't accept it until the 15th.

16     Q.  Okay.

17     A.  And that was --

18     Q.  June 15th, which was a Friday?

19     A.  Yes.

20     Q.  So on June 15th did you then tell him, Peter,

21  I'm out of here at the end of the month?

22     A.  Right.  I said, here's my letter.  Are you

23  going to take it now?  What do you want to do?

24         And he's says, yeah, I guess I have to and, you

25  know, we'll just work through.

00067

1        Q.  So you continued throughout the month of June,

2   worked at Crump --

3        A.  Yes.

4        Q.  -- doing what you'd been doing?

5        A.  Yes.

6        Q.  During the time that -- now, Mike had left,

7   right?

8        A.  Yes.

9        Q.  Do you know anything about the circumstances

10   under which he left?

11       A.  No.

12       Q.  Did he tell you why he -- when did he leave?

13       A.  He wasn't there when I got there.  He was

14   already gone, according to Peter, that --

15       Q.  June 4th?

16       A.  Yeah.

17       Q.  Did Mike ever tell you what happened such that

18   he was out of there June 4th?

19       A.  I knew he was gone that day, yeah, but Mike --

20   no, I didn't talk to him that day.  Well, that's not

21   true.  I did talk to him that day telling him that I was

22   going to go home and think about stuff, that I owed

23   Peter that.

24       Q.  Okay.  Up till today, has Mike ever told you

25   the circumstances under when he left on June 4th?

00068

1    A.  No.  Uh-uh.  I don't know.

2    Q.  So while he was working at All Risks from

3  June 4th on -- correct?

4    A.  Yes.

5    Q.  -- and at least for the month of June, you were

6  still at Crump, correct?

7    A.  Yes, I was.

8    Q.  Did you have any communications with him during

9  that month?

10    A.  He would call occasionally to make sure I was

11  doing okay.

12    Q.  And did he ask you anything about any specific

13  business?

14    A.  Not at all.

15    Q.  Did he ask you to provide him any information

16  about any of the accounts, customers, anything like

17  that?

18    A.  Absolutely not.

19    Q.  And then at the end of the month of June 2007,

20  you left Crump.

21    And did you go immediately to All Risks or take

22  time off?

23    A.  The following Monday I started.

24    Q.  So just moved from one job right to the next --

25    A.  Yes.

00069

1    Q.  -- without even --

2    A.  Yeah.

3    Q.  Next time take a week or two.

4    A.  Yeah.

5    MS. RUTTER:  Go to Europe.

6    THE WITNESS:  And the worst thing was it was my

7 birthday, too.

8 BY MR. STERN:

9    Q.  Oh, that's terrible.

10    A.  That's how I remember that date.

11    Q.  Okay.  No more chitchat.

12    In this whole situation dealing with you

13 leaving Crump -- well, you being, in essence, courted by

14 Nick Cortezi to go to All Risks and then ultimately

15 making the decision, during that whole period, did you

16 ever have any conversation with Mike about whether it's

17 a good idea to do this?  Gee, should I do this?  What do

18 you think?  Anything along that line?

19    A.  No.  I -- I would make my own -- I make my own

20 decisions on my career.  I can't -- I trust people, but

21 I don't trust them to make my decisions.  I -- and I

22 don't want to be able to blame someone for making a bad

23 decision either.

24    This was a scary move.  It was a startup, but

25 it was just -- it was exciting to me.

00070

1        Q.   Why?

2        A.   It just -- starting something from scratch

3   after being in the business for close to 20 years,

4   thinking I can go start something new and see if -- see

5   if I can really do it without it actually being me doing

6   it, my own money doing it.

7        Q.   Did -- did Mike McGrath ever attempt to get any

8   other employee of Crump to go over to All Risks?

9        A.   Not that I'm aware of.

10        Q.   Do you know if he had any contact with any

11   employees of Crump in the -- in the weeks or couple of

12   months after he left?

13        A.   Not -- I don't know.

14        Q.   Did you ever ask him whether he had any

15   interest in trying to bring anyone else over to All

16   Risks?

17        A.   No.

18        Q.   Did Mike ever tell you that he had any records

19   from Crump that he still had in his possession?

20        A.   No.

21        Q.   Did he ever indicate to you whether he had

22   deleted any information off of his computer, his home

23   computer?

24        A.   No.

25        Q.   Crump information.

1          I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, do hereby certify:

3          That the foregoing proceedings were taken

4     before me at the time and place herein set forth; that

5     any witnesses in the foregoing proceedings, prior to

6     testifying, were duly sworn; that a record of the

7     proceedings was made by me using machine shorthand

8     which was thereafter transcribed under my direction;

9     that the foregoing transcript is a true record of the

10    testimony given.

11         Further, that if the foregoing pertains to

12    the original transcript of a deposition in a Federal

13    Case, before completion of the proceedings, review of

14    the transcript [X] was [  ] was not requested.

15         I further certify I am neither financially

16    interested in the action nor a relative or employee

17    of any attorney or party to this action.

18         IN WITNESS WHEREOF, I have this date

19    subscribed my name.

20

21    Dated:    MAY 1 3 2008

22

23    _Suzanne F. Boschetti_

      SUZANNE F. BOSCHETTI

24    CSR No. 5111

25